# EXHIBIT 13 - Plaintiff Deposition

Case 1:05-cv-01921-PLF   Document 38-15   Filed 02/06/2008   Page 1 of 8

COPY

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4  - - - - - - - - - - - - - x
 5  GISELA VON MUHLENBROCK        :
 6          Plaintiff,            :
 7  vs.                           : Civil Action No. :05-1921 (HHK)
 8  JAMES H. BILLINGTON,          :
 9  LIBRARIAN OF CONGRESS         :
10          Defendant             :
11  - - - - - - - - - - - - - x
12
13                        Washington, D.C.
14                        Wednesday, September 19, 2007
15
16
17
18  Whereupon,
19                  GISELA VON MUHLENBROCK
20  the Witness, called for examination by Counsel for the
21  Defendant, pursuant to notice and agreement of counsel as to
22  time and place, at 501 3rd Street, N.W., Fourth Floor,
23  Washington, D.C., where were present on behalf of the parties:
24
25
```

Page 2

```
 1  APPEARANCES:
 2          On Behalf of the Plaintiff:
 3          PAUL S. THALER, ESQUIRE
 4          KELLY A. SCHMIDT, ESQUIRE
 5          Thaler Liebeler LLP
 6          International Square
 7          1825 Eye Street, N.W.
 8          Suite 400
 9          Washington, D.C.  20006
10          (202) 587-4750
11
12          On Behalf of the Defendant:
13          JONATHAN BRUMER, ESQUIRE
14          Special Assistant United States Attorney
15          501 3rd Street, N.W.
16          Fourth Floor
17          Washington, D.C.  20530
18          (202) 514-7176
19
20          On Behalf of the Agency:
21          JULIA DOUDS, ESQUIRE
22          Library of Congress
23          101 Independence Avenue, S.E.
24          Washington, D.C.  20540
25          (202) 707-7198
```

Page 3

```
 1                      I N D E X
 2  WITNESS:               EXAMINATION:           PAGE:
 3  Gisela Von Muhlenbrock  Mr. Brumer - Direct     4
 4
 5                      E X H I B I T S
 6  EXHIBIT NO.:      DESCRIPTION:                 PAGE:
 7     1      Settlement Agreement and              24
 8            Stipulation of Dismissal
 9     2      Vacancy Announcement Number 20307     33
10     3      Online Application                    36
11     4      E-mail                                47
12     5      Complaint of Discrimination           56
13     6      Complaint with Attachments            57
14     7      List                                  64
15     8      Plaintiff's Responses to Defendant's  69
16            First Set of Interrogatories
```

Page 4

             PROCEEDINGS
                 (10:05 a.m.)
Whereupon,
            GISELA VON MUHLENBROCK
was called as a witness and after having been first duly
sworn, was examined and testified as follows:)
            DIRECT EXAMINATION
        BY MR. BRUMER:
    Q.  Today is September 19th, 2007.  It's about 10:00 in
the morning.  This is the deposition of the Plaintiff, Gisela
Von Muhlenbrock in Von Muhlenbrock versus Billington, Civil
Docket Number 05-1921.  My name is Jonathan Brumer.  I'm
representing the Defendant, the Library of Congress, in this
case, and with me is Julia Douds, Agency counsel.  Also
present is Plaintiff's attorney, Paul Thaler and Kelly
Schmidt.  The court reporter, Mr. Victor Lindsay, is here, as
well.  Ms. Von Muhlenbrock, could you please state your full
name for the record?
    A.  Gisela Von Muhlenbrock.
    Q.  Could you spell your name, please?
    A.  V like -- V-O-N, U-H-L-E- B-R-O-C-K.
    Q.  Thank you.  Have you ever been deposed before?
    A.  Yes.
    Q.  How many times have you been deposed?
    A.  One time.

Page 9

1  you had anything to drink in the past eight hours?
2      A. No.
3      Q. Okay. Are you currently taking any medications that
4  would affect your ability to provide full, truthful and
5  complete testimony?
6      A. No.
7      Q. Are you feeling at all sick today? Do you feel well
8  enough to do this deposition today?
9      A. Yes, I do.
10     Q. Okay. Thank you, ma'am. Is there any other reason
11 why you don't feel that you could provide full, truthful and
12 complete testimony today?
