# EXHIBIT 14 - Shroff Deposition

Page 1

In the U.S. District Court
For the District of Columbia

---------------------------------x
                                 :
Gisela Von Muhlenbrock           :
                                 :
         v.                      : NO. 05-1921
                                 :
James H. Billington,             :
Librarian of Congress            :
                                 :
---------------------------------x

         October 3, 2007

DEPOSITION OF:

         Kersi Shroff,

a witness, called by counsel pursuant to notice, commencing at 10:00 a.m., which was taken at Thaler, Liebeler, 1825 Eye Street, NW, Washington, DC

Page 62

1 various periods of time until Mr. Sharp was
2 eventually appointed as a permanent director.
3 　　Q.　Who was the selecting official for the
4 position?
5 　　A.　The specific position that we're talking
6 about?
7 　　Q.　Yes.
8 　　A.　I was the selecting official.
9 　　Q.　What responsibilities does the selecting
10 official have at the Library of Congress in filling
11 a vacancy?
12 　　A.　Various responsibilities relating to equal
13 opportunity and to observe the processes of the
14 library and the Library of Congress as a whole, to
15 make the process as fair, open, transparent as
16 possible so that all qualified persons would be
17 encouraged to apply and to be considered for the
18 position.
19 　　Q.　Any other responsibilities the selecting
20 official has?
21 　　A.　The responsibilities of the selecting

Page 63

1 official would be to be part of the panel, to see
2 that the proceedings, the questions, the structured
3 interview process that was in place were observed
4 and to, after the interview process was over, to
5 deliberate with the panel in order to get a
6 consensus on the candidate to be appointed to the
7 position.
8 　　Q.　Any other responsibilities the selecting
9 official has?
10 　　A.　I think I've given you the totality of it.
11 　　Q.　What EEO responsibilities are you
12 referring to when you said that you have EEO
13 responsibilities, equal employment opportunity --
14 　　A.　Meaning that this process was put into
15 place as a result of a class action brought by some
16 employees of the Library of Congress and as part of
17 the -- I believe there was a consent decree in the
18 case.
19 　　　　The library had set in motion a new
20 transparent process for the hiring of employees.
21 　　Q.　What is your understanding about that new

Page 64

1 transparent process? What does that mean?
2 　　A.　That means that it was done on an
3 objective basis where any individual opinions or any
4 individual interference would not occur.
5 　　Q.　How is that ensured?
6 　　A.　I believe it's ensured through the
7 application process which is on line, the handling
8 of the on line applications by HR, which are not
9 notified to the hiring agency and protective
10 measures like that.
11 　　Q.　But for what you've called new transparent
12 process, if you had been given the opportunity,
13 would the plaintiff in this action have been a good
14 selection for this job vacancy, in your opinion?
15 　　　　MR. BRUMER: Objection as to form.
16 BY MR. THALER:
17 　　Q.　Please answer.
18 　　　　MR. BRUMER: You can answer.
19 　　　　THE WITNESS: I'm sorry, that is a
20 hypothetical.
21 　　　　I certainly would have looked at the

Page 65

1 applicants, including the plaintiff, from the
2 perspective of what they would bring to the
3 position.
4 　　　　Yes, I certainly would have looked at
5 it.
6 BY MR. THALER:
7 　　Q.　Knowing what you know today, would you
8 have chosen, given the opportunity, the plaintiff
9 here today, Ms. Von Muhlenbrock, or the person who
10 did fill the position, in your opinion?
11 　　A.　Well, Ms. Von Muhlenbrock was not a part
12 of the persons that we interviewed so I cannot make
13 that comparison.
14 　　Q.　But you know her. You've testified about
15 your opinion about her as an employee and you know
16 the person who filled the position, right?
17 　　A.　I would make the decision on the basis of
18 the resumes that I see, the current information that
19 I'm supplied with, the interview that I've
20 conducted.
21 　　　　So on that basis I cannot make the

Page 66

1  comparison because she was not part of that process.
2    Q. Is it your testimony now that you are
3  incapable of making that decision because you would
4  have to interview a co-worker of yours for many
5  years, Ms. Von Muhlenbrock?
6        MR. BRUMER: Objection,
7  argumentative.
8  BY MR. THALER:
9    Q. Is that your testimony?
10       MR. BRUMER: You can answer.
11       THE WITNESS: I would do whatever is
12  needed to conform with the procedure that we set in
13  place.
14  BY MR. THALER:
15    Q. You have testified that you are familiar
16  with the quality of Ms. Von Muhlenbrock's work,
17  true?
18       MR. BRUMER: Objection,
19  mischaracterizes prior testimony.
20       You can answer.
21  BY MR. THALER:

