# EXHIBIT 9

# TRANSCRIPT OF PROCEEDINGS

1

2  　　　　　　　　In the U.S. District Court
　　　　　　　　 For the District of Columbia

3
    - - - - - - - - - - - - - - - - - - - - - - - x
4                                                 :
    Gisela Von Muhlenbrock                        :
5                                                 :
    　　　　　　v.                                  : NO. 05-1921
6                                                 :
    James H. Billington,                          :
7   Librarian of Congress                         :
                                                  :
8   - - - - - - - - - - - - - - - - - - - - - - - x

9  　　　　　　　　　　November 1, 2007

10  DEPOSITION OF:

11  　　　　　　　　　　　Rubens Medina,

12  a witness, called by counsel pursuant to notice,
    commencing at 10:00 a.m., which was taken at Thaler,
13  Liebeler, 1825 Eye Street, NW, Washington, DC

14

15

16

17

19  This transcript has been completely indexed for your
    convenience. It will help you locate the testimony
    you want FAST. The index is located in the back
    pages of this volume.

20

21  **Overnite**
    Court Reporting Service
    Serving Washington, D.C. metro area                    (301) 593-0671

Page 10

1  Q. Does any of it affect your ability
2  to -- does it affect your memory or your ability to
3  speak?
4  A. I don't think so but I cannot tell you.
5  Q. You haven't taken any other drugs today?
6  A. No. Coffee. Is caffeine a drug?
7  Q. Did you review any documents in preparing
8  for today's deposition?
9  A. No, I have not.
10 Q. Have you reviewed any of the documents in
11 this litigation?
12 A. Yesterday I was shown documents concerning
13 personnel action recommendations.
14 Q. Then I'm confused. The prior question was
15 did you review any documents in preparation for your
16 testimony and you said no.
17 A. I was given these documents, look at my
18 signature. I didn't review the document.
19 Q. I see. So you saw some documents?
20 A. Yes.
21 Q. Which documents did you see?

Page 11

1  A. Personal action recommendations. It's a
2  form document.
3  Q. Any others?
4  A. No.
5  Q. Have you seen or reviewed any other
6  documents relating to this litigation since the
7  inception of the litigation?
8  A. No.
9  Q. Have you participated in the preparation
10 of any kind of responses in this litigation?
11 A. No, sir.
12 Q. You have not been submitted documents to
13 review and sign in this litigation?
14 A. No.
15 Q. Have you discussed the lawsuit brought by
16 this plaintiff, Gisela Von Muhlenbrock, with anybody
17 at the Library of Congress?
18 A. What happened yesterday --
19 Q. Let me caution you. I hate to interrupt
20 you, but I do want to caution you that as you
21 probably know, you do have a privilege. To the

Page 12

1  extent that your answers require you to identify
2  communications with counsel, it's okay to say you
3  spoke with your lawyer but don't, unless you are
4  waiving your privilege, don't disclose the
5  substance.
6  A. I spoke with the attorneys of the library
7  and Mr. Brumer yesterday.
8  Q. Aside from your meeting with counsel
9  yesterday, have you discussed this lawsuit with
10 anybody at the Library of Congress?
11 A. No.
12 Q. So you've not discussed the lawsuit with
13 Mr. Billington?
14 A. No.
15 Q. You've not discussed it with Bill Nichols?
16 A. No.
17 Q. You've not discussed it with Kersi Shroff?
18 A. No.
19 Q. You have not reviewed, for instance, the
20 interrogatories served by Ms. Von Muhlenbrock to the
21 Library of Congress?

Page 13

1  A. I have not.
2  Q. Ever?
3  A. Ever.
4  Q. Would that also apply to the request for
5  production of documents? Have you ever seen that?
6  A. No, I have not.
7  Q. Has anyone asked you to identify or
8  produce documents that might be requested in this
9  litigation?
10 A. I do believe my director of personnel
11 mentioned to me that there was a request for
12 documentation.
13    I don't recall that it was related.
14 Q. Aside from the fact that there was a
15 request, did you endeavor to look for documents?
16 A. No, I have not.
17 Q. Have you reviewed your own e-mails that
18 might relate to the substance of this lawsuit?
19 A. No.
20 Q. Do you archive your own e-mails?
21 A. The office does, not me personally.

Page 14

1  Q. Were there any steps that you took with
2  regard to your e-mails that were not the ordinary
3  and customary steps that you take with regard to
4  maintaining your e-mail files, anything different
5  that you've handled your e-mails as it relates to
6  this case?
7  A. Please repeat that question.
8  Q. It wasn't a very good question, was it?
9     Have you handled the maintenance of your
10 e-mails differently since this lawsuit was brought?
11 A. No.
12 Q. If your e-mails were archived they would
13 have been archived in the ordinary course as the
14 library archives?
15 A. That is correct.
16 Q. Is it your understanding that documents,
17 including e-mails, need to be handled differently
18 once a lawsuit is brought? Do you know anything
19 about that?
20 A. I am not aware of any special treatment of
21 documents.

