# EXHIBIT 16

# TRANSCRIPT OF PROCEEDINGS

1

2                        In the U.S. District Court
                         For the District of Columbia

3

-------------------------------x
4                                          :

Gisela Von Muhlenbrock            :

5                                          :

                    v.             : NO. 05-1921

6                                          :

James H. Billington,              :

7    Librarian of Congress         :

                                   :

8    -------------------------------x

9                        October 3, 2007

10   DEPOSITION OF:

11                        Kersi Shroff,

12   a witness, called by counsel pursuant to notice,
     commencing at 10:00 a.m., which was taken at Thaler,

13   Liebeler, 1825 Eye Street, NW, Washington, DC

14

15

16

17

**This transcript has been completely indexed for your
convenience. It will help you locate the testimony
you want FAST. The index is located in the back
pages of this volume.**

19

20

21                        **Overnite**

                         **Court Reporting Service**

Serving Washington, D.C. metro area                    (301) 593-0671

Page 18

1  protection.
2  A. Yes.
3  Q. When you brought the file to meet with the
4  lawyer, was it a full and complete copy made of your
5  file at any time, to your knowledge?
6  A. There wasn't any copy made.
7  MR. BRUMER: Objection.
8  MR. THALER: I want to make sure I
9  get a copy of that complete file.
10  BY MR. THALER:
11  Q. Just so that we're clear, there's no
12  communications between you and an attorney contained
13  in that file, right?
14  A. I don't know if the EEO investigator was
15  an attorney.
16  Q. I mean between you and an attorney
17  representing you.
18  A. No.
19  MR. THALER: Then the full contents
20  of that file I'd like to have.
21  BY MR. THALER:

Page 19

1  Q. So you reviewed that file, you reviewed
2  probably the complaint by plaintiff and you reviewed
3  the answers to interrogatories that were filed in
4  this case on behalf of the defendant?
5  A. Yes.
6  Q. With whom did you discuss your deposition
7  prior to coming to the deposition today?
8  A. With my attorneys.
9  Q. Who else?
10  A. I did not discuss the deposition itself
11  but I did mention that I was being deposed to my
12  current boss.
13  Q. Is this the same person you identified a
14  few minutes ago?
15  A. No, Mr. Sharp is no longer with us. I'm
16  referring to Dr. Reubens Medina.
17  Q. Who else?
18  A. None that I can recall.
19  Q. When was your discussion with -- it's
20  Dr. Medina, is that right?
21  A. Yes.

Page 20

1  Q. When was your discussion with Dr. Medina?
2  A. When we were first scheduled for the
3  deposition prior to this date, the original date of
4  the deposition, prior to that date I had mentioned
5  to him that I'm going to be tied up in the
6  preparation of the deposition and the deposition
7  itself.
8  Q. Tell me, if you would, anything else you
9  remember about the conversation.
10  A. Nothing of a specific nature.
11  Q. What about a general nature?
12  A. Well, "do what you have to do," that sort
13  of thing.
14  Q. That's what he said or what you said?
15  A. That's what he said.
16  Q. So Dr. Medina said "do what you need to
17  do," roughly?
18  A. Yes.
19  Q. What did that mean to you?
20  A. That meant to me that I could take the
21  time off. We had several projects. I had a couple

Page 21

1  of meetings that I had to miss and so forth. I was
2  just informing him that I was going to be tied up
3  with this matter and that's why I could not attend
4  to those.
5  Q. Did you have any discussions with
6  Dr. Medina about the substance of the lawsuit?
7  A. No, I did not.
8  Q. Did you discuss with Dr. Medina even the
9  identity of the plaintiff in this action?
10  A. Yes, I did.
11  Q. What did you say?
12  A. I said this is the matter involving
13  Gisela.
14  Q. What did he say?
15  A. He said "yes," acknowledging his knowledge
16  of it.
17  Q. Anything further?
18  A. Nothing further.
19  Q. You think that was roughly a month or so
20  ago?
21  A. Maybe less than that.

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 26

1    Q.  And you signed the certification, did you?
2    A.  I did.
3    Q.  That certification references only
4  interrogatory 1E.
5      Do you recall whether the information that
6  you assisted in providing for the responses to this
7  was limited to just that one?  Do you need to see
8  the answers?
9    A.  May I?
10   Q.  I'll show them to you.
11     (Pause)
12  BY MR. THALER:
13   Q.  Mr. Shroff, forgive me for asking.  Shall
14  I refer to you as Mr. Shroff or Dr. Shroff?
15   A.  Mr. Shroff.
16   Q.  Thank you.  Mr. Shroff, I'm going to show
17  you what's been marked as numbers 1 and 2.
18     (Whereupon the proffered item was
19     marked as exhibit number 1, 2.)
20  BY MR. THALER:
21   Q.  Can you identify what these are?

Page 27

1    A.  Exhibit number one relates to defendant's
2  response to plaintiff's first set of interrogatories
3  and second set of document requests to defendant in
4  the case of Gisela Von Muhlenbrock, plaintiff,
5  versus James Billington, defendant.
6    Q.  And number two?
7    A.  Number two is headed Certification and it
8  carries a statement that I made and which I signed
9  on September 26, 2007.
10   Q.  My question goes to the extent to which
11  you participated and provided responses to these
12  answers to interrogatories and whether you can now
13  confirm that what's contained in the answers to
14  interrogatories is consistent with your
15  recollection.
16   A.  In the certification I have stated that I
17  have reviewed the factual information contained in
18  defendant's responses to 1E or plaintiff's first set
19  of interrogatories and so forth and I certify that
20  the responses are true and correct.
21   Q.  I'm just wondering whether or not that was

Page 28

1  the full extent of your previous review of the
2  answers to interrogatories or whether you actually
3  did review all of them or some of them and at that
4  point confirmed that they were accurate?
5    A.  The portions that relate to my role in the
6  matter are the ones that I reviewed and I agreed to
7  certify.
8    Q.  As you sit here today, your recollection
9  is, and correct me if I'm wrong, that what appears
10  in the answers to interrogatories is consistent with
11  your understanding of the facts in this case?
12   A.  They are, yes.
13   Q.  Wherever your name appears you reviewed
14  those and confirmed that those were accurate?
15   A.  Yes.
16   Q.  When did you first come to know Gisela
17  Von Muhlenbrock?
18   A.  Whenever it is that she started working at
19  the library.  It must have been in the early
20  eighties, 1980s.
21   Q.  Were you co-workers at that point?

Page 29

1    A.  Yes.
2    Q.  What was your position and what was her
3  position at that time?
4    A.  My position was as a legal specialist and
5  I would believe that she had a similar position.
6    Q.  Were your offices close to each other,
7  your desks?
8    A.  Not particularly close.  They were at a
9  distance of -- there were about five offices between
10  us.
11   Q.  How often would you say you interacted
12  with the plaintiff at that time?
13   A.  I would see her on a regular basis.
14   Q.  Daily?
15   A.  No, not daily.  She worked in a different
16  division from mine.
17   Q.  Did you ever socialize?
18   A.  Yes, we did.
19   Q.  How often would that happen?
20   A.  We had the occasional lunch meetings.
21   Q.  Anything different than your interactions

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 34

1    A.  No, I did not.

2    Q.  Had you been aware of what she had been

3  doing for those several years already?

4    A.  No, I wasn't.

5    Q.  Do you, sitting here today, know what

6  happened to her in her life after she left the

7  Library of Congress?

8    A.  After she left the Library of Congress,

9  certainly, because I know she went back to Chile and

10  then after several years, maybe some time in the

11  early 1990's she may have come back and I recall

12  having a conversation with her about her experience

13  after leaving the library.

14    Q.  That's in the early 1990s?

15    A.  As best as I can recall.

16    Q.  There was a period of time when you didn't

17  hear or see her for many years until the late 1990s,

18  is that true?

19    A.  I believe that's true.

20    Q.  Are you aware of a previous complaint that

21  she filed with the EEOC against the library in the

Page 35

1  eighties?

2    A.  Yes.

3    Q.  What do you know about that?

4    A.  I believe that three or four of the female

5  employees had filed a discrimination complaint

6  against the law library and the plaintiff was one of

7  them.