13     A. No.
14     Q. Okay. Do you have any questions before I begin
15 asking questions myself?
16     A. No, I don't.
17     Q. Okay. Could you please tell me where you attended
18 college?
19     A. I studied law in Santiago, Chile, and I also studied
20 at the Law Center of Georgetown University and Johns Hopkins
21 University here in the District.
22     Q. Okay. And you studied at Johns Hopkins after you
23 graduated from Georgetown Law School, is that correct?
24     A. No. That was not a degree. It was a special course
25 on U.S. legal system.

Page 10

1      Q. Okay.
2      A. It's not a degree.
3      Q. Okay. And you attended Johns Hopkins after you
4  finished the program at Georgetown Law School?
5      A. Yes.
6      Q. And what did you -- what was -- could you briefly
7  describe the program at Johns Hopkins as well as the program
8  at Georgetown Law School?
9      A. Georgetown, basic comparative law, and Johns
10 Hopkins, a masters in international property policy, so it
11 addresses international history, culture and anything related
12 to public policy.
13     Q. Do you have any other degrees that are relevant to a
14 Law Library position or any other degree -- do you have any
15 other degrees that you'd like to -- have you earned any other
16 degrees post-college?
17     A. Well, they are not exactly degrees, but -- with the
18 exception of the Inter-American Course on Human Rights and,
19 yeah, the University of Heidelberg Center in Santiago on
20 comparative defense policies between Europe and Latin America,
21 and other diplomas that are not relevant to my position as a
22 Legal Specialist or my activities as a lawyer.
23     Q. So if you were to summarize the degrees that are
24 relevant, what would they be again? If you could just give me
25 a list of the degrees.

Page 11

1      A. Well, the Chilean law degree from Catholic
2  University of Chile is a five year degree, so it is the
3  equivalent of a J.D. in this country. Georgetown, the
4  comparative, but it's a diploma. It was a tool, a very
5  helpful tool. The Inter-American Human Rights Course,
6  absolutely. And, of course, the Hopkins degree because if you
7  work for Congress and don't know the framework of history and
8  of United States foreign policy, then you don't understand the
9  connection of their question in regard to foreign law issues
10 because politics -- law is policy and the Congress asks what
11 do they do about something in any country of the world and
12 they want also the background because a photocopier could do
13 that task, but also it needs the analysis and evaluation, and
14 hopefully the success if there is the information there of
15 what works in terms of allocation of resources.
16     Q. Okay. Can you tell me where you worked after you
17 finished the program at Georgetown University Law Center, what
18 the first job you held after finishing the program at
19 Georgetown Law Center was?
20     A. The Library of Congress.
21     Q. And when did you begin your employment there?
22     A. In 1981.
23     Q. And how long did you work there?
24     A. Until '89.
25     Q. Where did you work after you left the Library of

Page 12

1  Congress?
2      A. I worked in the Justice Department of Chile.
3      Q. And can you tell me during what period you worked
4  there?
5      A. 1990 to '94.
6      Q. Can you tell me where you worked after that, after
7  you left the Justice Department of Chile?
8      A. I have not worked in terms of employment as a
9  permanent contractor activity. I have done consultant work.
10     Q. Can you tell me where you've done consulting work or
11 other types of work since 1994?
12     A. '84 or '94?
13     Q. '94.
14     A. Since '94 I have done consultancy with the National
15 Democratic Institute for International Affairs here in
16 Washington, but I have done consultancies with the Agency of
17 International Development.
18     Q. Anything else?
19     A. No.
20     Q. Were any of these consultancies or other positions
21 paid positions?
22     A. Most of them, no. And actually I remember now
23 before I returned from Chile in 2005 I draft law for the
24 Chilean government, creating a system in internal auditing.
25     Q. Were any of the positions that you held after you

Page 13

1 left the Library of Congress in 1989 paid positions?
2    A. This last one was paid.
3    Q. Can you tell me roughly what you were -- what the
4 compensation was at that last position?
5    A. I don't remember exactly because the last is under
6 Chilean law and for you it's not useful if I say so many pesos
7 because I have to transform those in U.S. dollars and I don't
8 recall the exact amount.
9    Q. Would you be able to estimate the approximate
10 amount?