Page 67

1    Q. True?
2    A. Yes, I have knowledge of her work going up
3  to the late eighties.
4    Q. And you testified that she was a good
5  employee, right?
6    A. Up to that period of time, yes.
7    Q. Given the opportunity, would you have
8  allowed or would you have appointed
9  Ms. Von Muhlenbrock to this position?
10    A. If she was the best candidate that was on
11  the list, yes, I would have.
12    Q. You selected someone else, right?
13    A. Yes, I did.
14    Q. Based on what you know about both the
15  person you selected and Ms. Von Muhlenbrock, is
16  there any reason to believe that she would not have
17  fulfilled that position as well or better than the
18  person who did take it?
19    A. When we posted the position we had certain
20  objectives in mind based on the work that we were
21  receiving from Congress and the agencies and on that

Page 68

1  basis the person who was selected fit the bill the
2  best.
3    Q. Better than what you know
4  Ms. Von Muhlenbrock's background and experience at
5  the Library of Congress?
6        MR. BRUMER: Objection, asked and
7  answered.
8        You can answer.
9        THE WITNESS: I have no basis for
10  making that comparison.
11  BY MR. THALER:
12    Q. Why not? You know her as an employee.
13  You've testified about that.
14       You've had personal experience with her as
15  an employee at the Library of Congress.
16       Why can't you answer that?
17       MR. BRUMER: Objection, argumentative
18  and asked and answered.
19       THE WITNESS: I did not have any
20  current information about her to make that judgment.
21  BY MR. THALER:

Page 69

1    Q. What additional information would you have
2  needed?
3    A. Her experience since she left the position
4  at the Law Library of Congress.
5    Q. What has been the job performance of the
6  person who filled the position?
7    A. It's been very good.
8    Q. Are there regular evaluations of employees
9  at the Library of Congress?
10    A. Yes, there have been yearly evaluations.
11    Q. We're talking about Gustavo Guerra, is
12  that correct?
13    A. Yes.
14    Q. Is it your position that Mr. Guerra, and
15  again forgive the pronunciation, is a better
16  employee than Ms. Von Muhlenbrock?
17       MR. BRUMER: Objection, asked and
18  answered.
19       You can answer.
20       THE WITNESS: I've already answered
21  that question.

Page 78

1   Q.  And you took notes of those calls?
2   A.  **I believe there's a form that needs to be**
3   **filled out for that purpose.**
4   Q.  And you filled out that form?
5   A.  **I believe I did.**
6   Q.  And that form is part of the record?
7   A.  **I do not know that. That form is not with**
8   **me.**
9   Q.  Do you recall getting through to each of
10  the references identified by Mr. Guerra?
11  A.  **Yes, I recall getting through.**
12      **It sticks in my mind because one or two of**
13  **the references in Mexico were difficult to get and**
14  **so I had managed to get them after some repeated**
15  **attempts.**
16  Q.  So you recall there being a difficulty but
17  then ultimately you were able to get through?
18  A.  **Ultimately I was able to get that his**
19  **credentials were as stated on his paper and he came**
20  **highly recommended by the references, by the**
21  **referees.**

Page 79

1       **There was a third reference here at**
2   **Georgetown as well.**
3   Q.  Why do you have independent recollection
4   of that? I'm curious.
5   A.  **Because of the way in which I had to track**
6   **down the references.**
7       **I remember having had to call Mexico several**
8   **times. I ended up making the more convenient call**
9   **first, a local call here.**
10  Q.  Do you remember who that call was with?
11  A.  **No, I don't recall now.**
12  Q.  Did anyone verify the accuracy of the
13  representations made in his application?
14      MR. BRUMER: Objection, asked and
15  answered.
16      MR. THALER: I asked about
17  references.
18      MR. BRUMER: Could you repeat the
19  question?
20  BY MR. THALER:
21  Q.  Did anyone verify the accuracy of the

Page 80

1   representations, the statements made in his
2   application?
3       MR. BRUMER: Asked and answered, but
4   you can answer again.
5       THE WITNESS: I would recall that,
6   let's say with the Georgetown professor, I would
7   have asked did you work with Mr. Guerra or did
8   Mr. Guerra work with you, and so that to me would
9   have been verification.
10      And with the Mexican referees, I
11  believe one or both of them were judges and I asked
12  the question what do you think of his work based on
13  the assistance he had provided to the judges during
14  his professional career in Mexico.
15  BY MR. THALER:
16  Q.  And his bar membership was confirmed, was
17  it?
18  A.  **We did not take any independent steps to**
19  **confirm that but I believe that we had a copy on the**
20  **record that had been filed.**
21  Q.  What is your recollection of the