Page 15

1  Q. Do you know whether or not an effort
2  should be taken to ensure that e-mails and other
3  documents are not destroyed once litigation begins?
4  A. I understand the library has a system to
5  protect documentation but I don't know exactly how
6  they do it.
7  Q. Who is responsible for that?
8  A. The ITS, Information Technology Services.
9  Q. How is it conveyed to them that a lawsuit
10 has been served against the library?
11 A. I have no idea, sir.
12 Q. You don't know?
13 A. No.
14 Q. You are Dr. Medina, correct? I just want
15 to make sure I address you properly.
16 A. I have the degree but I don't claim
17 to -- I don't demand anybody to call me doctor.
18 Q. You have a Ph.D.?
19 A. Yes.
20 Q. I'll call you doctor. Dr. Medina, I'm
21 going to show you what have been marked as exhibits

Page 16

1  one and two today. Have you seen exhibit one
2  before?
3     (Whereupon the proffered item was
4  marked as exhibit number 1, 2.)
5     THE WITNESS: Exhibit one?
6  BY MR. THALER:
7  Q. Yes.
8  A. I don't recall having seen this document
9  before, no.
10 Q. Then I ask you to look at number two. Is
11 that your signature?
12 A. This is my signature.
13 Q. Do you recall signing this document?
14 A. Yes, I do.
15 Q. Do you remember the circumstances
16 surrounding your execution of this document, exhibit
17 two?
18 A. May I read it?
19 Q. Of course.
20    (Pause)
21    THE WITNESS: I don't recall the

Page 17

1  content but I see my signature there.
2  BY MR. THALER:
3  Q. You don't recall the circumstances
4  surrounding your execution of exhibit two?
5  A. That is correct, I don't recall.
6  Q. Having seen exhibit two now, does that
7  change your answer with regard to number one?
8  A. No, the recollection is still not there
9  having seen or read this document under exhibit
10 number one.
11 Q. Do you recall being asked to sign
12 documents that relate to other documents without
13 seeing the documents they relate to?
14 A. Would you ask it again?
15 Q. Let me direct your attention to number
16 two. It indicates that you have reviewed -- I'm
17 just reading from the certification, exhibit
18 two: "I have reviewed the factual information
19 contained in defendant's responses to
20 interrogatories number 2B of plaintiff's first set
21 of interrogatories." Then you certify under the

Page 18

1  laws of the United States that the responses are
2  true and correct to the best of your knowledge and
3  belief.
4       Is it your testimony that you did not even
5  see the responses?
6       A.  I think the word I used was I don't recall
7  having seen or read this document.
8       I don't recall this particular document
9  having signed myself now.  That's all I can say.
10 I'm not saying I did not.  I just don't recall
11 absolutely.
12      Q.  So you don't have any reason to believe
13 that you were given a certification certifying that
14 something is true without seeing the underlying
15 document?
16      A.  I don't believe so, sir.
17      Q.  Where did you attend college?
18      A.  Two places.  In Asuncion, Paraguay and
19 Madison, Wisconsin.
20      Q.  Your degrees were what?
21      A.  In Paraguay it was an attorney at law and

Page 19

1  in Wisconsin it was first a Masters in legal
2  institutions and then a Ph.D. in law and sociology.
3       Q.  In Paraguay did you get the equivalent of
4  a JD?
5       A.  That is correct.
6       Q.  Did you ever sit for a bar exam anywhere?
7  I don't know if they have that in Paraguay or not.
8       A.  Certification to sit before the
9  Supreme Court.
10      Q.  In the States did you ever sit for the
11 bar?
12      A.  No.
13      Q.  Prior to coming to the Library of Congress
14 what jobs did you hold?
15      A.  The title I don't recall contractually.
16 In Madison, Wisconsin I believe it was a visiting
17 lecturer or visiting professor and then at NYU Law
18 School also visiting lecturer prior to coming to the
19 library.
20      Q.  How many years were you at NYU Law School?
21      A.  That was an academic year, nine months

Page 20

1  actual teaching there.
2       Q.  What course?
3       A.  It was a course, empirical research
4  methodology for lawyers in developing countries.
5       Q.  Then you came to the Library of Congress?
6       A.  That is correct.
7       Q.  What year was that?
8       A.  1971, I believe.
9       Q.  You were in the Hispanic Law Division, is
10 that correct?
11      A.  Yes.
12      Q.  Your current position is law librarian?
13      A.  That is correct.
14      Q.  Have you held that since 1994?
15      A.  1994.
16      Q.  How would you describe your duties and
17 responsibilities as a law librarian for the Library
18 of Congress?
19      A.  It's managerial fundamentally,
20 administration of resources, application of LCR's on
21 all matters concerning production and management of

Page 21

1  resources, participating in the Library of Congress'
2  decision-making but not making decisions,
3  participating in them.
4       I'm a member of an executive committee,
5  leading the library into what has been defined to be
6  the fulfillment of a mission which is collect,
7  preserve and disseminate information as well as
8  provide status to the U.S. Congress, the U.S.
9  government.
10      That's a summary.  It's difficult to go
11 through my position description.
12      Q.  How many people are underneath your
13 supervision as law librarian right now?
14      A.  Direct supervision I'd say ten.
15      Q.  When you used the word "direct," I took
16 that to mean --
17      A.  People that are assigned to my office, the
18 office of the law librarian.
19      Q.  But your office oversees the entire --
20      A.  Oversees, yes, but not direct supervision.
21 There are layers of supervision under the umbrella