8    Q.  How do you know about that complaint?

9    A.  Just through general office conversation.

10  I may even have discussed it with the plaintiff at

11  the time.

12    Q.  What do you know about the basis for the

13  complaint?

14    A.  I believe it was sexual discrimination.

15    Q.  Did you come to form an opinion about the

16  allegations in the complaint?

17    A.  No, I did not know the details of the

18  complaint.  I respected the plaintiff.  As far as I

19  know, she was a good worker.  In that sense I had an

20  opinion.

21    Q.  How was she regarded at the Library of

Page 36

1  Congress?

2    A.  Well, I would say.

3    Q.  Do you recall any negatives about her

4  during her employment at the Library of Congress?

5    A.  No, I do not.

6    Q.  Do you recall anyone at the Library of

7  Congress ever speaking negatively about her, the

8  plaintiff, during her tenure at the Library of

9  Congress?

10    A.  No, I don't.

11    Q.  Did you discuss the previous EEO complaint

12  with anyone other than I think you identified the

13  plaintiff, did you discuss it with anyone else?

14    A.  No, I did not.

15    Q.  Did you ever discuss it with Dr. Medina?

16    A.  No, I did not.

17    Q.  What do you remember about your discussion

18  with the plaintiff about that prior case?

19    A.  That there was some difference in

20  treatment of the female employees from the rest of

21  the specialists and that they grieved that.

Page 37

1    Q.  Do you know the outcome of that matter?

2    A.  I believe it was settled in some fashion.

3    Q.  Did you hear the terms of the settlement?

4    A.  No, I did not.

5    Q.  Were there discussions about the matter in

6  the office aside from this discussion that you've

7  already identified with the plaintiff?

8    A.  Not that I recall.

9    Q.  When you said general office conversation

10  about how you knew about the matter, this previous

11  EEO matter, what were you referring to?

12    A.  Maybe one of the other plaintiffs.  There

13  were two other women.

14    Q.  What do you mean "maybe one of the other

15  plaintiffs"?

16    A.  I may have heard about the matter from one

17  of the other plaintiffs.

18    Q.  So you spoke about the matter with one of

19  the other plaintiffs as well?

20    A.  Or she may have spoken to me about it,

21  yes.

KERSI SHROFF DEPOSITION    October 3, 2007    VonMuhlenbrock v. Billington

Page 42

1  Hispanic law division who were not specialists so
2  I'm not including them.
3      Q.  How about today?
4      A.  There is no Hispanic Law Division any
5  more.
6      Q.  When was that done away with, the Hispanic
7  Law Division?
8      A.  The five divisions were done away with in
9  the early 1990s, about 1992, 1993.
10     Q.  What was substituted?
11     A.  In place of the five divisions, two new
12  divisions were created, the Eastern Law Division
13  which incorporated the staff from the Hispanic Law
14  Division, the Near Eastern and African Law Division
15  and the Far Eastern Law Division.
16     Q.  What was the other one?
17     A.  The Western Law Division. I'm sorry, the
18  Hispanic Law Division was not merged into the
19  Eastern Law Division. The Hispanic Law Division was
20  merged into the Western Law Division. I beg your
21  pardon.

Page 43

1      Q.  What other divisions were merged into the
2  Western Law Division?
3      A.  European Law Division, American-British
4  Law Division, my division, and the Hispanic Law
5  Division.
6      Q.  Is that still the case today?
7      A.  There are two divisions, directorate of
8  legal research which was created at the same time,
9  that's right.
10     Q.  And contained within each division how
11  many law specialists are there?
12     A.  Presently in the Western Law Division we
13  have a staff of ten foreign law specialists, as we
14  call them now, and one specialist who works on a
15  contract basis as and when the work requires it.
16     Q.  How about the Eastern Law Division?
17     A.  I'd have to look at a list but I think
18  they have about eight or nine specialists. They've
19  just hired two people so I don't have the up to date
20  count. That's not my division.
21     Q.  The size of the different offices, when

Page 44

1  you look at them either separately or combined,
2  they've remained roughly the same through the years,
3  is that true?
4      In other words, today the Western Law
5  Division comprising three previous divisions totals
6  roughly the same number of law specialists if you
7  had added them up previously?
8      A.  Roughly. I think there's been an addition
9  there. The Western Law Division we've added, and
10  even in the Eastern Law Division, we've added extra
11  positions.
12     In the Western Law Division we've added a
13  Brazilian law specialist. That division did not
14  exist in the Spanish Law Division. In the Eastern
15  Law Division we've added an Australian law
16  specialist and that position was not a position by
17  itself previously.
18     Q.  You are aware, are you not, that there was
19  also a previous lawsuit brought by the plaintiff
20  here?
21     A.  Which previous lawsuit are we talking

Page 45

1  about?
2      Q.  Are you aware of any previous lawsuit?
3      A.  Well, I thought we discussed the issue of
4  the plaintiff's sex discrimination complaint.
5      Q.  Your understanding is that's what took
6  place in the eighties and you gave me all your
7  testimony about that already?
8      A.  That's right.
9      Q.  Your testimony is that you never formed an
10  opinion about the validity of the claims brought?
11     A.  I had no basis for forming any opinion
12  about that.
13     Q.  Were you aware of any other opinions
14  expressed by other employees at the Library of
15  Congress about the allegations brought in those
16  claims?
17     A.  No.
18     Q.  Did you ever discuss with
19  Ms. Von Muhlenbrock the allegations that were
20  previously brought?
21     MR. BRUMER:  Objection.

**KERSI SHROFF DEPOSITION**     October 3, 2007     **VonMuhlenbrock v. Billington**

Page 54

1  of the personnel.
2      Q.  Different personnel would be in those
3  spots?
4      **A.  Yes.**
5      Q.  Roughly when was this policy put into
6  place?
7      **A.  Which policy?**
8      Q.  To maintain FTE's at a certain level.
9      **A.  I cannot pinpoint a period of time but**
10  **that's been sort of emphasized over the years.**
11      Q.  You've been there for how many years?
12      **A.  I have been employed at the Library of**
13  **Congress for 31 years, 30 plus years.**
14      Q.  Do you know that to be the policy
15  throughout your tenure?
16      **A.  No, I don't.**
17      Q.  I'm trying to think of another way to help
18  jog your memory as to when the policy was put into
19  place.
20          Any ballpark estimate of when this policy
21  became policy of the law library?

Page 55

1      **A.  I would say the nineties after Dr. Medina**
2  **became law librarian and once he had the time to**
3  **reorganize the five divisions into two and create a**
4  **directorate of legal research and a directorate of**
5  **library services which is the library part of it and**
6  **once that was done, then gradually over that period**
7  **of time since then, the policy of going to Congress**
8  **and saying we need these FTE's for the kind of**
9  **service that we provide.**
10      Q.  You've identified several foreign law
11  specialists within the Spanish Law Division and it's
12  been roughly the same through the years.  How many
13  other employees would be part of the Hispanic Law
14  Division during the nineties?
15      **A.  I would say about three or four on a**
16  **fluctuating basis.**
17      Q.  Do you recall whether employees were hired
18  for the Hispanic Law Division in the nineties?
19      **A.  Yes, there were.**
20      Q.  And they posted the available positions
21  for that position in the nineties?