11   A. Approximately $3,000 or something like that.
12   Q. 3,000 U.S. dollars?
13   A. Yeah.
14   Q. And during what period were you earning that salary?
15   A. No. That was -- I did it in one month, to draft a
16 law.
17   Q. So you were paid $3,000 for one month of work?
18   A. That's what I'm saying. It's a consultancy
19 contract, short term.
20   Q. And which month and year was this again?
21   A. I don't recall.
22   Q. Do you recall which year it was? Was it -- did you
23 say 2000 --
24   A. 4.
25   Q. In 2004?

Page 14

1    A. 4.
2    Q. Thank you. What was your position when you started
3 working at the Library of Congress, what was your job title?
4    A. Foreign Law Specialist.
5    Q. And how would you describe your duties as a Foreign
6 Law Specialist at the Library of Congress when you started in
7 1981?
8    A. Foreign Law Specialist mainly work for Congress
9 answering their requests or members or committees that want to
10 know the state of the law in foreign countries and
11 international law. But the Law Library also answers the
12 questions of the executive agencies and of the courts.
13   Q. Who was your supervisor when you were working at the
14 Library of Congress?
15   A. Rubin Madena.
16   Q. Did you have any other supervisor during that period
17 that you were working at the Library of Congress?
18   A. No.
19   Q. Were you a Foreign Law Specialist throughout the
20 1981 to 1989 period?
21   A. Yes, I was.
22   Q. Could you tell me your grade when you started work
23 at the Library of Congress in 1981?
24   A. I was offered a GS-12 position and my first check
25 was a GS-11 position, and that's when I started to complain in

Page 15

1 later years to clarify the fact that I had signed a form for a
2 GS-12 position.
3    Q. Who offered you a GS-12 position?
4    A. Rubin Madena.
5    Q. In a letter?
6    A. I came to the Law Library because I had seen an ad
7 in the newspaper for this position. I had an interview and
8 was given a form to fill with my data and I had brought my
9 copies of my law degrees and -- my law degree and transcripts
10 and documents necessary to the interview. So they needed
11 somebody now because the form said immediate, and so I filled
12 one. I filled for a GS-12 position.
13   Q. When did you apply for that position?
14   A. That was in 1980, and between that interview and my
15 actual hiring we had the Carter freeze.
16   Q. Okay. And was the position advertised as a GS-12
17 position or a GS-11 position in the vacancy announcement?
18   A. I don't remember that.
19   Q. Okay. And what was your grade when you left the
20 Library of Congress in 1989?
21   A. GS-14, step 5.
22   Q. How would you describe the experience you had
23 overall during the period that you worked for the Library of
24 Congress?
25   A. Concerning my personal, professional opportunity and

Page 16

1 work, I was delighted because I did the kind of work that I
2 liked to do, I was trained to do. It's not only law. I also
3 speak French. I also read Portugese and Italian, languages
4 that are also used in the Hispanic. I could also answer the
5 question from Spain when most European specialists couldn't do
6 it. And I liked to do research. I liked public policy. I'm
7 the daughter of a Chilean senator who would have been 24 years
8 in the Senate, so I always was hearing public policy issues,
9 and then to be able to work for the United States Congress on
10 this issue that I really liked to do and are relevant to their
11 legislative work, I was perfectly happy with what I had to do
12 and the opportunity to use my professional background.
13      In the area of labor relations, that's where I --
14 that was the area that was cut and that made me very unhappy.
15 Happily, I liked my work specifically. That's why I kept
16 going.
17   Q. Who were the people -- could you list the people you
18 worked with closely at the Library of Congress, who you worked
19 with on a daily basis at the Library of Congress?
20   A. Question. What do you mean, the Secretary of the
21 Division?
22   Q. The names of the Library of Congress employees who
23 you regularly worked with.
24   A. You want to know all the names of the people who
25 worked at the Hispanic Law Division?

Page 25

1 Stipulation of Dismissal.
2  Q. And does this relate to the EEO complaints you filed
3 in the 1980s, this Settlement Agreement and Stipulation of
4 Dismissal?
5  A. Yes, this is the one that settled the civil action.
6  Q. Okay. And what -- could you please summarize the
7 terms of this settlement and Stipulation of Dismissal as they
8 relate to you?
9  A. As they relate to me, it will provide remedy to my
10 denial of promotion, and this settlement has an appendix of
11 the conditions for the Library to fulfill a schedule of
12 promotions and conditions, and the payment of attorney's fees
13 and for the Plaintiff that asks for back pay also as
14 scheduled.