Page 81

1   discussions you had concerning the interview
2   process, meaning the discussions that took
3   place -- you spoke with Billie Nichols about the
4   interview process when it came time to interview the
5   applicants, did you?
6       MR. BRUMER: Objection, compound and
7   confusing question, but you can answer if you
8   understand.
9   BY MR. THALER:
10  Q.  Did you have discussions with Billie
11  Nichols about the interview process for this job
12  vacancy?
13  A.  **Yes, I had contact with Billie Nichols.**
14      **She was the point person in Human Resources**
15  **for this vacancy announcement.**
16      **So as and when the vacancy closed, she would**
17  **have come back to us as the panel to tell us how**
18  **many applicants had successfully made it through the**
19  **application process and then asking us as to how**
20  **many applicants would you, out of those that have**
21  **successfully completed the process, would the panel**

Page 82

1  want to interview.
2       I would have gone back to the panel and said
3  this is the breakdown. She would have provided us
4  with a score showing the number of the applicants
5  who had scored at certain rates.
6       So the panel was made aware that X number of
7  applicants had qualified and that a certain number
8  were at this 100 percent rate, 98 percent,
9  97 percent ranking.
10      And on the basis of that information the
11 panel decided in its wisdom let's see the top ten
12 candidates, widen the pool. We were not required to
13 do so but we wanted to see the top ten candidates,
14 to interview them.
15      Q.  What is the standard number of candidates
16 who are interviewed pursuant to the policies and
17 procedures at the Library of Congress, to your
18 knowledge?
19      A.  I believe the standard number is seven.
20      Q.  Seven being the standard, with ties,
21 correct? In other words, the top seven candidates

Page 83

1  and then whoever is tied with the 7th, is that
2  right? Is that your understanding?
3       A.  No, that's not my understanding. I meant
4  top seven candidates.
5       Q.  How many times have you gone through this
6  process at the Library of Congress of filling a job
7  vacancy?
8       A.  This was the first position and subsequent
9  to that I have filled two more positions.
10      Q.  As part of your participation did you
11 review the policies and procedures of the Library of
12 Congress in filling positions?
13      A.  Yes, we have guidelines provided to us on
14 that.
15      Q.  And you did so on this occasion for this
16 job vacancy that we're talking about?
17      A.  Yes.
18      Q.  It's your understanding that it's the top
19 seven without ties?
20      A.  I don't even believe it's the top seven.
21 I think -- the number that stays in my mind, it's

Page 84

1  seven candidates, seven candidates to be
2  interviewed, successful candidates.
3       Q.  If that's your understanding, why do
4  something different in this case?
5           MR. BRUMER: Objection, compound
6  question, but you can answer, if that's your
7  understanding.
8           THE WITNESS: We wanted to broaden
9  the pool of talent that we wanted to see for the
10 position.
11 BY MR. THALER:
12      Q.  Why?
13      A.  When we looked at the breakdown of the
14 scores, the candidates were in the 100th percentile,
15 the 99th percentile and the 98th percentile, they
16 seemed to be the type of people we wanted to
17 interview and there happened to be ten candidates, I
18 believe, who scored at that level.
19      Q.  What was it in your mind that made it
20 significant that they had those particular scores?
21      A.  I'm sorry, I don't understand the

Page 85

1  question.
2       Q.  You said the scores 100, 99, 98 were the
3  types of candidates that you wanted to interview.
4  Correct me if I'm wrong, but I think that's what you
5  said.
6       A.  Yes, because they were the top candidates.
7       Q.  So my question is what is it about those
8  scores of 100, 99, 98 that distinguishes them from,
9  say, a 97?
10      A.  Three percentages more than 97.
11      Q.  And 99 is one percentage more than 98, so
12 why not stop at 99, why go to 98?
13      A.  As I said, we wanted to broaden the pool,
14 see what talent was out there for this position and
15 I believe at the 98 percent there was a nice break
16 there because if he had gone above 98 it would have
17 meant seeing, I believe, more candidates.
18      It was not just one person who scored at
19 that level. There were I think three or four or
20 five or whatever.
21      So seeing that there were ten candidates who