Page 34

1   A. No, satisfactory performance is what it
2   means, satisfactory.
3   Q. You recall the occasion in which she filed
4   a previous EEO complaint?
5   A. I recall. I don't remember the dates but
6   I recall that incident.
7   Q. Do you remember the substance of that
8   action?
9   A. The substance is discrimination and sexual
10  harassment I think it was at the time. Those are
11  the things I vaguely remember.
12  Q. You were identified in that complaint,
13  right?
14  A. As a discriminating officer, I think it
15  was, ADA, alleged discriminating, ADO, something
16  like that.
17  Q. We have too many acronyms in our lives.
18  A. Yes, I know, I know.
19  Q. Did you participate in the litigation of
20  that action?
21  A. I don't recall the details but I was

Page 35

1   served notice. What I remember is that the library
2   settled.
3   Q. This was the matter that you weren't sure
4   whether or not you had your deposition taken?
5   A. Yes. I'm not sure that it was.
6   Q. Did you answer or participate in the
7   answering of the complaint brought by, among others,
8   Gisela Von Muhlenbrock in that first action?
9   A. I was given notice, I think, of the
10  complaint, yes.
11  Q. What was your opinion of the allegations
12  brought in that lawsuit?
13  A. Of course, I rejected the sexual
14  harassment and the two charges of discrimination.
15  For me it was an issue of performance simply. If I
16  remember correctly, it was coupled with a request
17  for promotion that I denied.
18  Q. Did you make remarks in the presence of
19  Gisela Von Muhlenbrock about her physical
20  appearance?
21  A. I don't recall anything specific.

Page 36

1   Q. You might have?
2   A. I would be speculating. I don't think I
3   would.
4   Q. But you don't specifically know that you
5   never said anything about her physical appearance,
6   do you?
7   A. No, I would say that I wouldn't make
8   references to her personal appearance.
9   Q. Did you ever tell her you loved her?
10  A. That is unlikely, sir.
11  Q. You say it's unlikely. I guess I'm trying
12  to figure out whether or not it's your
13  recollection --
14  A. I say no.
15  Q. You say no?
16  A. That's right.
17  Q. Now, did you discuss this prior action
18  brought by, among others, Gisela Von Muhlenbrock,
19  with anyone at the Library of Congress over the past
20  several years?
21  Have you discussed that action over the past

Page 37

1   several years?
2   A. No.
3   Q. So you haven't discussed it with
4   Mr. Shroff?
5   A. No.
6   Q. Or Mr. Levush?
7   A. No.
8   Q. And the next person, Mr. Hsia?
9   A. No.
10  Q. You know you did not discuss that prior
11  litigation with any of these individuals?
12  A. No, no.
13  Q. You said no, but it could be construed as
14  a double negative.
15  A. Did not discuss the case with any of the
16  persons mentioned.
17  Q. When was the last time you discussed that
18  matter with anybody? Do you recall?
19  MS. DOUDS: Which matter?
20  MR. THALER: The first matter brought
21  by Gisela Von Muhlenbrock.

Page 42

1   it. It should be somewhere around there, in the
2   nineties, late nineties.
3     Q. Late nineties or early 2000?
4     A. Something.
5     Q. What was the nature and purpose of that
6   meeting?
7     A. I don't know what the intention was.
8   Again I said "okay." He told me he wasn't related
9   to any of these actions that was in the past and the
10  latest one.
11    Q. The first discussion came at a time that
12  was after the first action had already been
13  concluded, correct?
14    A. That is correct.
15    Q. Did it seem strange to you that he was
16  raising it after everything was already done?
17    A. I passed no judgment. I thought it was
18  something he wanted to say. It was noted. That's
19  all I would say. I have no idea what moves him to
20  do those things.
21    Q. Anyone else that you spoke to or with

Page 43

1   about Ms. Von Muhlenbrock's now two actions against
2   the library?
3     A. No.
4     Q. Did your opinion about Ms. Von Muhlenbrock
5   change after she brought the first action?
6     A. No.
7     Q. Are you aware of an article entitled
8   Asylum and Refuge in Central America?
9     A. Say that again, sir, please, the question?
10    Q. Asylum and Refuge.
11    A. What is the question?
12    Q. Are you aware of an article entitled that?
13    A. No, I don't recall.
14    Q. Do you remember an article that was
15  written by Gisela Von Muhlenbrock?
16    A. Article? No.
17    Q. Now, there came a time when
18  Ms. Von Muhlenbrock resigned from the Library of
19  Congress, correct?
20    A. Yes.
21    Q. How do you recall learning about her

Page 44

1   resignation?
2     A. I know that I took notice of it but I
3   don't know how it was, whether it was herself
4   telling me or some documentation.
5     I don't recall the details, but I became
6   cognizant of that fact.
7     Q. What was your understanding about why
8   Ms. Von Muhlenbrock resigned?
9     A. I really didn't know.
10    Q. You didn't know or you don't remember?
11    A. I don't remember what is the reason. She
12  resigned, I remember.
13    Q. Since her resignation in or about the fall
14  of 1989 from the Library of Congress have you had
15  communications with Ms. Von Muhlenbrock?
16    A. I remember very vaguely one day she
17  stopped by my office to say hello.
18    Q. Any other times?
19    A. No.
20    Q. When did she stop by your office to say
21  hello?