Page 56

1      **A.  I have no knowledge of that.**
2      Q.  After Ms. Von Muhlenbrock departed from
3  the Library of Congress you were never made aware by
4  anyone else at the Library of Congress that she was
5  seeking reemployment at the Library of Congress?
6      **A.  No, I was not.**
7      Q.  What role do you generally take in the
8  employee hiring processes at the Library of
9  Congress?
10      **A.  Well, in 2000 when I became chief of the**
11  **Western Law Division the hiring of staff in the**
12  **division became one of my responsibilities.**
13      Q.  Is that for all staff or just parts of the
14  staff?
15      **A.  That would be all staff for the Western**
16  **Law Division.**
17      Q.  The Western Law Division?
18      **A.  Right.**
19      Q.  Is that part of your job description?
20      **A.  Yes, I believe it is.**
21      Q.  You're aware of the position that this

Page 57

1  lawsuit concerns, the job vacancy announcement known
2  as 020307, you're aware of that?
3      **A.  I'm aware of the position.  I'd have to**
4  **refresh my memory as to the number that you recited.**
5      Q.  And you took part in filling that
6  position, did you?
7      **A.  I did.**
8      Q.  How much of the development of the
9  description of the vacancy did you contribute?
10      **A.  What we do is form a panel for each**
11  **vacancy that we propose to announce, a panel of**
12  **three subject matter experts as we call them.  I was**
13  **one of the three.**
14      Q.  Did you select the other two members of
15  the panel?
16      **A.  I think we sort of left it by tradition**
17  **that the two members would be the chiefs of each of**
18  **the two divisions and then the division, other than**
19  **the one that was hiring, would select the subject**
20  **matter expert for the particular position, for the**
21  **third panel member.**

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 58

1    Q.   Specifically with regard to this vacancy,
2    do you remember who was involved, the names of the
3    people involved on the panel?
4    **A.   Yes, Dr. Tao-Tai Hsia, Ms. Ruth Levush.**
5    Q.   What other people were involved in the
6    hiring process for this vacancy?
7         MR. BRUMER: Objection, assumes facts
8    not in evidence.
9         THE WITNESS: In developing the
10   vacancy I had to work with my then bosses, the
11   director of legal research, so that would be one.
12   BY MR. THALER:
13   Q.   Please use names at this point.
14   **A.   I cannot recall names because we've had**
15   **five or six directors of legal research during the**
16   **years.**
17   Q.   So you worked with the director of legal
18   research and who else?
19   **A.   In developing the position.  Then**
20   **administrative assistant to help with the background**
21   **paperwork for the development.**

Page 59

1    Q.   Who would that have been?
2    **A.   Again, there could be more than one name**
3    **for that.**
4    Q.   Anyone else?
5    **A.   At a certain point after the position**
6    **description is developed and the vacancy is ready to**
7    **be announced we would have involvement with our**
8    **Human Resources.**
9    Q.   What person in particular would have been
10   involved from Human Resources?
11   **A.   There could be several but in this**
12   **instance it ended up with a staffing specialist in**
13   **HR by the name of Billie Nichols.**
14   Q.   Who else was involved?  These are people
15   involved in the hiring process for this vacancy.
16   **A.   These are people in HR.  I wouldn't even**
17   **know their names.**
18   Q.   We're still with the list.  We've
19   identified the director of legal research, the
20   administrative assistant and Billie Nichols.  Were
21   there any others?

Page 60

1    **A.   The two panelists, we mentioned that.**
2    **None other than that, no, that I can recall.**
3    Q.   Dr. Medina?
4    **A.   Dr. Medina would be the final signing off**
5    **authority.**
6         **Once we developed a position description**
7    **between myself and the director of legal research,**
8    **the document went to him for final sign-off.**
9    Q.   So Dr. Medina would have to sign off
10   before it goes to Billie Nichols, is that right?
11   **A.   Before the position description is**
12   **accepted for whatever formal purposes that we have,**
13   **yes.**
14   Q.   Did you have conversation with Dr. Medina
15   about this position?
16   **A.   No, I did not have any specific**
17   **conversation about this position.**
18   Q.   Do you remember having e-mails between you
19   and Dr. Medina about the position?
20   **A.   No, I do not.  I did not communicate with**
21   **Dr. Medina by e-mail.**

Page 61

1    Q.   Were there any questions that he posed
2    concerning the position when the form was -- was a
3    form submitted to him that he needed to sign?
4    **A.   It was, yes.**
5    Q.   When that was submitted to Dr. Medina,
6    were there any questions at all posed by him?
7    **A.   Not that I recall, not to me, because as I**
8    **said, I would be reporting to the director of legal**
9    **research and the director would be dealing with**
10   **Dr. Medina.**
11   Q.   You were a level removed?
12   **A.   I was a level removed.**
13   Q.   Dr. Medina, if he had any questions, he
14   would have directed them to the director of legal
15   research?
16   **A.   Correct.**
17   Q.   This person, we don't know who it was in
18   the timeframe?
19   **A.   I would have to refresh my memory as to**
20   **the various appointments that we've had.  There were**
21   **three people who worked in acting positions at**

**KERSI SHROFF DEPOSITION**       October 3, 2007        VonMuhlenbrock v. Billington

Page 62

1   various periods of time until Mr. Sharp was
2   eventually appointed as a permanent director.
3      Q. Who was the selecting official for the
4   position?
5      A. The specific position that we're talking
6   about?
7      Q. Yes.
8      A. I was the selecting official.
9      Q. What responsibilities does the selecting
10  official have at the Library of Congress in filling
11  a vacancy?
12     A. Various responsibilities relating to equal
13  opportunity and to observe the processes of the
14  library and the Library of Congress as a whole, to
15  make the process as fair, open, transparent as
16  possible so that all qualified persons would be
17  encouraged to apply and to be considered for the
18  position.
19     Q. Any other responsibilities the selecting
20  official has?
21     A. The responsibilities of the selecting

Page 63

1   official would be to be part of the panel, to see
2   that the proceedings, the questions, the structured
3   interview process that was in place were observed
4   and to, after the interview process was over, to
5   deliberate with the panel in order to get a
6   consensus on the candidate to be appointed to the
7   position.
8      Q. Any other responsibilities the selecting
9   official has?
10     A. I think I've given you the totality of it.
11     Q. What EEO responsibilities are you
12  referring to when you said that you have EEO
13  responsibilities, equal employment opportunity --
14     A. Meaning that this process was put into
15  place as a result of a class action brought by some
16  employees of the Library of Congress and as part of
17  the -- I believe there was a consent decree in the
18  case.
19        The library had set in motion a new
20  transparent process for the hiring of employees.
21     Q. What is your understanding about that new

Page 64

1   transparent process? What does that mean?
2      A. That means that it was done on an
3   objective basis where any individual opinions or any
4   individual interference would not occur.
5      Q. How is that ensured?
6      A. I believe it's ensured through the
7   application process which is on line, the handling
8   of the on line applications by HR, which are not
9   notified to the hiring agency and protective
10  measures like that.
11     Q. But for what you've called new transparent
12  process, if you had been given the opportunity,
13  would the plaintiff in this action have been a good
14  selection for this job vacancy, in your opinion?
15        MR. BRUMER: Objection as to form.
16  BY MR. THALER:
17     Q. Please answer.
18        MR. BRUMER: You can answer.
19        THE WITNESS: I'm sorry, that is a
20  hypothetical.
21        I certainly would have looked at the

Page 65

1   applicants, including the plaintiff, from the
2   perspective of what they would bring to the
3   position.
4         Yes, I certainly would have looked at
5   it.
6   BY MR. THALER:
7      Q. Knowing what you know today, would you
8   have chosen, given the opportunity, the plaintiff
9   here today, Ms. Von Muhlenbrock, or the person who
10  did fill the position, in your opinion?
11     A. Well, Ms. Von Muhlenbrock was not a part
12  of the persons that we interviewed so I cannot make
13  that comparison.
14     Q. But you know her. You've testified about
15  your opinion about her as an employee and you know
16  the person who filled the position, right?
17     A. I would make the decision on the basis of
18  the resumes that I see, the current information that
19  I'm supplied with, the interview that I've
20  conducted.
21        So on that basis I cannot make the

Page 70

BY MR. THALER:

1
2    Q.  What is your answer?
3    A.  I have no basis for knowing how a person
4    whose resume and application I do not have would
5    perform in a position as compared to somebody who
6    has the most up to date information as to
7    qualifications and experience.
8        You are asking me now a hypothetical because
9    I spoke of the -- of Ms. Von Muhlenbrock as an
10   employee going back to the late nineties.
11       We're talking about a decision made in 2003,
12   a gap of 13 years, and in order for me to make that
13   assumption I would have to have the up to date
14   information about the person who is applying.
15   Q.  You have no reason to believe sitting here
16   today that she would not have performed well in that
17   position, do you?
18   A.  I have no reason to believe that.
19       MR. THALER:  Let's take about a five
20   minute break.
21       (Recess from 11:22 a.m. - 11:32 a.m.)