15  Q. Did this Settlement Agreement change the process
16 through which applications for employment at the Library of
17 Congress were made? Did it all change the process for
18 considering and making determinations on applications for
19 employment at the Library of Congress?
20  A. Not that I know.
21  Q. At the time that you worked at the Library of
22 Congress, were you familiar with the application process for
23 people who were interested in applying at the Library of
24 Congress?
25  A. Not directly. Through the union I was the Law

Page 26

1 Library's steward and so I knew about the activities of Local
2 2910 of the American Federation of State, County and Municipal
3 Employees Union that were concerned, and I also later as the
4 steward negotiated the contract with the Law Library -- for
5 the Law Library.
6  Q. In your capacity as somebody who had applied for a
7 position in the Library of Congress as well as an attorney and
8 a former law librarian in the Library of Congress, were you
9 familiar with the SF171?
10  A. Yes. I had seen one and filled one.
11  Q. When had you completed one?
12  A. In 1980.
13  Q. When you were applying for the position you held at
14 the Library of Congress?
15  A. Yes.
16  Q. Are you aware of any changes in the 1980s or 1990s
17 to the application process for people who were interested in
18 working at the Library of Congress?
19  A. No. I left in 1989 and since then until 2005 I was
20 outside the country.
21  Q. When did you -- why did you leave the Library of
22 Congress in 1989?
23  A. Because I traveled to Chile to attend the wedding of
24 my daughter and went to visit my father and went up to the
25 lakes in the mountains, and there was a storm at the border

Page 27

1 with Argentina and I rode down with a horse, on top, down a
2 ravine. After that I was left with serious back problems and
3 was, of course, advised not to travel and follow a
4 rehabilitation process. That was long, costly and painful.
5  Q. This was in 1989?
6  A. In 1989.
7  Q. And when did you recover from your injuries?
8  A. Almost a year later, but the main reason really was
9 that transport from -- I don't know if you have visited ever
10 there. The flight from Miami is 12 hours, and for somebody
11 who has to be -- of course, not supposed to move while
12 healing, you know, air transportation would have been
13 dangerous or very, very costly and then who take care of me
14 here? And so that's why in thinking you thought -- the
15 Division consisted of a Chief and Assistant Chief and one
16 Legal Specialist. I thought that I was being honest and fair
17 to resign so that they could fill an opening because I know
18 that we have a huge volume of work.
19  Q. So you voluntarily resigned?
20  A. Yes. It was my resignation, and I was in Chile when
21 I resigned.
22  Q. Nobody encouraged you to resign?
23  A. No. My doctor said stay quiet.
24  Q. I mean nobody at the Library of Congress --
25  A. No.

Page 28

1  Q. -- encouraged you to resign?
2  A. No. I didn't have any contact. If you think about
3 the date, there was no Internet or any of those things, and I
4 was sick.
5  Q. So you would have happily continued at the Library
6 of Congress if it weren't for that -- for your injury in 1989?
7  A. Exactly, yes.
8  Q. After you left the Library of Congress -- after you
9 resigned from the Library of Congress, did you apply for any
10 other positions at places other than the Library of Congress?
11  A. Really not, no applications.
12  Q. You were only interested in working at the Library
13 of Congress?
14  A. You mean in the United States or are you including
15 Chile?
16  Q. Anywhere.
17  A. Anywhere, I never applied to a job.
18  Q. Did you ever apply for a position at the Library of
19 Congress after you left there in 1989?
20  A. Yes. I started to apply after I recovered in 1991
21 through 1992.
22  Q. Did you -- you applied for a position in 1991?
23  A. No, I didn't apply. I requested information in
24 order to apply because some of my colleagues that were at the
25 Law Library had writing to me concerned about my roaring

Page 33

1 at the Library of Congress?
2    A. No, only the application that was online.
3    Q. When did you submit an online application to the
4 Library of Congress?
5    A. I think that was February 2003 or January. I
6 remember the posting terms.
7    Q. Do you remember when you saw the vacancy for which
8 you applied in 2003?