Page 86

1  had scored in the top three percent, we decided that
2  that would be a nice break.
3     Q.  I'm going to show you what's been marked
4  as number four.
5        (Whereupon the proffered item was
6     marked as exhibit number 4.)
7  BY MR. THALER:
8     Q.  Is this the sheet which you were basing
9  these decisions you've just testified about?
10    A.  This seems to be the attachment to the
11 e-mail that I received from Ms. Nichols.
12    Q.  But this is the breakdown that you're
13 making your decision about who to invite to
14 interview or was there something else?
15    A.  No, this would be the breakdown on which
16 we made the decision to invite ten candidates.
17    Q.  So your testimony was that you invited
18 100, 99 and 98?
19    A.  I'm sorry.  I obviously meant 100 to 97.
20 97 upwards.
21    Q.  So if the general policies and procedures

Page 87

1  of the Library of Congress that had been established
2  prior to this job vacancy are to include the top
3  seven, and pursuant to your testimony I'm going to
4  show it to you in a second because I think it
5  was -- well, let's assume it's top seven.  What's
6  the magic -- I'm trying to understand what in your
7  mind and the rest of the panel's mind was
8  significant about going beyond what had already been
9  established as the appropriate number of
10 interviewees, in this case seven would have been
11 through 98, correct?
12       MR. BRUMER:  Objection.  That's
13 vague, confusing and compound.
14 BY MR. THALER:
15    Q.  You agree with me looking at this exhibit
16 in front of you right now, sir, that the scores
17 through a score of 98 gets you eight candidates, is
18 that right?
19    A.  That's right.
20    Q.  I'm trying to understand the significance
21 in your mind and the rest of the panel's minds of

Page 88

1  going beyond that.
2        If eight satisfies the policies and
3  procedures and it takes you for the first three
4  scores which a few minutes ago you thought those
5  were the right ones and now it seems it's 97 which
6  is the correct score, what is the significance
7  between these numbers to you?
8        MR. BRUMER:  Objection, misstating
9  prior testimony and it's argumentative, but go ahead
10 and answer.
11       THE WITNESS:  The policy of the
12 library doesn't confine us to that.  That is a
13 minimum number, I understand, but it doesn't stop us
14 from interviewing more than the minimum number.
15       Based on that and based on our
16 appraisal at that time of the breakdown, to the best
17 of my knowledge looking at it again, the 97 percent
18 seemed to provide a convenient break for us, because
19 you'll see if you go up to 96 there would be five
20 more candidates to interview.
21       At the 97 percentile we reached the

Page 89

1  number ten, giving us a more than adequate pool of
2  talent to interview for the position.
3        In the wisdom of the panelists, number
4  ten being a very convenient number, also being in
5  conformance with the break that I mentioned that if
6  you take it one percent more you would end up with
7  five more candidates, to the best of my recollection
8  that was the wisdom that we employed in picking the
9  ten candidates.
10 BY MR. THALER:
11    Q.  What was the important dividing line at
12 this point in the mind of the committee?  Was it the
13 score of -- now it's 97, or the fact that you ended
14 up with ten interviewees?  Which was the more
15 important part?
16    A.  The score and the number, both, the score
17 meaning capturing the top, the candidates who had
18 ranked at the top, plus making a convenient point
19 for us to draw a line so that we saw a rich pool of
20 interviewees.
21    Q.  Do you think that the normal course, in

Page 114

1  Q. Right.
2  A. No.
3  Q. Are you aware of any communications
4  between anyone on the panel or Billie Nichols and
5  people outside of that group?
6  A. No.
7  Q. Did you keep the director involved during
8  the selection process?
9  A. The director would be informed at the
10 point that we had selected a candidate.
11 Q. And also at the posting time, right?
12 A. At the posting time, yes.
13 Q. But not in between?
14 A. Not in between.
15 Q. Was that always the case?
16 A. That's generally the case. I happen to
17 have a director who was kind of, you know, give you
18 the turf, get on with it and give me the final
19 candidate.
20 Q. Are you aware of times when that wasn't
21 the case, when you did involve the director in the

Page 115

1  middle period of time?
2      MR. BRUMER: Objection, asked and
3  answered.
4      THE WITNESS: No.
5  BY MR. THALER:
6  Q. What do you remember about Mr. Guerra that
7  led you to decide to recommend that he be the one
8  who would be hired?
9  A. His overall credentials.
10 Q. Anything else?
11 A. No.
12 Q. When you say his overall credentials, what
13 in your mind does that mean?
14 A. His Mexican law qualification, his
15 experience in Mexico, his LLM degree in Washington
16 and his interview.
17 Q. What do you remember about his interview?
18 A. A very competent individual who would be
19 able to take over the responsibilities, to work
20 according to the manner in which we expected the
21 person to work, cooperatively and taking on