Page 45

1     A. I was already the law librarian. I think
2   it was the year after I became the law librarian or
3   something around that time.
4     Q. The mid-nineties?
5     A. Mid-nineties, in the nineties I think it
6   was. I'm not sure.
7     Q. How long was that meeting?
8     A. Say hello by the door.
9     Q. That was it?
10    A. Didn't come in.
11    Q. Any other communications with
12  Ms. Von Muhlenbrock since she left?
13    A. No, not that I can remember.
14    Q. No e-mails?
15    A. I don't recall receiving any e-mail or
16  responding to any e-mails.
17    Q. No letters?
18    A. I don't recall any letters.
19    Q. No phone calls?
20    A. Except hello, I don't recall, no.
21    Q. Have you ever been treated at all for any

Page 46

1  kind of memory problems as a neurological issue?
2    A.  Not yet.
3    Q.  Are you aware of any memory concerns that
4  you've had for yourself?
5    A.  I'm 78. That's all I can say. Whatever
6  happens at that age, maybe.
7    Q.  You haven't noticed a pattern of having
8  memory deficits over the past several years?
9    A.  Not yet.
10   Q.  Since the mid-nineties it's your testimony
11 that you've had no communication whatsoever with
12 Ms. Von Muhlenbrock until you greeted her this
13 morning?
14   A.  That is correct.
15   Q.  Do you recall shortly before that meeting
16 to say hello a communication with
17 Ms. Von Muhlenbrock concerning her interest in
18 returning to the Library of Congress?
19   A.  No.
20   Q.  You don't recall that?
21   A.  No.

Page 47

1    Q.  Between the time she resigned in 1989 and
2  today, this morning, is it your testimony that you
3  had one communication with Ms. Von Muhlenbrock which
4  was to say hello outside your office in --
5    A.  By the door of my office, yes.
6    Q.  Were there other communications?
7    A.  In person she came to visit, in person,
8  yes. It wasn't a visit but just to say hello.
9    Q.  Aside from that, though, you've had no --
10   A.  I don't recall. No communication that I
11 either initiated or received, no, not that I can
12 recall.
13   Q.  And you don't recall her expressing
14 interest in coming back to the Library of Congress
15 ever?
16   A.  I don't recall that.
17   Q.  What is your opinion about her returning
18 to the Library of Congress?
19   A.  Opinion?
20   Q.  Yes. Do you have an opinion about that?
21   A.  It's a good place to be in, I think.

Page 48

1    Q.  From the library's perspective, is that a
2  good thing that she wants to come back?
3    A.  It's hard for me to judge as to what is
4  for her. Is it good for her? Probably it is, yes.
5    Q.  Assuming it's good for her because she has
6  expressed an interest, as you know from the
7  litigation, to return, sir, but is it your
8  impression that that would be a good thing for the
9  library to have her come back?
10   A.  I cannot pass a judgment on that. Would
11 you hire her -- for instance, is that the question?
12 It's not the question. I say I have no answer to
13 that question.
14   Q.  Would you rehire her if given the
15 opportunity?
16   A.  Opportunity and given that we need someone
17 with her qualifications.
18   Q.  The answer is yes?
19   A.  Yes, if there is such a need and it's
20 defined with a position description.
21   Q.  You were at one point her supervisor?

Page 49

1    A.  Yes. There was a need at the time. She
2  fit the expectations. I hired her.
3    Q.  Given the opportunity, you would rehire
4  her again?
5    A.  I would.
6    Q.  Are you saying you don't remember a phone
7  conversation with Ms. Von Muhlenbrock?
8    A.  I don't remember.
9    Q.  Even if I were to put a timeline roughly
10 January of 1999?
11   A.  No.
12   Q.  You don't remember receiving any letters
13 from her?
14   A.  No, I don't.
15   Q.  Dr. Medina, I'm going to show you what's
16 been marked as exhibit number three and ask you to
17 review both pages because I'm probably going to
18 focus my attention on the second page more than the
19 first.
20       (Whereupon the proffered item was
21 marked as exhibit number 3.)

Page 62

1  Q. Do you have access to applications for
2  applicants?
3  A. No.
4  Q. Do you have access to their responses to
5  the KSA?
6  A. No.
7  Q. Are there ways that an LOC employee can
8  override an applicant's response? Do you know?
9  A. No, sir, I'm not aware of that.
10 Q. You are familiar with the KSA's, correct?
11 A. It's an acronym for something. K is
12 knowledge -- yes, I am familiar with that.
13 Q. There are a series of questions that are
14 given to applicants and those responses are
15 weighted?
16 A. By the system, yes. I wouldn't dare to
17 describe what the system is because it's very
18 complicated.
19    My assessment of it -- it's handled by the
20 Human Resources department. We are not part of
21 that.