Page 71

BY MR. THALER:

1
2    Q.  The vacancy that was being filled, was
3    that a new position or was the Library of Congress
4    replacing an employee who had previously held the
5    position?
6    A.  It was a new position that was created.
7    Q.  Why was it created, do you recall?
8    A.  After I became chief of the division I
9    made an assessment of the jurisdictions that were in
10   demand from Congress and from the agencies and on
11   the basis of the staff that were handling those
12   countries at that time we thought the addition of a
13   third person would be beneficial for the work flow.
14   Q.  You testified earlier the process in
15   developing the description of the job was formulated
16   and then the form was submitted to Dr. Medina.
17       My recollection of your testimony was that
18   you didn't have any actual communication with
19   Dr. Medina once that was submitted to him.
20   A.  That's right.
21   Q.  Is it fair to say that in your opinion he

Page 72

1    had no input in the development of that position,
2    job description?
3    A.  As we progressively discussed the need for
4    another position in the area there were discussions
5    with the director of legal research, and through the
6    director of legal research mostly, with Dr. Medina.
7    His input was received at that earlier stage of
8    formulation of the position.
9    Q.  You did say that.  You are not aware
10   because this was a step removed from where you were
11   in --
12   A.  That's right.
13   Q.  Your understanding is that there was some
14   contribution but you just don't know what it was
15   from Dr. Medina in developing the position?
16   A.  Contribution to the extent of what
17   jurisdictions needed extra assistance.
18   Q.  In your testimony concerning Dr. Medina's
19   role in developing the job description do you
20   specifically know with regard to this particular job
21   that he had such input or are you just basing this

Page 73

1    answer on your general understanding as to how
2    things worked?
3        MR. BRUMER:  Objection, vague,
4    confusing.
5        You can answer if you understand.
6        THE WITNESS:  Prior to this
7    particular position being developed there were
8    discussions as to the need of it and that's where
9    the input from both the director and the law
10   librarian would have to come in.
11   BY MR. THALER:
12   Q.  That's the crux of my question.  You say
13   it would have come in.
14       I'm trying to figure out if you know in this
15   particular situation that Dr. Medina did in fact
16   have that contribution.
17   A.  I do know that he had that contribution.
18   Q.  How do you know that?
19   A.  His emphasis on assistance being required
20   for the positions that were in high demand from
21   Congress.

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 74

1    Q.  And he said that -- did he say that to you
2  or was this in an e-mail or a memo or how was this
3  expression of that position made known to you?
4    A.  In general discussions.
5    Q.  That you had with Dr. Medina?
6    A.  And then through the director.
7    Q.  Roughly how many discussions did you have
8  with Dr. Medina about this position, the need for
9  the position?
10    A.  It's very difficult to recall.  I would
11  guess maybe no more than two to three.
12    Q.  Who else would have been involved in those
13  two or three discussions that you had with
14  Dr. Medina concerning the position?
15    A.  The director of legal research.
16    Q.  Anyone else?
17    A.  At that time the person who occupied the
18  position of work force development.
19    Q.  Can you tell me what that position means?
20  What does that mean, work force development?  Is
21  that an HR type position?

Page 75

1    A.  It is an HR type position but the position
2  was not in our overall HR headquarters upstairs but
3  in the law library itself.
4    Q.  So this was a law library position called
5  work force development?
6    A.  I'm not sure that that's the exact
7  description, title, the -- exact title, but that's
8  the description.
9    Q.  Do you recall the name of that person, who
10  that person was at the time?
11    A.  I believe it was a person by the name of
12  Lana Turner.
13    Q.  The movie star, Lana Turner, she changed
14  careers?
15    A.  We would have loved to have had her.
16    Q.  So Lana Turner is involved as --
17    A.  I'm sorry.  Lana Turner is not right.
18  It's Lana but the last name I do not recall.
19    Q.  At the time when you had these two or
20  three discussions with Dr. Medina about this
21  position the director of legal research who was also

Page 76

1  there was who?
2    A.  As I said, there have been so many people
3  in acting positions -- to the best of my knowledge,
4  that could have been a Mary -- the last name escapes
5  me at the moment.  Mary Leverning.
6    Q.  As best as you can recall, how would you
7  describe the position that was being filled?
8    A.  The position being filled was for an extra
9  specialist to cover Latin American countries,
10  particularly Mexico, Colombia and also to have some
11  extra assistance on countries in Latin America that
12  have a Portuguese language base.
13    Q.  Which countries would those be?
14    A.  Mainly Brazil.
15    Q.  Anything else you can recall about the
16  position description?
17    A.  Latin American specialist is how I think
18  of it and looked at it.
19    Q.  Do you recall the background of
20  Mr. Guerra?
21    A.  Mr. Guerra is qualified in Mexico and he

Page 77

1  has an LLM from Georgetown here in Washington.
2    Q.  What did you mean when you said he was
3  qualified in Mexico?
4    A.  He had a law degree from the University of
5  Mexico.
6    Q.  Do you know which university?
7    A.  The name Sonora sticks in my mind but I'm
8  not completely sure.
9    Q.  Were his references checked?
10    A.  Yes, his references were checked.
11    Q.  By whom?
12    A.  I made the checks myself.
13    Q.  How do you remember doing that?
14    A.  Because after the interview process is
15  over and there's a consensus as to who to appoint to
16  the position, the list of references are provided to
17  the selecting official and prior to the final
18  decision being made, the references are called up
19  for information about the candidate.
20    Q.  And you recall making those calls?
21    A.  I do recall making those calls.

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 78

1    Q. And you took notes of those calls?

2    A. I believe there's a form that needs to be

3    filled out for that purpose.

4    Q. And you filled out that form?

5    A. I believe I did.

6    Q. And that form is part of the record?

7    A. I do not know that. That form is not with

8    me.

9    Q. Do you recall getting through to each of

10    the references identified by Mr. Guerra?

11    A. Yes, I recall getting through.

12    It sticks in my mind because one or two of

13    the references in Mexico were difficult to get and

14    so I had managed to get them after some repeated

15    attempts.

16    Q. So you recall there being a difficulty but

17    then ultimately you were able to get through?

18    A. Ultimately I was able to get that his

19    credentials were as stated on his paper and he came

20    highly recommended by the references, by the

21    referees.

Page 79

1    There was a third reference here at

2    Georgetown as well.

3    Q. Why do you have independent recollection

4    of that? I'm curious.

5    A. Because of the way in which I had to track

6    down the references.

7    I remember having had to call Mexico several

8    times. I ended up making the more convenient call

9    first, a local call here.

10    Q. Do you remember who that call was with?

11    A. No, I don't recall now.

12    Q. Did anyone verify the accuracy of the

13    representations made in his application?

14    MR. BRUMER: Objection, asked and

15    answered.

16    MR. THALER: I asked about

17    references.

18    MR. BRUMER: Could you repeat the

19    question?

20    BY MR. THALER:

21    Q. Did anyone verify the accuracy of the

Page 80

1    representations, the statements made in his

2    application?

3    MR. BRUMER: Asked and answered, but

4    you can answer again.

5    THE WITNESS: I would recall that,

6    let's say with the Georgetown professor, I would

7    have asked did you work with Mr. Guerra or did

8    Mr. Guerra work with you, and so that to me would

9    have been verification.

10    And with the Mexican referees, I

11    believe one or both of them were judges and I asked

12    the question what do you think of his work based on

13    the assistance he had provided to the judges during

14    his professional career in Mexico.

15    BY MR. THALER:

16    Q. And his bar membership was confirmed, was

17    it?

18    A. We did not take any independent steps to

19    confirm that but I believe that we had a copy on the

20    record that had been filed.

21    Q. What is your recollection of the

Page 81

1    discussions you had concerning the interview

2    process, meaning the discussions that took

3    place -- you spoke with Billie Nichols about the

4    interview process when it came time to interview the

5    applicants, did you?

6    MR. BRUMER: Objection, compound and

7    confusing question, but you can answer if you

8    understand.