9    A. You see, that position was posted in 2002. Then it
10 was removed. Then I e-mailed to ask why -- what happened here
11 because it was removed before the ending of the term. I
12 didn't get answers. And then again when I checked, it had
13 been restated, so for me it's hard to be precise from the
14 terms because these are changing circumstances.
15    Q. Where did you see the 2002 vacancy posting?
16    A. In the Library of Congress web site.
17    Q. And where did you see the second vacancy posting
18 that you saw in 2003?
19    A. In the same place.
20    Q. And what sort of a position was the vacancy for?
21    A. Foreign Law Specialist.
22       MR. BRUMER: Mr. Lindsay, could you please mark this
23 as Government's Exhibit Number 2?
24 (Whereupon, the document that was referred to as Government's
25 Exhibit Number 2 was marked for identification.)

Page 34

1       BY MR. BRUMER:
2    Q. Ms. Von Muhlenbrock, here's a copy of what's been
3 designated Government's Exhibit Number 2. Do you recognize
4 this?
5    A. Yeah. It's one of the versions of the posting.
6    Q. Which version is this? Is this the --
7    A. I'm trying to see the date because I have seen the
8 posting of 2002, and then there is something also -- they
9 changed the format, you know, so it looks slightly different
10 because of that.
11    Q. What's the vacancy announcement number listed?
12       MR. THALER: Objection. The document speaks for
13 itself. Go ahead and answer the question. The question is
14 what's the number?
15       WITNESS: 20307.
16       BY MR. BRUMER:
17    Q. Is this the vacancy for which you applied in 2003?
18    A. Yes.
19    Q. How did you apply?
20    A. I tried to apply online. First, I printed the form
21 online because it takes time. You know, this is the beginning
22 of all this done online type of thing, and so I printed that
23 out to see how long it would take, what information you need
24 to fill it, so I don't know exactly when I filled the
25 information and sent it.

Page 35

1    Q. Did you know anything about the selection process at
2 the time that you submitted your application in 2003?
3    A. I knew that there were changes as a consequence of
4 the lawsuit filed in the 1980s by the Black Professional and
5 Technicians of the Library of Congress that ended with a --
6 Cook decision so that I knew that there was a new contract,
7 but in terms of application, I think maybe the federal
8 requirements -- I assumed they were the same.
9    Q. Could you describe what -- your understanding of the
10 changes that resulted from the Cook case?
11    A. That there was a new contract. Only that because I
12 was told that -- written -- somebody wrote to me that things
13 were changing and there was a new -- and that they missed me
14 as the steward because I always got leave for Thanksgiving, so
15 her letter tells me things are changing, there is a new
16 contract and things like that.
17    Q. Were you familiar with the AVUE system when you
18 applied in 2003?
19    A. No, sir, no.
20    Q. Are you familiar with it today?
21    A. I had to.
22    Q. What's your -- how do you understand -- what's your
23 understanding regarding how it works?
24    A. You get prompt responses when you file and prompt
25 responses to tell you that you didn't get it, but if you ask

Page 36

1 me about my experience in labor relations, especially after my
2 work in Chile where I supervised a Justice Department, I
3 wasn't happy from what I saw because it's very different to
4 have a personal interview, but to establish first qualifiers,
5 and the questions, technically I think they didn't a good job
6 because they mix like -- knowledge and skills with a lot of
7 legal -- that is a lawyer's work.
8    Q. Could you tell me anything about your expectation
9 regarding how the selection would work at the time that you
10 applied in 2003?
11    A. I just waited.
12       MR. BRUMER: Could you please, Mr. Lindsay, mark
13 this document as Exhibit Number 3?
14 (Whereupon, the document that was referred to as Government's
15 Exhibit Number 3 was marked for identification.)
16       BY MR. BRUMER:
17    Q. Ms. Von Muhlenbrock, could you please look at
18 Government's Exhibit Number 3? Are you familiar with this
19 document?
20    A. Primarily, yes.
21    Q. What is that?
22    A. It looks like my online application.
23    Q. Is your name printed on the first page?
24    A. Yes.
25    Q. What's the date indicated on the first page?

Page 41

1  I thought -- no, no, I never did because I gave the copy that
2  I had to one of the investigators, Mr. Greenburg, in the
3  presence of my own lawyer and that is part of my affidavit at
4  that time, and after that it was lost.
5      Q. So you don't have any copies of the application you
6  submitted to the Library of Congress in 2003?