Page 116

1  assignments as they were given.
2  BY MR. THALER:
3  Q. Can you just briefly describe your
4  background, education and job history, for the
5  record?
6  A. My education? Yes. Where do you want me
7  to start at the college level?
8  Q. Yes, college.
9  A. I have a BA, LLB from the University of
10 Karachi in Pakistan, after which I practiced law in
11 Karachi for about just under a year.
12     Then I went to England to study for the
13 degree of Barrister at Law. I enrolled at the Inns
14 of Court School of Law in London, attached to
15 Limpkins Inn.
16     When I qualified, I was called to the bar in
17 England and for three years after that,
18 approximately, I worked for the British government
19 as a legal assistant.
20     Then I came to the United States to pursue
21 what they call a Masters in Competitive Law at

Page 117

1  George Washington University, after which I was
2  allowed to take the bar exams for the State of
3  Virginia and I qualified in the State of Virginia in
4  1977 and I'm currently a member of the state bar.
5  Q. The work history between, the three years
6  when you were legal assistant for the British
7  government, I know you came here to get your Masters
8  at GW.
9      Were you working during that time?
10 A. No. When I was pursuing my Masters I was
11 full time. After I acquired the Masters I started
12 working here, I started my work experience.
13 Q. At the Library of Congress?
14 A. No. I was employed elsewhere at a legal
15 research firm in Charlottesville, Virginia.
16 Q. The name of that firm?
17 A. The National Legal Research Group.
18 Q. Can you explain what that is?
19 A. It's a firm that assists attorneys across
20 the United States on various issues that -- they
21 provide the facts and the firm puts those facts to

Page 118

1  the law and provides either memoranda or even writes
2  briefs for them.
3      So I was working on international law cases
4  for them.
5      Q. And you were there for how many years?
6      A. Roughly two to two and a half years.
7      Q. And after that?
8      A. After that I started my employment at the
9  Law Library of Congress.
10     Q. Now I'll show you what's been marked as
11  number nine.
12         (Whereupon the proffered item was
13     marked as exhibit number 9.)
14  BY MR. THALER:
15     Q. I ask, if you would, to identify that.
16     A. Yes, this is the packet, the questions
17  that were posed to Mr. Guerra, my notes of the
18  answers, sometimes in scribble form, and the ranking
19  that I gave to him on those answers.
20     Q. I'm tempted, but I'm not sure I will ask
21  you to read -- as you noted, it is a lot of

Page 119

1  scribble.
2      Do you recall how your rankings compared to
3  the others? There is a process for rankings, is
4  that correct?
5      A. Attend the panelists sit down with the HR
6  staffer and each one of them calls out the ranking
7  and the staffer then combines them and gives the
8  overall ranking.
9      Q. Were your ratings for Mr. Guerra, did any
10  of them result in a discussion about whether or not
11  they ought to be changed?
12     Do you recall?
13     A. It may have, but I don't recall.
14     Q. What would you say are the most, the two
15  most important KSA's for this job position, in your
16  opinion?
17     A. To my mind, number five concerning
18  knowledge of and competency in the laws of Spanish
19  language jurisdictions would rank at the top.
20     Q. What would come in at number two?
21     A. I would put at number two the first

Page 120

1  portion of one, prior background and experience.
2      Q. As best you can, if you would please read
3  your notes to the record of the answers that you got
4  from Mr. Guerra as reflected in this exhibit to
5  question 1A and 5.
6      I know you said five was the most important
7  but why don't you start with 1A?
8      A. 1A, prior background and experience. My
9  notes read: Attorney, licensed in Mexico 1995.
10  Then I later added something to the effect that it's
11  five years of experience.
12     He explained to us that there is no
13  undergraduate system in Mexico so it was a seamless
14  progression to a law degree.
15     He worked as a law clerk, that he worked in
16  state courts, that he was in state courts for ten
17  years, that he did legal research of a complex
18  nature and then he came to do graduate studies.
19     He's a team player. He has the language
20  skills, knowledge, experience in Latin American
21  countries.

Page 121

1      He has not an in-depth knowledge of
2  Portuguese but a working knowledge and international
3  legal studies, in international trade, international
4  telecommunications, dealt with something in
5  counselor -- in consumer how, corporation law, he
6  handled trials which are sort of like constitutional
7  questions, he was familiar with the process.
8      He was part of the judicial stream in that
9  in the civil law countries one decides at the law
10  graduation level whether you are going to become a
11  legal practitioner or you want to become a judge and
12  he had apparently at one time chosen the judicial
13  stream.
14     I think the other questions related to his
15  English. That relates to question 1B, how good is
16  his English.
17     So these were the remarks that I made on the
18  basis of his prior education and experience.
19     Q. When you were going through your notes you
20  hit the part about experience in Latin America.
21  What is the next line which is about five or six