Page 63

1  Q. Have you ever been to the file room at the
2  Library of Congress?
3  A. No, I've never been there.
4  Q. You know where it is, though, right?
5  A. No idea. I don't even know that it
6  exists.
7  Q. When you are given a vacancy announcement
8  such as the one that was part of this process -- I
9  might as well show it to you. This would be number
10 13.
11    I'm going to show you number four to your
12 deposition, exhibit number four.
13    (Whereupon the proffered item was
14    marked as exhibit number 4.)
15 BY MR. THALER:
16 Q. This is purportedly a vacancy announcement
17 request which is the name of it at the top.
18    Do you know this to be the vacancy
19 announcement that's the subject matter of this
20 lawsuit?
21 A. I cannot relate directly. There are many

Page 64

1  actions like this. This may be, yes.
2  Q. When you are given such a vacancy
3  announcement request, please describe the actions
4  that you would take when given such a request.
5  A. Attached to this comes the proposal for
6  posting. I review that and approve so that the
7  procedure could move on.
8  Q. You did approve this particular one,
9  correct?
10 A. Yes.
11 Q. On or about November 21, 2002?
12 A. November 21, 2002, correct.
13 Q. About how much time do you spend in your
14 review of this type of announcement request?
15 A. To read the posting and justification, 15
16 minutes, 20 minutes maximum.
17 Q. And it's your testimony, is it, that you
18 don't have any discussions with the people who
19 submit this to you for your review?
20 A. I don't recall any discussions about this
21 position.

Page 65

1  Q. How many times in the last 13 years in
2  which you've been reviewing these things have you
3  had -- are you okay?
4  A. A hundred employees. It's a lot. I can't
5  tell you a number.
6  Q. I think you were answering a question I
7  wasn't asking.
8  A. Sorry.
9  Q. I wanted to know how many times of the
10 hundreds, whatever the number is that you've had
11 requests, do you recall following up with
12 communications, oral communications or e-mails or
13 something, asking questions about the request?
14 A. I cannot mention the number. From time to
15 time there are some references to can we do this, do
16 we have funding, before they initiate the action.
17 Q. But subsequent to you getting this form,
18 approximately how many times would you say over the
19 last --
20 A. After I get the form there is no further
21 discussions. Either rejected or approved.

Page 66

1   Q. So your answer is "never"?
2   A. Never after.
3   Q. After you get the form such as we've
4   identified as number four --
5   A. I don't recall ever discussing any more.
6   Once it is approved, ready for action.
7   Q. I'm asking about prior to you actually
8   signing it saying I approve and after the time
9   someone hands it to you, have there ever been any
10  discussions?
11  A. No, none after that.
12  Q. Do you have any specific recollection
13  about the filling of this position that's identified
14  in exhibit four, about the process that was taken in
15  filling the position?
16  A. Would you repeat?
17  Q. Do you have any recollection about the
18  process that was taken in filling the position
19  identified in number four here?
20  A. I don't, no. What went on between this
21  and the actual recommendation, no.

Page 67

1   Q. Did it ever occur to you that this might
2   be a position that Gisela Von Muhlenbrock would be
3   appropriate for?
4   A. No, no one mentioned that.
5   Q. You say no one mentioned it but did it
6   occur to you was the question.
7   A. No.
8   Q. Sitting here today, would you say she
9   would be an appropriate person to fill that
10  position?
11  A. I don't remember the posting the way it
12  was, the content of the posting. The position
13  description is something that controls the -- it's
14  very generic. All right?
15      It's up to the selecting and recommending
16  officer to determine who is the best candidate.
17  Q. Is it your testimony you had no meetings
18  with anybody about filling this position that's
19  identified in that posting?
20  A. No, I don't recall having any such
21  meetings, no.

Page 68

1   Q. Do you specifically know that you didn't
2   have such meetings?
3   A. I cannot say specifically.
4   Q. You might have had meetings?
5   A. In this particular case I don't think I
6   had any meetings, no.
7   Q. Is there a director of legal research
8   named Mary something?
9   A. Is there a director?
10  Q. Of legal research whose first name is
11  Mary?
12  A. There was.
13  Q. What's her last name?
14  A. An acting director, Ms. Leverning, Mary
15  Leverning.
16  Q. What years was she there?
17  A. Five, six years ago, maybe.
18  Q. That's when she left?
19  A. She didn't leave. She was given as a
20  loan.
21  Q. She was loaned to the Library of Congress?