9    BY MR. THALER:

10    Q. Did you have discussions with Billie

11    Nichols about the interview process for this job

12    vacancy?

13    A. Yes, I had contact with Billie Nichols.

14    She was the point person in Human Resources

15    for this vacancy announcement.

16    So as and when the vacancy closed, she would

17    have come back to us as the panel to tell us how

18    many applicants had successfully made it through the

19    application process and then asking us as to how

20    many applicants would you, out of those that have

21    successfully completed the process, would the panel

**KERSI SHROFF DEPOSITION**　　　　October 3, 2007　　　VonMuhlenbrock v. Billington

Page 82

1　want to interview.
2　　　I would have gone back to the panel and said
3　this is the breakdown.  She would have provided us
4　with a score showing the number of the applicants
5　who had scored at certain rates.
6　　　So the panel was made aware that X number of
7　applicants had qualified and that a certain number
8　were at this 100 percent rate, 98 percent,
9　97 percent ranking.
10　　　And on the basis of that information the
11　panel decided in its wisdom let's see the top ten
12　candidates, widen the pool.  We were not required to
13　do so but we wanted to see the top ten candidates,
14　to interview them.
15　　Q.  What is the standard number of candidates
16　who are interviewed pursuant to the policies and
17　procedures at the Library of Congress, to your
18　knowledge?
19　　A.  I believe the standard number is seven.
20　　Q.  Seven being the standard, with ties,
21　correct?  In other words, the top seven candidates

Page 83

1　and then whoever is tied with the 7th, is that
2　right?  Is that your understanding?
3　　A.  No, that's not my understanding.  I meant
4　top seven candidates.
5　　Q.  How many times have you gone through this
6　process at the Library of Congress of filling a job
7　vacancy?
8　　A.  This was the first position and subsequent
9　to that I have filled two more positions.
10　　Q.  As part of your participation did you
11　review the policies and procedures of the Library of
12　Congress in filling positions?
13　　A.  Yes, we have guidelines provided to us on
14　that.
15　　Q.  And you did so on this occasion for this
16　job vacancy that we're talking about?
17　　A.  Yes.
18　　Q.  It's your understanding that it's the top
19　seven without ties?
20　　A.  I don't even believe it's the top seven.
21　I think -- the number that stays in my mind, it's

Page 84

1　seven candidates, seven candidates to be
2　interviewed, successful candidates.
3　　Q.  If that's your understanding, why do
4　something different in this case?
5　　　MR. BRUMER:  Objection, compound
6　question, but you can answer, if that's your
7　understanding.
8　　　THE WITNESS:  We wanted to broaden
9　the pool of talent that we wanted to see for the
10　position.
11　BY MR. THALER:
12　　Q.  Why?
13　　A.  When we looked at the breakdown of the
14　scores, the candidates were in the 100th percentile,
15　the 99th percentile and the 98th percentile, they
16　seemed to be the type of people we wanted to
17　interview and there happened to be ten candidates, I
18　believe, who scored at that level.
19　　Q.  What was it in your mind that made it
20　significant that they had those particular scores?
21　　A.  I'm sorry, I don't understand the

Page 85

1　question.
2　　Q.  You said the scores 100, 99, 98 were the
3　types of candidates that you wanted to interview.
4　Correct me if I'm wrong, but I think that's what you
5　said.
6　　A.  Yes, because they were the top candidates.
7　　Q.  So my question is what is it about those
8　scores of 100, 99, 98 that distinguishes them from,
9　say, a 97?
10　　A.  Three percentages more than 97.
11　　Q.  And 99 is one percentage more than 98, so
12　why not stop at 99, why go to 98?
13　　A.  As I said, we wanted to broaden the pool,
14　see what talent was out there for this position and
15　I believe at the 98 percent there was a nice break
16　there because if he had gone above 98 it would have
17　meant seeing, I believe, more candidates.
18　　　It was not just one person who scored at
19　that level.  There were I think three or four or
20　five or whatever.
21　　　So seeing that there were ten candidates who

Page 86

1    had scored in the top three percent, we decided that
2    that would be a nice break.
3        Q.  I'm going to show you what's been marked
4    as number four.
5            (Whereupon the proffered item was
6        marked as exhibit number 4.)
7    BY MR. THALER:
8        Q.  Is this the sheet which you were basing
9    these decisions you've just testified about?
10       A.  This seems to be the attachment to the
11   e-mail that I received from Ms. Nichols.
12       Q.  But this is the breakdown that you're
13   making your decision about who to invite to
14   interview or was there something else?
15       A.  No, this would be the breakdown on which
16   we made the decision to invite ten candidates.
17       Q.  So your testimony was that you invited
18   100, 99 and 98?
19       A.  I'm sorry.  I obviously meant 100 to 97.
20   97 upwards.
21       Q.  So if the general policies and procedures

Page 87

1    of the Library of Congress that had been established
2    prior to this job vacancy are to include the top
3    seven, and pursuant to your testimony I'm going to
4    show it to you in a second because I think it
5    was -- well, let's assume it's top seven.  What's
6    the magic -- I'm trying to understand what in your
7    mind and the rest of the panel's mind was
8    significant about going beyond what had already been
9    established as the appropriate number of
10   interviewees, in this case seven would have been
11   through 98, correct?
12           MR. BRUMER:  Objection.  That's
13   vague, confusing and compound.
14   BY MR. THALER:
15       Q.  You agree with me looking at this exhibit
16   in front of you right now, sir, that the scores
17   through a score of 98 gets you eight candidates, is
18   that right?
19       A.  That's right.
20       Q.  I'm trying to understand the significance
21   in your mind and the rest of the panel's minds of

Page 88

1    going beyond that.
2            If eight satisfies the policies and
3    procedures and it takes you for the first three
4    scores which a few minutes ago you thought those
5    were the right ones and now it seems it's 97 which
6    is the correct score, what is the significance
7    between these numbers to you?
8            MR. BRUMER:  Objection, misstating
9    prior testimony and it's argumentative, but go ahead
10   and answer.
11           THE WITNESS:  The policy of the
12   library doesn't confine us to that.  That is a
13   minimum number, I understand, but it doesn't stop us
14   from interviewing more than the minimum number.
15           Based on that and based on our
16   appraisal at that time of the breakdown, to the best
17   of my knowledge looking at it again, the 97 percent
18   seemed to provide a convenient break for us, because
19   you'll see if you go up to 96 there would be five
20   more candidates to interview.
21           At the 97 percentile we reached the

Page 89

1    number ten, giving us a more than adequate pool of
2    talent to interview for the position.
3            In the wisdom of the panelists, number
4    ten being a very convenient number, also being in
5    conformance with the break that I mentioned that if
6    you take it one percent more you would end up with
7    five more candidates, to the best of my recollection
8    that was the wisdom that we employed in picking the
9    ten candidates.
10   BY MR. THALER:
11       Q.  What was the important dividing line at
12   this point in the mind of the committee?  Was it the
13   score of -- now it's 97, or the fact that you ended
14   up with ten interviewees?  Which was the more
15   important part?
16       A.  The score and the number, both, the score
17   meaning capturing the top, the candidates who had
18   ranked at the top, plus making a convenient point
19   for us to draw a line so that we saw a rich pool of
20   interviewees.
21       Q.  Do you think that the normal course, in

**KERSI SHROFF DEPOSITION**        October 3, 2007        VonMuhlenbrock v. Billington

Page 90

1  the normal course of events at the Library of
2  Congress that there's an insufficient pool of
3  interviewees at the number seven?
4      **A.  I do not know that.**
5      Q.  Have you always gone beyond the number
6  seven when you've participated in these vacancies?
7      **A.  I cannot recall at the moment.**
8      Q.  Had the top ten people been as low as,
9  say, 94 -- I'm just picking an arbitrary number --
10     **A.  I do not recall.**
11     Q.  I'm saying if the top ten would have
12 driven it all the way down to, say, 94, would you
13 have cut it off at a higher number and seen fewer
14 interviewees?
15          MR. BRUMER:  Objection, speculative.
16 You can answer.
17          THE WITNESS:  That would be
18 speculation on my part.  I would generally in my
19 mind say we wanted to see the top five percent of
20 the candidates if people have scored at that level.
21 That's in my mind.