7      A. No, because what I have is what the Library of
8  Congress gave me, not the one that I printed and -- when I
9  sent the application.
10     Q. At the time that you submitted your application in
11 2003, did you have any information about how the questions you
12 submitted would be weighted?
13     A. No.
14     Q. Did you have any knowledge of which responses to any
15 given question within that application would maximize your
16 chances of getting a position?
17     A. No. I had been abroad since 1999 and so I didn't
18 have much information about the new contract that establishes
19 merit selection and promotion -- I filed that from 12,000
20 miles away and only answered according to myself perception of
21 the kind of job I did while I was there.
22     Q. Was this application important to you?
23     A. Yes, it was.
24     Q. Were you very focused on getting a position at the
25 Library of Congress in 2003?

Page 42

1      A. Well, I wanted to return to the United States and
2  have the job that I liked back.
3      Q. So it was important to you?
4      A. Yes.
5      Q. But you don't have a copy of the application --
6         MR. THALER: Objection, asked and answered and now
7  you're getting a little argumentative there. You can answer
8  him again. You answered it a few minutes ago. He asked the
9  same question.
10        WITNESS: I gave it to the investigator of the
11 Library of Congress in the former case of my complaint in the
12 presence of my counsel.
13        MR. BRUMER: What happened after you submitted an
14 application to the Library of Congress in 2003?
15        MR. THALER: Objection. What happened?
16        MR. BRUMER: I'll rephrase.
17        MR. THALER: Okay.
18        BY MR. BRUMER:
19     Q. Did you receive a response to the application you
20 filed online in 2003 with the Library of Congress?
21     A. Yes. They sent a certified application received.
22     Q. When did you receive that message, how shortly after
23 you submitted your application?
24     A. I don't remember exactly, but it wasn't immediately
25 the next day, but their response was very prompt.

Page 43

1      Q. Within a few days?
2      A. Yes.
3      Q. Did you receive any subsequent response to your 2003
4  application?
5      A. Now I want you to clarify what do you mean if it's
6  Human Resources or the other system?
7      Q. Did anybody at the Library of Congress contact you
8  after you submitted your 2003 application about that
9  application?
10     A. I only received from the system the e-mail saying
11 your application has been received, and then there was a
12 message telling me that I had not been selected and thank you
13 very much and apply to another position.
14     Q. Who sent you that message?
15     A. Again, the automated system.
16     Q. Did you get an interview for the 2003 position?
17     A. No.
18     Q. Why do you believe that you didn't get an interview?
19     A. I tried to find out why not and, therefore, e-mailed
20 to Ms. Nichols in Human Resources to give me please the
21 information concerning my score.
22     Q. When did you send her that e-mail?
23     A. I don't have it in front of me to give you exactly
24 the date, but it was shortly after they answered, and then it
25 took, I think, up to June of that year that Human Resources

Page 44

1  told me your score was 96. The cutoff was 97.
2      Q. Why do you -- as you sit here today, what is your
3  belief regarding the reason that you were not given an
4  interview for the 2003 position?
5      A. As somebody who has administrative experience, I can
6  tell you that if the score is not -- that the score
7  establishes by the automated system as part of the selection
8  process. It's not the selecting official. That why you have
9  interviews. That's only a preliminary stage that goes through
10 the basic, minimal qualifications of a candidate. That
11 information is sent to the panel and the panel evaluates, and
12 the panel has to received the information of all the
13 applicants, so I wondered, you know, how come I had done work
14 for nine years, had a Meritorious Service Award and have not
15 qualified?
16     Q. And did you -- and what did you ultimately conclude
17 was the reason?
18     A. I conclude that this would only be explained by
19 retaliation because in 1991 to '92 I was denied a form and
20 information about a vacancy. Now I didn't make it to the top
21 ten, and that was confirmed when I filed the complaint and
22 went through the documents provided by the Library, and they
23 had seen my name.
24     Q. So you thought that the Library of Congress didn't
25 grant you an interview in 2003 because you had filed EEO

Page 45

1 complaints when you worked there?