Page 69

1   A. She was transferred temporarily to us.
2   Q. Five or six years ago?
3   A. Yes.
4   Q. About 2001?
5   A. Thereabouts, yes. She is -- she was an
6   attorney in the copyright division in the Library of
7   Congress, temporary -- the correct term to designate
8   that is -- I don't remember.
9   Q. How long was she on loan to the Library of
10  Congress?
11  A. Approximately a year maybe.
12  Q. Did you have much interaction with
13  Ms. Leverning while she was on loan to the Library
14  of Congress?
15  A. Weekly meetings, updates, activities with
16  the rest of the directors.
17  Q. What would be the nature of those
18  meetings?
19  A. Updating of activities taking place in
20  every part of the department, updating me as to what
21  is the status of activities and projects.

Page 70

1  Q. Would it include hiring discussions?
2  A. It would include. Not discussions.
3  Telling me we are posting, we are interviewing, we
4  are hiring.
5  Q. So that this is another example of a
6  meeting in which people are talking but you don't
7  say anything to them?
8  A. Typically it's an update to me. I ask
9  questions and I receive information. I share
10 information with the director as to what
11 instructions I get from my boss, Librarian of
12 Congress.
13 Q. So I understand, you corrected me when I
14 said "discussions." You said it wasn't discussions.
15 A. No discussions. It is updated, what is
16 the action being taken, what is the status of
17 actions being taken. It's not a discussion of
18 happens in there and so forth, no. It's an update
19 session.
20 Q. How would you distinguish this update
21 session from a discussion, just so I understand the

Page 71

1  words that we're using here?
2  A. We have questions that go to the substance
3  of the action.
4    It would be more operational rather than
5  figures, how things are working. That would be a
6  discussion.
7    When there is a need for me to know more in
8  detail, it could happen sometimes.
9  Q. Do you happen to know? Was Ms. Leverning
10 still with the library at the time that exhibit
11 four, at the time that posting was made, do you know
12 if she was still the director of legal research?
13 A. I cannot recall that.
14 Q. She might have still been there?
15 A. There were three temporary directors
16 assigned to the law library and she was one of them.
17 Q. It's your testimony that you don't ever
18 have meetings with people to discussion needs to
19 hire employees? The only way you find out about
20 them is the request that comes on a piece of paper,
21 is that right?

Page 72

1  A. Not right. I have sessions, discussions
2  when I call one particular director on an issue that
3  I believe is an issue that requires my attention and
4  decision.
5    Those are specific sessions with directors.
6  The regular meeting weekly is updates.
7    MR. THALER: We'll take a five minute
8  break.
9    (Recess from 11:30 a.m. - 11:43 a.m.)
10 BY MR. THALER:
11 Q. Dr. Medina, I'm showing you what's been
12 marked as number five.
13   (Whereupon the proffered item was
14 marked as exhibit number 5.)
15 BY MR. THALER:
16 Q. Do you know what this is?
17 A. This is the position description.
18 Q. Did you have any role in assisting in the
19 preparation of this document?
20 A. Not at this level. HR, the system AVUE,
21 they are composed with the participation of HR and I

Page 73

1  believe there are other instruments that are used to
2  put the elements in here.
3  Q. So the answer is no?
4  A. No, I did not have a direct participation
5  in this, no.
6  Q. It's also true with the KSA's, you didn't
7  have any participation in the development of the
8  KSA's for this particular position?
9  A. No.
10 Q. How many lawsuits have you been involved
11 in as a party?
12 A. I don't think I've been party to any one.
13 The Librarian of Congress is normally the party to
14 it, so I am either witness or ADO, alleged
15 discriminating officer or something.
16 Q. How many actions have you been either a
17 witness or an ADO?
18 A. I mentioned three that I can remember.
19 Q. Any others?
20 A. Not that I can remember.
21 Q. Do you know who is responsible for

Page 74

1  determining which applicants would be selected for
2  an interview in the process of hiring someone at the
3  Library of Congress?
4     A. I think the system, AVUE, determines who
5  will be accepted as qualified applicants.
6     Q. Did you have any discussions with anyone
7  at the Library of Congress regarding which
8  applicants would be selected to be interviewed for
9  this position?
10    A. No, sir, I did not.
11    Q. Have you ever had such discussions?
12    A. As a law librarian I never have, no.
13    Q. Are you make mag distinction --
14    A. When I was a selecting and recommending
15 officer I would participate in that but not as a law
16 librarian.
17    Q. When you participated in that, would you
18 please describe for the record what the process is
19 in identifying who will be interviewed?
20    A. There is a pre-AVUE system where the
21 interviewing process -- we were trained to do that

Page 75

1  but it was less structured. Now the process is very
2  structured.
3     Q. What is your understanding of the process?
4     A. Now it's control, it's a controlled
5  process, it's a very standardized -- when I say
6  structured, it goes to the method. You are expected
7  to ask exactly the same question using the same
8  words to every applicant.
9     Q. You said that's since when?
10    A. AVUE, I don't know when they started, but
11 10, 15 years ago.
12    Q. Do you understand what the criteria is
13 used to determine which applicants will be
14 interviewed?
15    A. No, sir. That's previous to coming
16 to -- we get the applicants that have been selected
17 by the system.
18    Q. Do you recall having any communications
19 with the director of legal research regarding the
20 status of the hiring process for this position?
21    A. No.