Page 91

1  BY MR. THALER:
2      Q.  In your mind the top five percent is the
3  magic number?
4      **A.  Yes.**
5      Q.  If this chart was incorrect in terms of
6  the number of people who scored at a certain score,
7  would that have impacted your decision or you still
8  would have wanted the top five percent?
9          MR. BRUMER:  Objection.
10 BY MR. THALER:
11     Q.  What's the more important consideration
12 there?
13     **A.  The important consideration is to see the
14 best talent available at a certain convenient
15 number.**
16     Q.  Do you know this chart to be accurate?  Do
17 you believe it's accurate?
18     **A.  I believe it is, to the best of my
19 knowledge.**
20     Q.  Did you check it against anything else
21 subsequently?

Page 92

1      **A.  No, I did not.**
2      Q.  I'm going to show you number five now.
3          (Whereupon the proffered item was
4      marked as exhibit number 5.)
5  BY MR. THALER:
6      Q.  Can you confirm that those are the
7  policies and procedures that govern the Library of
8  Congress in filling a position?
9          (Pause)
10          MR. BRUMER:  What is the question?
11          MR. THALER:  I'm just asking him to
12 confirm that these are the policies and procedures
13 that govern the selection process in filling a
14 vacancy at the Library of Congress.  That's the
15 pending question.
16          THE WITNESS:  It appears to be,
17 though I have not personally seen the cover page on
18 this.
19 BY MR. THALER:
20     Q.  Aside from the cover page, are these the
21 same policies and procedures that you are familiar

Page 93

1  with that govern the selection process at the
2  Library of Congress?
3      **A.  Yes.**
4      Q.  When we were talking a few minutes ago
5  about whether or not you had ever consulted this and
6  you said that your recollection -- well, I think you
7  said that you had but you couldn't recall if it was
8  in conjunction with this particular position.
9      **A.  That's right.**
10     **I think when this new hiring process was put
11 into place there were some training sessions held
12 for those serving as subject matter experts and
13 selecting officials and this would have been part of
14 that training.**
15     Q.  It's from these policies and procedures
16 that you got the number seven -- when you testified,
17 I asked you about how many candidates are supposed
18 to be interviewed and you said the policies and
19 procedures require seven and then I asked whether
20 that included tie scores and you said no.  Do you
21 remember that testimony?

Page 94

1    A. Yes, I do.

2    Q. That testimony, does that spring from

3  these policies and procedures?

4    A. I don't believe it does. I do not know

5  without going through this document. I'm just

6  calling my recall of what I learned through the

7  training process.

8    Q. I direct your attention to page ten at the

9  very top where it starts off with little letter D.

10    A. Yes.

11    Q. Do you see that? Do you see where it says

12  "the automated system generates a list of the top

13  seven applicants plus tied scores"?

14    A. Yes.

15    Q. Do you have any reason to believe that

16  that's not the process and procedure that was in

17  place at the time of this vacancy?

18    A. I have no reason to believe that. It's

19  not part of the process.

20    Q. Do you now agree that the general default

21  position at the Library of Congress in filling a job

Page 95

1  vacancy is to interview the top seven, plus anyone

2  who was tied with that seventh person?

3    A. I believe so.

4    Q. Had that worked out in this case, in other

5  words had you kept the number of interviewees to

6  that number, what score would have been the score of

7  the seventh person, plus any tie, according to the

8  chart that's in front of you?

9    A. The way I see it in the chart, we would

10  have asked for candidates scoring 98 and up.

11    Q. You were employing your discretion as a

12  panel to expand that number?

13    A. Yes, we were.

14    Q. Do you recall getting a referral list from

15  Ms. Nichols? Well, strike that.

16    I'm going to show you what's been marked as

17  number six.

18    (Whereupon the proffered item was

19    marked as exhibit number 6.)

20  BY MR. THALER:

21    Q. Do you recall that e-mail exchange between

Page 96

1  you and Ms. Nichols?

2    A. Yes, I believe this is the same e-mail

3  that you showed me in the batch of documents that we

4  gave you earlier.

5    Q. Is this the e-mail that you indicated a

6  few minutes ago that was essentially the cover of

7  the chart that we've been referring to?

8    A. Yes, I believe it is.

9    Q. You said that the chart was an attachment

10  to an e-mail?

11    A. To me it looks like it was, yes.

12    Q. Tell me about the discussion that you had

13  that's referenced at the very top in your e-mail to

14  Billie Nichols in which you say "Hi, Billie, as we

15  discussed, at first I would still like to interview

16  the top ten candidates."

17    A. I do not recall that discussion now.

18    Q. Do you recall what was your understanding

19  of what was meant in the e-mail that's below from

20  Billie Nichols to you in which she says: "The

21  numbers have changed somewhat"?

Page 97

1    A. I would have thought that to mean that at

2  the closing maybe more applications came in and so

3  those who qualified was either higher or lower than

4  what she previously mentioned.

5    To me that's the best I can interpret, the

6  way I can interpret it.

7    Q. Had you seen any lists prior to the chart

8  that you got in front of you there?

9    A. No, I don't recall seeing this prior to.

10    Q. What was the first list you recall seeing

11  for this job vacancy?

12    A. It would be the one that's exhibit 12E.

13    Q. Could you use the exhibit number?

14    A. I'm sorry, exhibit four.

15    Q. Subsequent to that, what was the list that

16  you received and when did you receive it, as best

17  you can recall?

18    A. I do not recall receiving any subsequent

19  list except for the ten applicants who were asked to

20  be interviewed.

21    Q. I'm going to show you what's been marked

KERSI SHROFF DEPOSITION          October 3, 2007          VonMuhlenbrock v. Billington

Page 102

1    Q. Those are the correct spellings of those
2  people's names?
3    A. Yes.
4    Q. What's your understanding as to how the
5  list is supposed to be presented to the committee,
6  the list of potential -- the list of referred
7  interviewees?
8    How is that supposed to be presented to you,
9  do you know?
10    A. In the form that it came. This is what we
11  are looking at.
12    Q. Is there anything improper about this, to
13  the best of your knowledge?
14    A. There's nothing improper.
15    There is no reference to the ranking but we
16  asked for the top ten candidates and we accepted
17  them as the candidates who scored up to the 97
18  percentile.
19    Q. Your understanding when you said that it
20  doesn't have the ranking, it's not supposed to have
21  the scores on this referral sheet?

Page 103

1    A. I don't know one way or the other.
2    Q. Is it your understanding as to whether or
3  not it's supposed to be in any kind of order
4  according to anything?
5    A. I would have assumed that it's in the
6  order of the ranking without showing the ranking.
7    Q. So it was your understanding when you see
8  this, that this would have been -- if the first guy
9  on the list -- you would have thought that guy had
10  the best score, true?
11    A. I would have, but I didn't look at it from
12  that standpoint. I looked at it from a composite
13  ten.
14    Q. That's your understanding?
15    A. That would have been my understanding had
16  I thought about it.
17    Q. In fact, as you compare it to the actual
18  list that's exhibit seven, as you compare it do you
19  see that it's in the same order as the scores?
20    A. Yes, it is.
21    Q. So you were correct if you were thinking

Page 104

1  that this is in the order of the way it was scored,
2  then you would have been correct, right?
3    A. But, where but I did not think that way.
4    Q. That's what your assumption would have
5  been?
6    A. Right.
7    Q. But you're not aware of whether or not
8  that's an appropriate way to list the interviewees?
9    A. I have no --
10    MR. BRUMER: Objection, asked and
11  answered, but go ahead. You were starting to
12  answer.
13    THE WITNESS: No.
14  BY MR. THALER:
15    Q. Referring your attention back to the
16  policies and procedures, the same page, which is
17  page ten, do you see at section D2 where it
18  states: "The list of applicants referred shall be
19  in alphabetical order with no reference to the
20  automated system results"?
21    A. Yes, I do see that.