2   A. Yes.
3      REPORTER: Can we pause just one second?
4         (OFF THE RECORD)
5         (ON THE RECORD)
6      MR. BRUMER: Should I ask that question again?
7      REPORTER: No. I think I got her answer.
8      BY MR. BRUMER:
9   Q. You said a few minutes ago that they saw your name.
10 Whom did you mean by they?
11  A. I assumed that they had seen my name because this is
12 what the selecting panel was supposed to see the name of
13 people who were minimally qualified. As I told you, most of
14 the information, I had mostly a hunch derived from my prior
15 experience in the '90s. Now this happens again. And so I
16 complained, thought that my relief reconfirmed, especially
17 after looking at that document. Finally they hired a person
18 with less qualifications than me. Explain? So I wondered.
19 There must be some intentionality here because it's the second
20 time.
21  Q. So --
22  A. And it's the same actors.
23  Q. Could you provide me with the names of the people
24 who you believe saw your name before deciding on your 2003
25 application?

Page 46

1   A. Well, Kersi Schroff and Tsou Tsia sit in the panel.
2   Q. So are Kersi Schroff and Tsou Tsia the two people
3 who you believe saw your name before deciding on your 2003
4 application?
5   A. Yes.
6   Q. They're the only people?
7   A. I don't know how many other people could have seen
8 paperwork or anything -- documents related to select -- to the
9 paperwork of the selecting process, but Kersi Schroff knew me
10 and Tsou Tsia had been a party in the lawsuit of the '80s.
11  Q. Why did you believe that those two individuals had
12 seen your name before deciding on your 2003 application?
13  A. When I saw the documents I saw the list with names
14 of the scoring, and I was told that my score -- by Billie
15 Nichols that my score had been 96, so there had to be a list
16 of names. Otherwise, how does he give me the information?
17  Q. Which document -- you say that you saw a document
18 that listed the applicants' names. Which document are you
19 referring to?
20  A. A document provided by Mr. Greenburg that consist of
21 an e-mail of Billie Nichols addressed to Kersi Schroff on the
22 numbers of applicants and those qualified for interview and
23 asking how many or -- this is giving him the results and
24 asking how many are you going to interview, to prepare for all
25 that.

Page 47

1      MR. BRUMER: Mr. Lindsay, could you please mark
2 these documents as Government's Exhibit --
3      REPORTER: 4.
4      MR. BRUMER: -- 4? Thank you.
5      REPORTER: Both of them as Number 4?
6      MR. BRUMER: Both of them.
7 (Whereupon, the document that was referred to as Government's
8 Exhibit Number 4 was marked for identification.)
9      WITNESS: I'm glad you gave me this because I was
10 trying to convert to Word from Word Perfect Word and lost it.
11     BY MR. BRUMER:
12  Q. Ms. Von Muhlenbrock, here is a copy of Government's
13 Exhibit 4. Could you please look over it for a minute? It's
14 a two-page document. If you could look at it and tell me if
15 you recognize it.
16  A. No. This is not the list that --
17  Q. You don't recognize it?
18  A. No, because it's not the breakdown. It's just the
19 number of applicants that are minimally qualified.
20  Q. Have you not -- have you seen this document before?
21  A. Yes.
22  Q. What is it?
23  A. Well, it says Exhibit 12E, so there has to be C, B,
24 E or something.
25     MR. THALER: Objection. I mean --

Page 48

1      WITNESS: It's not --
2      MR. THALER: I understand your question, but if
3 you're just asking her to read what it is, then I object on
4 the basis that it speaks for itself, but if there's another
5 question, maybe it could be expressed differently. It sounds
6 like she's getting ready to read the document to you. Is that
7 what you want her to do?
8      BY MR. BRUMER:
9   Q. The first page is an e-mail, isn't that right?
10  A. Yes.
11  Q. And the e-mail's from Kersi Schroff to Billie
12 Nichols?
13  A. Answering an e-mail from Billie Nichols to Kersi
14 Schroff concerning an attachment, and it's not this one
15 because it's not defined as breakdown.
16  Q. So you recognize the e-mail, but you --
17  A. I recognize the e-mail but not the attachment.
18  Q. How do you know that the attachment to the e-mail
19 which you recognize is different from this attachment?
20     MR. THALER: Objection on a lot of bases. You want
21 her to assume something that's not in -- that she hasn't
22 testified to, and it also -- I mean it's the continuing
23 problem of being just being kind of argumentative with her.
24 You're asking her to tell you what these documents are and
25 what they read like, but I'm not sure that you're getting any