Page 76

1     Q. Can you describe how the scores are
2  assigned for each applicant?
3     A. The system does, as far as I know. I
4  don't know.
5     Q. And you do not interview people for the
6  positions, is that correct?
7     A. Not for these. For those that are
8  reporting directly to my office.
9     Q. The seven or ten --
10    A. The seven or ten that I mentioned before.
11    Q. Do you know how many applicants are
12 selected for interviews?
13    A. No.
14    Q. How many would you expect there would be
15 for this type of position?
16    A. I have no idea. 40, 50, 30, I have no
17 idea.
18    Q. Those are a reasonable number for --
19    A. That's what I hear. We have no access to
20 the applications until they are interviewed.
21    Q. Do you know the name of the applicant who

Page 77

1  was hired for the position that's at issue here?
2     A. I do believe it is -- I'm not certain but
3  I do believe it is Mr. Guerra from Mexico, a Mexican
4  attorney from the United States.
5     Q. You approved of his hiring?
6     A. I approved the selection and
7  recommendation, yes.
8     Q. What was the basis for your approving his
9  hiring?
10    A. The justification, that is the selection
11 and the recommendation made by the selecting
12 officer.
13    Q. Did you review any of the supporting
14 documents submitted by the applicants themselves?
15    A. No. That's up to the selecting and
16 recommending officer.
17    Q. For instance, do you know whether or not
18 he's even a lawyer?
19    A. I do know that.
20    Q. How?
21    A. The statement made by the selecting

Page 86

1  A. Five or six years ago, maybe more, ten
2  maybe.
3  Q. Is that an Outlook program, do you know?
4  A. I don't know what it is. It's Group Wise.
5  Q. I take it those files are not deleted, are
6  they?
7  A. I don't know what the library does with
8  those.
9      MR. THALER: I'd like to get
10 production of the calendar that was in existence at
11 the time.
12     MR. JAMES: I can tell you it doesn't
13 exist. Every year the computer system deletes. It
14 does it automatically.
15     MS. DOUDS: For which years?
16     MR. THALER: The years that we're
17 talking about, 2001 --
18     MS. DOUDS: I know we don't have
19 them. I just called about something like this on
20 another case.
21     MR. JAMES: What happens is it cycles

Page 87

1  out every six months anyway and anything -- and the
2  system wasn't that sophisticated back when it first
3  started. It is not a good system. It doesn't
4  exist.
5      We have this question consistently and
6  it doesn't exist.
7  BY MR. THALER:
8  Q. What about your personal e-mails that you
9  get? You have a computer at your desk, right?
10 A. Yes, I do.
11 Q. You have an e-mail account that comes to
12 you?
13 A. I do.
14 Q. Do you participate in maintaining them?
15 A. No. It's ITS.
16 Q. The tech service people?
17 A. The Information Technology Services group.
18 Q. Would you have your calendar for two weeks
19 ago when you met with Mr. Clarke?
20 A. I would assume so.
21 Q. Is there a protocol once you are made

Page 88

1  aware of someone filing this type of action, are
2  there actions or steps that you take in your
3  capacity?
4  A. I haven't received any instructions to do
5  that, no. When I receive instructions, do this, do
6  that, then I do, but in this case, no.
7  Q. Have you reviewed yourself the library's
8  merit selection and promotion plan?
9  A. No, I have not.
10 Q. Ever?
11 A. May have read it.
12 Q. You may have read it but you don't
13 specifically remember?
14 A. I don't recall having studied it and to
15 tell you what it consists of.
16 Q. So you can't say one way or the other
17 sitting here today whether or not you've ever
18 reviewed it?
19 A. That's correct.
20 Q. Do you know what it is?
21 A. It's a policy statement, I believe. Merit

Page 89

1  selection, merit -- I'm not an expert in that field.
2  Q. Do you know whether or not there are any
3  responsibilities that you are supposed to have
4  pursuant to the terms of this merit selection and
5  promotion plan?
6      Do you know?
7  A. Only with respect to those that I am
8  directly responsible for in the sense of a matter in
9  which the procedure will be complied with to
10 recruit, examine, select and recommend.
11 Q. What are those?
12 A. Those are things -- the judgment is made
13 of the applicants that go through the interview as
14 to who is the best qualified to perform the duties
15 assigned.
16 Q. But you're saying that you are familiar
17 with that part of the merit selection and promotion
18 plan.
19 A. Yes.
20 Q. What is it?
21 A. I just mentioned. The interview is

Page 90

1  designed to find out whether the person has
2  indeed -- who is the best qualified among the
3  selected applicants to perform the duties assigned
4  in the description, best qualified.
5    Q. Are you able to articulate any of the
6  specifics that support your answer?
7    A. There is an interview guide that is used.
8  As I mentioned before, it's structured. You cannot
9  deviate from that. The scoring is what the officer
10 does.
11      Generally there is a panel at my level,
12 there is a panel that do proceed to assess the
13 performance of the applicant during the interview
14 and that is computed later on.
15   Q. You're saying that's identified in this
16 merit selection, promotion plan?
17   A. I'm not saying that is a specific part of
18 it but that's a procedure that we follow under the
19 assumption it is a merit selection rather than
20 subjective analysis.
21   Q. How can you know? You don't know what's