Page 105

1    Q. Why do you think that would be in the
2  policies and procedures?
3    A. I have no idea. Convenience.
4    Q. Or perhaps so it's not to give the
5  committee an impression as to who did better on the
6  scores, so that it's blind?
7    A. It could be.
8    Q. Is this the first time you are aware of
9  this being the policy and procedure at the Library
10  of Congress?
11    A. No. As I said, we went through training
12  sessions, so this document would have been discussed
13  but obviously these are very detailed points that,
14  you know, it's hard to recall at the moment and this
15  is not the responsibility of the selecting official.
16  It's not something that I would have paid special
17  attention to.
18    Q. Your recollection is that as you interview
19  you take notes and there's a form you are filling
20  out as you are interviewing, is that right?
21    A. Right.

**KERSI SHROFF DEPOSITION**          October 3, 2007          **VonMuhlenbrock v. Billington**

Page 106

1    Q.  Are you familiar with a report that's
2  compiled, including the documentation developed and
3  maintained at each step of the selection process?
4  Are you familiar with that kind of report?
5    A.  No, I'm not.
6    Q.  Have you ever participated in the
7  development of that kind of report?
8    A.  Could you explain to me what that report
9  is?
10    Q.  Sure.  I direct your attention to page 13
11  of the same policies and procedures, section Roman
12  numeral VIII A second sentence:  "At the conclusion
13  of the selection process a report will be compiled
14  that will include documentation developed and
15  maintained at each step of the library's merit
16  selection process."
17    A.  I see that.
18    Q.  Are you familiar with ever having
19  participated in the development of that kind of
20  report?
21    A.  No, I'm not.

Page 107

1    Q.  Your answer is that you didn't participate
2  in the preparation of a report in this particular
3  job vacancy?
4    A.  This seems to be an HR responsibility so I
5  would be out of it.
6    Q.  Your answer is that you are not aware
7  of --
8    A.  I'm not aware and neither did I
9  participate in it.
10    Q.  Do you have any idea of what the scoring
11  system is once the KSA's are responded to by an
12  applicant, how those answers translate to a score
13  such as the ones we've been discussing, 98, 97, so
14  forth?
15    A.  I have a general awareness of it because
16  in developing the position when those KSA's are
17  developed, we give a weighting to it.  It's the
18  panel that gives the weighting to it.  I believe
19  that one or two are crucial, the ones that are
20  absolutely essential to the position.
21    In that sense, yes, I'm aware of the scores

Page 108

1  that are assigned to each statement of the KSA's.
2    Q.  Do you have any understanding as to
3  literally what the formula is that goes from answers
4  to KSA's to the final score?
5    MR. BRUMER:  Objection, asked and
6  answered, but go ahead.
7    THE WITNESS:  I do not know.  That's
8  a process in HR.  I have nothing to do with it.
9  BY MR. THALER:
10    Q.  For this job vacancy posting, you did
11  participate in the KSA developments, is that right?
12    A.  I did.
13    Q.  Do you know whether anyone manually
14  reviewed the applicant responses to the KSA's?
15    A.  No, I do not.
16    Q.  You did not?
17    A.  I did not.
18    Q.  Do you know whether that is supposed to
19  happen?
20    A.  No, it's not.  To the best of my
21  understanding, that should not happen.  That's what

Page 109

1  I meant by a transparent process.
2    Q.  That the computer handles it?
3    A.  That's right, an objective way of handling
4  it.
5    Q.  Are you familiar with circumstances in
6  which there are override entries to the computer?
7    A.  No, I'm not.
8    Q.  Do you know what that even means?
9    A.  I do not, no.
10    Q.  You've never heard of an override
11  response?
12    MR. BRUMER:  Objection, asked and
13  answered.
14    Go ahead.
15    THE WITNESS:  I mean, I can take a
16  stab at it.
17    An override function would mean if
18  you've made a mistake in something and you want to
19  change that, an override button may allow you to do
20  that.
21    I assume that's what you're talking

Page 110

1  about.
2  BY MR. THALER:
3     Q.  I'm just asking whether or not you are
4  familiar within the Library of Congress in the
5  answers to the KSA's of there being some sort of
6  override process?
7        MR. BRUMER:  Objection, asked and
8  answered.
9        THE WITNESS:  No.
10  BY MR. THALER:
11     Q.  You are saying that you are not familiar?
12     **A.  I'm not familiar.**
13     Q.  In the other times that you've
14  participated in the hiring process for other
15  positions at the Library of Congress, did you have
16  the same approach that you had in this job vacancy
17  of selecting a particular number of interviewees or
18  did you just take what --
19     **A.  In one instance I seem to recall that we**
20  **interviewed the entire range of successful**
21  **applicants because the number was manageable.**

Page 111

1  **After all, three people have to take time**
2  **off. The interview process takes roughly two to**
3  **three days.**
4     **Numbers are important, but in this case the**
5  **one that I recall I think was a manageable number**
6  **and so we saw the entire range of successful**
7  **applicants.**
8     Q.  What about the other times that you've
9  participated?
10     **A.  I think we made a selection, probably on**
11  **the basis of what I told you.**
12     Q.  Of looking at the numbers of candidates
13  who scored a particular score?
14     **A.  Right.**
15     Q.  And then selecting the number based on
16  that?
17     **A.  That's right.**
18     Q.  Did you ever go back after you've done a
19  round of interviews and ask for additional
20  applicants for interview?
21     **A.  No, we haven't.  I haven't.**

Page 112

1     Q.  It's really that initial decision that
2  cuts off the applicants between -- that divides the
3  interviewees from the remaining applicants?
4     **A.  It so happened that in the cases that I**
5  **was involved in, there was a rich pool of applicants**
6  **in the first cut.**
7     Q.  The other time that you participated in
8  filling a position, not the one where you said it
9  was such a small number that you went ahead and
10  interviewed everyone, but the other time that you
11  participated in which you had to make a decision, do
12  you remember what the score cutoff was there?
13        MR. BRUMER:  Objection, vague.  You
14  may go ahead.
15        THE WITNESS:  I don't recall.
16  BY MR. THALER:
17     Q.  Is it your general impression
18  that -- strike that.
19     In your understanding about the KSA's for
20  this position, it was that it was important that the
21  person have a Spanish and Portuguese background, is

Page 113

1  that right?
2     **A.  Mainly Spanish background, qualification**
3  **from one of the Spanish speaking jurisdictions in**
4  **the Latin American region and I believe the way we**
5  **worded it, a working knowledge of Portuguese**
6  **language countries.**
7     Q.  Are you familiar with discussions that
8  took place outside of your committee with any
9  others, for instance your director or Dr. Medina,
10  during this timeframe of selecting who was going to
11  be interviewed and the actual interviews themselves,
12  in that timeframe?
13        MR. BRUMER:  Objection, vague.  By
14  whom?  With whom?  When?
15  BY MR. THALER:
16     Q.  Go ahead and answer the question.
17     **A.  No.**
18     Q.  You don't recall any communications
19  outside of your committee about the interviews?
20     **A.  Any communication between myself and**
21  **anybody not on the panel?**

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 114

1    Q. Right.
2    A. No.
3    Q. Are you aware of any communications
4  between anyone on the panel or Billie Nichols and
5  people outside of that group?
6    A. No.
7    Q. Did you keep the director involved during
8  the selection process?
9    A. The director would be informed at the
10  point that we had selected a candidate.
11    Q. And also at the posting time, right?
12    A. At the posting time, yes.
13    Q. But not in between?
14    A. Not in between.
15    Q. Was that always the case?
16    A. That's generally the case. I happen to
17  have a director who was kind of, you know, give you
18  the turf, get on with it and give me the final
19  candidate.
20    Q. Are you aware of times when that wasn't
21  the case, when you did involve the director in the

Page 115

1  middle period of time?
2        MR. BRUMER: Objection, asked and
3  answered.
4        THE WITNESS: No.
5  BY MR. THALER:
6    Q. What do you remember about Mr. Guerra that
7  led you to decide to recommend that he be the one
8  who would be hired?
9    A. His overall credentials.
10    Q. Anything else?
11    A. No.
12    Q. When you say his overall credentials, what
13  in your mind does that mean?
14    A. His Mexican law qualification, his
15  experience in Mexico, his LLM degree in Washington
16  and his interview.
17    Q. What do you remember about his interview?
18    A. A very competent individual who would be
19  able to take over the responsibilities, to work
20  according to the manner in which we expected the
21  person to work, cooperatively and taking on