Page 91

1  in there, right?
2    A. I don't know.
3    Q. Because you've never read it, to your
4  recollection?
5    A. Never studied it. I may have read it,
6  like many things I read.
7    Q. You may have read it but you don't
8  specifically remember?
9    A. No, I didn't study it.
10   Q. You also testified, didn't you, that you
11 don't have a recollection of ever reading it?
12   A. Correct.
13   Q. Sitting here today have you ever seen
14 Ms. Von Muhlenbrock's application for this position?
15   A. I've never seen it.
16   Q. Have you ever seen any of the applications
17 for this position?
18   A. I have not seen any of the applications
19 for this position.
20   Q. Aside from when Mr. Guerra's name was
21 presented to you, were you ever told the names of

Page 92

1  any other individuals who had applied for the
2  position?
3    A. No, I didn't participate in the
4  interviews, never seen any -- I didn't see any
5  applications at all.
6    Q. Do you know which other Library of
7  Congress employees would personally know
8  Ms. Von Muhlenbrock, employees who were present at
9  the time that she was reapplying?
10   A. I have no idea, sir, no.
11   Q. Just so the record is clear, I think we
12 touched on this briefly but I want to make sure I
13 understand.
14      Has anyone involved in the hiring process
15 for this position ever said anything to you or said
16 anything in your presence about Ms. Von Muhlenbrock?
17   A. No.
18   Q. I'll just identify some of the names here
19 to make sure we're clear. Shroff?
20   A. No, I have not heard from him.
21   Q. Ayers?

Page 93

1    A. No.
2    Q. Hsia?
3    A. No.
4    Q. Levush?
5    A. No.
6    Q. Nichols?
7    A. No.
8    Q. Or the research director who I think you
9  identified?
10   A. Mary Leverning? If she was the one, no, I
11 have not.
12   Q. Do you ever meet with Mr. Billington?
13   A. Yes, I do.
14   Q. Do you discuss ongoing litigation with
15 him?
16   A. No.
17   Q. So he's never asked about this case?
18   A. He receives reports directly from OGC, I
19 think. Not in the executive committee meetings
20 which I'm a part of.
21   Q. Do you feel it's your responsibility to be

Page 94

1  fully aware and briefed about what's happening in
2  this case?
3  A. I don't think it is my responsibility. I
4  approve or disapprove, that's all I do.
5  Q. You clearly approve but I think you
6  testified you never disapproved, is that right?
7  A. Never had the chance to disapprove but I'm
8  empowered to and I would if I have to. Lack of
9  funding would be one instance.
10 Q. Did you participate in the EEO portion of
11 this case?
12 A. I don't think so, no.
13 Q. Did you ever meet with an investigator?
14 A. I don't recall, sir. Sorry, no.
15 Q. You know that the EEO portion of this was
16 just a few years ago. You don't remember meeting
17 with an investigator?
18 A. I just don't remember. No, I don't
19 remember. Investigator?
20 Q. Yes, sir.
21 A. I don't remember. Sorry.

Page 95

1  Q. Do you remember giving an affidavit in
2  that case, in the EEO portion of this case?
3  A. No, I don't recall. What year was that
4  again?
5  Q. Three years ago.
6  A. No, I don't recall. Sorry.
7  Q. Do you remember Mr. Paul Greenberg?
8  A. Paul Greenberg?
9  Q. Yes, sir.
10 A. No.
11     (Whereupon the proffered item was
12     marked as exhibit number 7.)
13 BY MR. THALER:
14 Q. Dr. Medina, I'm going to show you what's
15 been marked as number seven.
16    Does that help refresh your recollection
17 about Mr. Greenberg and whether or not you prepared
18 an affidavit in the EEOC part of
19 Ms. Von Muhlenbrock's claim?
20 A. My signature is here.
21 Q. That's your signature?

Page 96

1  A. Yes.
2  Q. Other than that, you have no recollection
3  of this document?
4  A. No recollection of this document.
5  Q. Do you know whether or not --
6  A. No.
7  Q. Do you know whether or not you read this
8  document prior to signing it?
9  A. I read it and didn't disagree with the
10 content to sign but recollection of it, no.
11 Q. You have no reason to doubt this is in
12 fact your signature?
13 A. No, no. This is my signature.
14 Q. Your signature is on the --
15 A. On the subsequent page as well. That is
16 my full signature. My initials are on the first
17 page.
18 Q. Have you ever read the complaint that was
19 filed in court in this case?
20 A. No, I don't recall having read it, a
21 complaint filed in court, no.

Page 97

1     MR. THALER: Let's take another
2  break. We're almost done.
3     (Recess from 12:15 p.m. - 12:23 p.m.)
4     MR. THALER: We have no further
5  questions. I thank you. Are you waiving or
6  reading?
7     MS. DOUDS: Reading.
8     MR. THALER: We're done.
9     (Deposition adjourned at 12:30 p.m.)