Page 116

1  assignments as they were given.
2  BY MR. THALER:
3    Q. Can you just briefly describe your
4  background, education and job history, for the
5  record?
6    A. My education? Yes. Where do you want me
7  to start at the college level?
8    Q. Yes, college.
9    A. I have a BA, LLB from the University of
10  Karachi in Pakistan, after which I practiced law in
11  Karachi for about just under a year.
12        Then I went to England to study for the
13  degree of Barrister at Law. I enrolled at the Inns
14  of Court School of Law in London, attached to
15  Limpkins Inn.
16        When I qualified, I was called to the bar in
17  England and for three years after that,
18  approximately, I worked for the British government
19  as a legal assistant.
20        Then I came to the United States to pursue
21  what they call a Masters in Competitive Law at

Page 117

1  George Washington University, after which I was
2  allowed to take the bar exams for the State of
3  Virginia and I qualified in the State of Virginia in
4  1977 and I'm currently a member of the state bar.
5    Q. The work history between, the three years
6  when you were legal assistant for the British
7  government, I know you came here to get your Masters
8  at GW.
9        Were you working during that time?
10    A. No. When I was pursuing my Masters I was
11  full time. After I acquired the Masters I started
12  working here, I started my work experience.
13    Q. At the Library of Congress?
14    A. No. I was employed elsewhere at a legal
15  research firm in Charlottesville, Virginia.
16    Q. The name of that firm?
17    A. The National Legal Research Group.
18    Q. Can you explain what that is?
19    A. It's a firm that assists attorneys across
20  the United States on various issues that -- they
21  provide the facts and the firm puts those facts to

Page 118

1   the law and provides either memoranda or even writes
2   briefs for them.
3       So I was working on international law cases
4   for them.
5       Q.  And you were there for how many years?
6       A.  Roughly two to two and a half years.
7       Q.  And after that?
8       A.  After that I started my employment at the
9   Law Library of Congress.
10      Q.  Now I'll show you what's been marked as
11  number nine.
12          (Whereupon the proffered item was
13      marked as exhibit number 9.)
14  BY MR. THALER:
15      Q.  I ask, if you would, to identify that.
16      A.  Yes, this is the packet, the questions
17  that were posed to Mr. Guerra, my notes of the
18  answers, sometimes in scribble form, and the ranking
19  that I gave to him on those answers.
20      Q.  I'm tempted, but I'm not sure I will ask
21  you to read -- as you noted, it is a lot of

Page 119

1   scribble.
2       Do you recall how your rankings compared to
3   the others?  There is a process for rankings, is
4   that correct?
5       A.  Attend the panelists sit down with the HR
6   staffer and each one of them calls out the ranking
7   and the staffer then combines them and gives the
8   overall ranking.
9       Q.  Were your ratings for Mr. Guerra, did any
10  of them result in a discussion about whether or not
11  they ought to be changed?
12      Do you recall?
13      A.  It may have, but I don't recall.
14      Q.  What would you say are the most, the two
15  most important KSA's for this job position, in your
16  opinion?
17      A.  To my mind, number five concerning
18  knowledge of and competency in the laws of Spanish
19  language jurisdictions would rank at the top.
20      Q.  What would come in at number two?
21      A.  I would put at number two the first

Page 120

1   portion of one, prior background and experience.
2       Q.  As best you can, if you would please read
3   your notes to the record of the answers that you got
4   from Mr. Guerra as reflected in this exhibit to
5   question 1A and 5.
6       I know you said five was the most important
7   but why don't you start with 1A?
8       A.  1A, prior background and experience.  My
9   notes read:  Attorney, licensed in Mexico 1995.
10  Then I later added something to the effect that it's
11  five years of experience.
12      He explained to us that there is no
13  undergraduate system in Mexico so it was a seamless
14  progression to a law degree.
15      He worked as a law clerk, that he worked in
16  state courts, that he was in state courts for ten
17  years, that he did legal research of a complex
18  nature and then he came to do graduate studies.
19      He's a team player.  He has the language
20  skills, knowledge, experience in Latin American
21  countries.

Page 121

1   He has not an in-depth knowledge of
2   Portuguese but a working knowledge and international
3   legal studies, in international trade, international
4   telecommunications, dealt with something in
5   counselor -- in consumer how, corporation law, he
6   handled trials which are sort of like constitutional
7   questions, he was familiar with the process.
8       He was part of the judicial stream in that
9   in the civil law countries one decides at the law
10  graduation level whether you are going to become a
11  legal practitioner or you want to become a judge and
12  he had apparently at one time chosen the judicial
13  stream.
14      I think the other questions related to his
15  English.  That relates to question 1B, how good is
16  his English.
17      So these were the remarks that I made on the
18  basis of his prior education and experience.
19      Q.  When you were going through your notes you
20  hit the part about experience in Latin America.
21  What is the next line which is about five or six

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 122

1  lines down above where it says "Portuguese." What
2  does that say?
3     A.  I can't read that.
4     Q.  Is it accurate you gave him a four on this
5  answer?
6     A.  Yes, I gave him a four.
7     Q.  Five being the highest?
8     A.  Five being the highest.
9     Q.  Same exercise for number five, if you
10  don't mind.
11     A.  All right.  Would you like me to --
12     Q.  Please.  Read it into the record, sir.
13     A.  Keeping in mind that knowledge and
14  competency in the laws of Spanish/Portuguese
15  jurisdictions is a sort of continuation of the prior
16  background and experience which sort of covers
17  common ground, he talked about graduate studies in
18  comparative law.
19     He gave an instance of how they were doing
20  an exercise in international comparative law and how
21  he counseled the class on the application to a

Page 123

1  particular problem of Latin American law to the
2  issues they represented.
3     In the telecommunications course, he dealt
4  with simulations, exercises of some sort, handled
5  lots of questions.
6     Q.  Try your best to actually read what is
7  being said, not so much the summary.  I know that
8  you are jumping around a little bit.
9     A.  Surely.  The international
10  telecommunications course, he presented or made
11  presentations and simulated or showed differences
12  between the systems.  I mean differences, my
13  annotation.  He handled questions in that area.  The
14  further note says "recent interest in
15  telecommunications but he does not want to
16  specialize."
17     Q.  Below that?
18     A.  That says "Q," meaning there was a
19  question that was asked perhaps by me: "Can you
20  read Portuguese?"  He said "Honest, have not had
21  something beyond a layman but is similar."  That

Page 124

1  means he knows Portuguese as a layperson would.
2     Then the further note is "no experience in
3  Portuguese."
4     Q.  Meaning the language?
5     A.  No experience with Portuguese laws, which
6  would be Brazil and Portugal.
7     Q.  And you gave him a four on this one as
8  well?
9     A.  Yes, I did.
10     Q.  I'm showing you what's been marked as
11  number ten.
12     (Whereupon the proffered item was
13  marked as exhibit number 10.)
14  BY MR. THALER:
15     Q.  I ask if you can identify this, please.
16     A.  Yes, this is the final, one of the final
17  acts in the selection to show the justification for
18  the selection of the candidate and this is the
19  summation of what you find in the application plus
20  the interview process.
21     Q.  Do you know who prepared this document?

Page 125

1     A.  I believe I did, but I don't have a
2  signature attached to it.  I am certain that I did
3  but I'm not completely certain.  I think this is my
4  writing.
5     Q.  And you would have referred to your notes,
6  would you?
7     A.  I would have referred to my notes, I would
8  have referred to my impression of the candidates,
9  the interview process, I would have referred to my
10  reference check.
11     Q.  What was meant by three rounds of
12  interviews at the very beginning?
13     A.  I think we had interviews, seeing three or
14  four applicants in one round.
15     We were seeing three interviews on one day
16  and the second round another three and the third
17  round probably four.
18     Q.  Three days of interviews is what you
19  meant, is that right?
20     A.  That's what I believe it is, yes.
21     Q.  So Mr. Guerra didn't go himself through