# EXHIBIT 20

# TRANSCRIPT OF PROCEEDINGS

1

2          In the U.S. District Court
           For the District of Columbia

3
   ------------------------------x
4                                 :
   Gisela Von Muhlenbrock         :
5                                 :
              v.                  : NO. 05-1921
6                                 :
   James H. Billington,           :
7  Librarian of Congress          :
                                  :
8  ------------------------------x

9              September 27, 2007

10 DEPOSITION OF:

11             Billie Nichols,

12 a witness, called by counsel pursuant to notice,
   commencing at 10:00 a.m., which was taken at Thaler,
13 Liebeler, 1825 Eye Street, NW, Washington, DC

14

15

16

17

19 This transcript has been completely indexed for your convenience. It will help you locate the testimony you want FAST. The index is located in the back pages of this volume.

20

21            **Overnite**
           Court Reporting Service

Serving Washington, D.C. metro area                (301) 593-0671

Page 58

1    Q.  What year?
2    A.  I don't recall. I don't know.
3    Q.  Was it long after 1980 or was it shortly
4  after 1980?
5    A.  Well, I'm trying to think. I don't think
6  it was too long. Maybe it was two years. You are
7  asking me to guess.
8    Q.  That's okay. How long were you with the
9  D.C. government, how many years?
10    A.  I believe I was with D.C. government for
11  seven years. Well, actually, I was with the
12  Department of Human Services for seven years which
13  was D.C. government and with the school system I
14  believe approximately three years.
15    Q.  So ten years in D.C. and 2001 with the
16  Library of Congress?
17    A.  Yes.
18    Q.  All right.
19    A.  Getting back to one of your earlier
20  questions, with regards to the difference between 98
21  and 97, again the system scores the applications on

Page 59

1  the basis of the responses and it may be that an
2  individual who selected a -- there are three
3  choices.
4    Some choices are the highest level -- some
5  choices are the highest level in skill or experience
6  for a particular KSA.
7    Then there's a middle choice and a bottom
8  choice. Depending upon which choice is selected,
9  the system would calculate so many points for that
10  particular one and if a candidate selected a lesser
11  choice for a KSA that was weighted higher, that
12  might have made the significance or the difference
13  between a 98 and 97. I don't know that I'm really
14  answering your question but that's the best that I
15  can explain it.
16    Q.  It's your testimony that the selecting
17  official, Mr. Shroff, told you he wanted a cutoff of
18  97. So far that's true?
19    A.  He indicated in the e-mail that he would
20  like to receive the top ten candidates. That was in
21  the e-mail, but in the first e-mail which I don't

Page 60

1  recall seeing in the merit file he requested a
2  cutoff score of 97, I think.
3    Q.  In your experience, is there any way for
4  Mr. Shroff -- is there some significance to that
5  number?
6    That's what I'm trying to get at. Why is it
7  that a selecting official would choose a particular
8  number over another number?
9    A.  Well, again, knowing that he had to at
10  least receive the top seven and when he saw the
11  scoring breakdown he knew that there were three
12  additional candidates within that score range which
13  would result in ten candidates.
14    If there were going to be several -- I mean,
15  selecting officials don't necessarily want to see 50
16  or 30 or 40 candidates, knowing at least they have
17  to receive the top seven and tied scores within that
18  range, that's where he cut off his cutoff scoring.
19    Q.  That's where the policy comes in, top
20  seven --
21    A.  Yes, plus whoever is tied with seven.

Page 61

1    Q.  But he wanted to go beyond that because he
2  saw that there were some individuals who came close
3  enough, is that right? He wanted to go beyond the
4  top seven?
5    A.  He knew that the tied scores had to be
6  referred as well. That's why he indicated that I
7  want to interview the top ten.
8    Q.  I'm going to show you what's being marked
9  as number two.
10       (Whereupon the proffered item was
11       marked as exhibit number 2.)
12  BY MR. THALER:
13    Q.  Is this the breakdown that you showed to
14  Mr. Shroff?
15    A.  Yes.
16    Q.  Is this the computer generated result of
17  when you punched in on the drop-down menus that we
18  were talking about earlier?
19    A.  No, this is a typed document.
20    Q.  Typically the computer generates
21  something, right, with the scores and the names?

Page 66

1   This was the scoring breakdown. I provided
2   this after having had the computer provide me the
3   ranking of the applications.
4   Q. Was there a prior interface with the
5   computer before you put in the drop-down menu that
6   we've been discussing?
7   A. Well, when I prepared the vacancy
8   announcement, I mean that's through the automated
9   system.
10      So the vacancy announcement is created
11  through the automated system and, of course, after
12  it closes, that's when we get into the other phases
13  for the process.
14  Q. But isn't the normal procedure that once
15  all the applications are in and you decide the
16  answers to those questions on the drop-down menu
17  that the computer generates a list of the top seven?
18  Isn't that the starting point?
19  A. The system will not automatically generate
20  anything. I have to key in or select certain
21  information for the system to generate the

Page 67

1   documents.
2       Prior to closing, maybe one to two days
3   prior to closing, I provided a scoring breakdown to
4   the selecting official and that indicated -- it
5   would have been another document like this.
6       MR. BRUMER: Let the record reflect
7   that the witness just referred to plaintiff's
8   exhibit two.
9   BY MR. THALER:
10  Q. You are familiar with what we talked about
11  earlier, the Library of Congress policy, merit
12  selection promotion plan, and you know that in it,
13  it indicates, and I can show it to you if you want,
14  that the automated system generates a list of the
15  top seven applicants plus tied scores?
16  A. But in my interrogatory response that I
17  certified that the computer generates that list
18  after the cutoff score is determined by the
19  selecting official or if that cutoff score
20  determined by the selecting official is keyed into
21  the system and it results in that.

Page 68

1   The system will not automatically do
2   anything. I noticed that it was worded that way but
3   the system can't do it without me.
4   Q. You put in what the cutoff score is?
5   A. Yes.
6   Q. And --
7   A. And then after putting -- I put in the
8   cutoff score and the cutoff score resulting in the
9   top seven candidates plus tied scores because the
10  selecting official and management knows that they
11  have to receive at least a minimum of the top seven
12  plus tied scores.
13      So when I provided the scoring breakdown to
14  the selecting official and he saw this --
15      MR. BRUMER: Let the record reflect
16  that the witness is referring to plaintiff's exhibit
17  two.
18      THE WITNESS: He saw that -- see
19  under 100 there were three applicants or three
20  applications, there were two applications rated at
21  99 and there were three rated at 98. So the seventh

Page 69

1   candidate --
2   BY MR. THALER:
3   Q. Was a 98?
4   A. Falls within -- right. The seventh
5   candidate fell within the 98 score.
6   Q. Why go beyond it? At 98 you had eight.
7   A. But at 98, there were three at 98.
8   Q. You had a total of eight with a score of
9   98 or above, right?
10  A. According to the scoring breakdown there
11  were five candidates with a score above 98.
12  Q. 98 or above you had a total of eight?
13  A. Yes, that is correct.
14  Q. If you already have satisfied the policies
15  of the top seven then what's the basis for going one
16  point more to include 97?
17  A. Because the 97 fell within the selecting
18  official's cutoff score range. He requested a
19  cutoff score of 97.
20  Q. Prior to seeing these stats or after
21  seeing these stats?

Page 74

1  closing.
2      MR. BRUMER: Let the record reflect
3  that the witness again is pointing to plaintiff's
4  exhibit four.
5  BY MR. THALER:
6    Q. Is this typically what the computer will
7  generate at the end of a closing?
8    A. It will generate a list at the end of
9  closing after I request it to, yes. This is a
10 ranking list.
11   Q. What was forwarded to Mr. Shroff?
12   A. This document --
13   Q. Use exhibit numbers when you say it.
14   A. Exhibit two was forwarded to Mr. Shroff.
15   Q. What else?
16   A. The e-mail I believe that it was attached
17 to providing him with a scoring breakdown.
18   Q. Had you had prior discussions about the
19 breakdown before sending him that document that's
20 been marked as number two?
21   A. I sent a scoring breakdown probably one to

Page 75

1  two days before it closed, before the vacancy
2  closed.
3       It included a ranking of the individuals or
4  the applications that were received prior to vacancy
5  closing, one or two days prior to vacancy closing.
6    Q. What did you do with that list?
7    A. The list was maintained as a part of the
8  merit file but I sent a document like this as well
9  that showed the scoring breakdown prior to closing.
10      MR. BRUMER: Let the record reflect
11 that the witness is referring to plaintiff's exhibit
12 two.
13      MR. THALER: I'm not sure we have
14 that document either. Is that still part of the
15 file?
16      THE WITNESS: I noticed when I was
17 reviewing the file that the document prior to
18 closing which would have looked like this was not in
19 the file and there's one other document I noticed.
20      During my processing of the vacancy I
21 had domain over the file. However, since then the

Page 76

1  EEO investigator had access to it and so did
2  Ms. Douds, so it may have been the document
3  inadvertently --
4  BY MR. THALER:
5    Q. Is lost?
6    A. Right.
7    Q. But you know, don't you, that the files
8  are supposed to be maintained especially in a
9  circumstance involving a claim such as this, right,
10 supposed to be retained until the claim is over,
11 isn't that right?
12   A. Yes, I do. As I stated, during the
13 process in which I had dominion or domain of the
14 file I know that the documents were included in the
15 file.
16   Q. Any other documents that are not in the
17 file that you remember being there?
18   A. One that comes to mind is the -- there
19 were two level -- it's the AA review form which
20 reflects the diversity information about the
21 candidates and that's the one that was included

Page 77

1  prior to what's in the file, but I didn't see the
2  one that was included after, after the vacancy
3  closed.
4    Q. When you answered "yes" when I say they
5  are supposed to be maintained, you are saying that
6  because of the policy at the Library of Congress is
7  merit selection files will be maintained for
8  two -- if a grievance is filed you are supposed to
9  maintain it until the grievance is over, right?
10     Isn't that your understanding of the
11 policies?
12   A. That is my understanding of the policies.
13 "Merit selection files will be maintained for two
14 years from the date of selection or cancellation of
15 a vacancy."
16   Q. You said that there was another document
17 that you generated -- that you sent another document
18 to Mr. Shroff.
19   A. I sent another e-mail attachment prior to
20 this one.
21   Q. When you say "this one," you are pointing

Page 78

1  to number two?
2  A. Exhibit two, yes.
3  Q. It looked similar?
4  A. It looked similar. However, I recall in
5  the e-mail when I sent this one that I indicated to
6  him that the numbers had changed somewhat and that's
7  because additional applicants, there were additional
8  applications received after closing and consequently
9  there were additional individuals or scores on the
10  ranking.
11  Q. So number two has more numbers than the
12  one that you thought was an attachment to an e-mail
13  that you don't know where it is any more, is that
14  what your testimony is?
15      In other words, the total number on number
16  two is bigger than the total number that you would
17  have had on the prior submission to Mr. Shroff, is
18  that right?
19      MR. BRUMER: Objection, vague. It's
20  not clear what "total number" means. Of what?
21      MR. THALER: There's only one series

Page 79

1  of numbers on this number two. It's number of
2  applicants that are minimally qualified.
3      THE WITNESS: I could answer this
4  question better.
5      I believe you may have a document
6  that's reflecting, that's showing -- it's dated 1/24
7  that looks like this and we can look at --
8  BY MR. THALER:
9  Q. We'll see about that in a second but let
10  me ask you this.
11      I show you what's number five. Is that the
12  e-mail to which you were just referring?
13      (Whereupon the proffered item was
14  marked as exhibit number 5.)
15      THE WITNESS: Yes. Where I say
16  submitting the attached to you after vacancy
17  closing, the numbers have changed somewhat. This is
18  the document that was attached after vacancy
19  closing, exhibit two.
20  BY MR. THALER:
21  Q. When you say the numbers have changed

Page 80

1  somewhat on this e-mail from you to Kersi Shroff,
2  the numbers to which you refer are what?
3  A. I'm not referring to a change in a
4  particular application score.
5      There may have been additional applications
6  that were on the scoring breakdown who had a
7  particular score.
8  Q. Your recollection is that there had been
9  some communication between you and Kersi Shroff
10  before the exchange of exhibit number two, is that
11  right?
12  A. Yes. The exchange was that I provided a
13  scoring breakdown before this one, before closing.
14  Q. How are you able to generate a document
15  such as that before the process is even closed,
16  before the application time as ended?
17  A. I can ask the system again to provide a
18  ranking of the applications that are currently
19  received, those that are minimally qualified.
20  Q. Just the raw data? Does it have names
21  with it?

Page 81

1  A. Yes, it will have names with it.
2  Q. Is it much like the one I showed you which
3  is marked --
4  A. It's similar, right, to this.
5  Q. Was this document -- what number is this?
6      MR. BRUMER: Plaintiff's exhibit
7  four.
8  BY MR. THALER:
9  Q. With whom did you share number four?
10  A. This document wasn't shared with anyone.
11  Q. You are saying that there was a similar
12  document that you believed was dated I think you
13  said January 24?
14  A. I believe so, yes.
15  Q. You saw that recently in the merit file?
16  A. I thought I saw it when I reviewed the
17  merit file.
18  Q. Do you remember what the difference
19  between the 124 and the 130 list would be? Is it
20  just an additional number of applicants?
21  A. I think when I looked at them there may

Page 86

1  number twelve? Don't let me testify for you. I
2  thought that's what you were getting at.
3      A.  I understand. That is correct.
4      I could not have stopped at twelve because
5  there were two other people tied at 96. There were
6  two other people tied at the twelfth score. So I
7  would have had to submit those other two on that
8  form so that the diversity office could review it
9  and make the determination as to whether or not we
10 needed to drop down further in order to meet
11 diversity.
12     Q.  You say it used to be the policy to go to
13 twelve?
14     A.  We don't do the level two any more. Our
15 procedures and policies have changed
16 various -- there have been numerous changes since
17 2003 or 2002, whenever this vacancy was advertised
18 and we do not do the level four or the level three
19 any more and neither do we do the level two.
20     Q.  Going back to the e-mail exhibit that's
21 number five --

Page 87

1      A.  Yes, it's exhibit five.
2      Q.  In response to your e-mail in which you
3  asked how many candidates Mr. Shroff wished to
4  interview, his response was up top, right?
5      A.  Yes.
6      Q.  He says "as we discussed at first, I would
7  like to interview the top ten."
8      A.  Yes.
9      Q.  Tell me what you remember, whatever that
10 discussion was that he's referencing?
11     A.  He's referencing just the response, just
12 from the e-mail that was sent prior to closing where
13 he indicated that he would like to interview the top
14 ten.
15     Q.  Anything else that you remember from the
16 communication?
17     A.  No.
18     Q.  Was that done by e-mail you say?
19     A.  Yes.
20     Q.  So there's another e-mail?
21     A.  The other e-mail would have contained the

Page 88

1  attached that was sent prior to closing.
2      This one was after closing. So the e-mail,
3  the other e-mail, would have had the attachment
4  similar to this with the scoring breakdown prior to
5  closing.
6      Q.  So you compiled exhibit number two based
7  on exhibit number four?
8      A.  Yes.
9      Q.  On exhibit number four would you agree
10 that there are four people with a score of 96?
11     A.  Yes.
12     Q.  Yet exhibit two says there are five?
13     A.  It's a mistake.
14     Q.  Okay.
15     A.  It's my mistake on here because this is a
16 computer generated document. It's my mistake on
17 here.
18         MR. BRUMER: Let the record reflect
19 that the witness was pointing to plaintiff's exhibit
20 two when she said "my mistake on here."
21 BY MR. THALER:

Page 89

1      Q.  At the end of the selection process was
2  there a report that was compiled including
3  documentation developed and maintained at each step
4  of the selection process in this matter?
5      A.  I believe that's the one that's referred
6  to as the level three that you are referring to.
7      Q.  I'm just asking if there was a report
8  compiled.
9      A.  Would you ask the question again, please?
10     Q.  At the conclusion of the selection process
11 for this job vacancy was there a report compiled
12 that included documentation developed and maintained
13 at each step of the library's selection process?
14     A.  I don't recall.
15     Q.  You don't recall seeing such a report in
16 the merit file that you reviewed?
17     A.  No, I don't.
18     Q.  When you looked through the merit file did
19 you see the previous e-mail that you testified to
20 took place between you and Kersi Shroff prior to
21 five? Did you see that e-mail?

Page 118

1   Q. Who is your supervisor?
2   A. Sheila Williamson.
3   Q. How long has she been your supervisor?
4   A. About a year, a little longer.
5   Q. Before that who was your supervisor?
6   A. Bill Ayers.
7   Q. How long was Mr. Ayers your supervisor?
8   A. I don't remember when he first came on
9   board. This is a guesstimate. Maybe three years.
10  Q. Prior to Mr. Ayers was who?
11  A. Her first name was Towanda. I can't
12  remember the last name. She was there for a short
13  while. I can't remember her last name.
14  Q. Who was your direct supervisor at the time
15  this hiring was taking place?
16  A. Bill Ayers.
17  Q. Did you come to learn anything about the
18  prior lawsuit and action back in the eighties that
19  Ms. Von Muhlenbrock brought?
20  A. No.
21  Q. When did you first become aware that

Page 119

1   Ms. Von Muhlenbrock was a prior employee of the
2   Library of Congress who was trying to get back in?
3   A. Well, I became aware that she was a prior
4   employee when the EEO investigator met with me when
5   I provided an affidavit.
6   Q. So you had no knowledge, even though her
7   name was on a list, that she happened to already
8   have worked at the Library of Congress?
9   A. No, because the focus is on numbers and
10  her name was just one of many other names of
11  individuals who had applied for a position.
12  Q. Does that fact, that a potential new hire
13  has a background of having already worked at the
14  Library of Congress, matter in the hiring process at
15  the Library of Congress?
16  A. No.
17  Q. They are given no advantage for their
18  previous experience at the Library of Congress?
19  A. Well, in terms of -- they are given no
20  advantage, but depending upon how they respond to
21  the KSA's, but there's no advantage given from the

Page 120

1   standpoint of any additional points or anything for
2   a particular candidate.
3   Q. Whatever their response is to the KSA
4   questionnaire on their application, that's the only
5   basis in which they are ranked going into the
6   interview process?
7   A. Yes. Depending upon the choices they
8   select, the computer assigns a score incorporating
9   the weights that are assigned to a given KSA and
10  then if they meet the cutoff score then they are
11  referred for interview.
12  Q. Is it your testimony that the first time
13  you became aware of Gisela Von Muhlenbrock was when
14  the EEOC matter was brought to your attention
15  subsequent to the hiring in this position?
16  A. The first time I became?
17  Q. You became aware of Gisela
18  Von Muhlenbrock, it was when the EEOC brought it to
19  your attention?
20       MR. BRUMER: Objection, asked and
21  answered.

Page 121

1        THE WITNESS: When you say became
2   aware of her, aware of her in what context?
3   BY MR. THALER:
4   Q. In any context. I recognize that she
5   appears on a list, but aside from that, was that the
6   first time you became aware or familiar with her as
7   a person, as a potential employee, a former
8   employee?
9        Was it the first time that the EEOC matter
10  was brought to your attention?
11  A. Yes, but I wouldn't say I became familiar
12  with her as a person.
13  Q. I understand.
14  A. Okay.
15  Q. Was there a hiring freeze that you are
16  aware of in the nineties at the Library of Congress?
17  A. I have no idea. I started in 2001.
18  Q. Did you participate in any other capacity
19  in the hiring process for the job vacancy in this
20  case other than what you've already testified to?
21  A. Could you be more specific?

Page 146

1  mistake like that.
2  Q. Did the computer make a mistake --
3  A. In fact -- I'm sorry.
4  Q. Were there instances in which the computer
5  made a mistake that you are distinguishing in your
6  answer?
7  A. I'm trying to think of an example. It's
8  not in relation to minimally qualified as it is in
9  relation to --
10 Q. Yes?
11 A. It wasn't even what I would call a
12 mistake. There has been an instance when you are
13 trying to create the vacancy announcement and when
14 you attempted to do what we have to do to create it,
15 the system would not allow me to do it.
16 Q. What I'm interested in is whether or not
17 you've ever seen the computer make a mistake when it
18 comes to scoring applicants for a job.
19 A. No, I've never seen that.
20 Q. Are you familiar with some sort of ability
21 to do an override response on applicants' KSA's

Page 147

1  answers? Do you know what that means?
2  A. If the applicant indicates that -- say,
3  for instance, the position is limited to a
4  particular department and applicants outside apply
5  for the position, in order to have the system
6  generate a listing of the individuals who are within
7  the area of consideration, an override could be done
8  where you indicate that the candidate was not within
9  the area of consideration, area of consideration
10 being that the position was limited to the agency or
11 limited to the department.
12 Sometimes because the vacancies go on USA
13 Jobs, the applicants will apply anyway if they don't
14 see that that's the case and they will apply and
15 when that happens then you can do an override and
16 indicate that the applicant was out of the area of
17 consideration because they were an outside
18 applicant.
19 Q. But that wouldn't just show up on their
20 answers to the KSA's?
21 A. It doesn't show up -- well, no, not to

Page 148

1  their KSA's. It also is indicative of how they
2  complete their on line application.
3  There are various fields and sometimes they
4  select the wrong thing.
5  I had a candidate to indicate that he was a
6  disability candidate and after seeing that, I
7  informed him that I needed certain documentation to
8  show, a certification of his disability, and then he
9  sent me an e-mail "I made a mistake, I selected the
10 wrong -- I am not a disability candidate."
11 Q. Are you familiar with any override that
12 took place in this case?
13 A. No, absolutely not.
14 Q. Is it the practice of the Library of
15 Congress to print out the KSA responses? Is it the
16 practice of the Library of Congress to print out the
17 KSA responses with the condition of override status?
18 Is that normal?
19 A. Well, if there had been an override, I
20 mean I wouldn't say it's a practice per se.
21 However -- no, I wouldn't say that it's a practice.

Page 149

1  Q. I asked you earlier about your e-mail and
2  you said some of them are archived. Do you know
3  what the cutoff timeframe for archiving your e-mails
4  would be?
5  A. I believe now it's after 180 days.
6  Q. Did you go back and check your archived
7  e-mail for this litigation to see if you had
8  e-mails?
9  A. I did.
10 Q. Did you find e-mails that had to do with
11 this case?
12 A. I didn't find an e-mail that showed that
13 this was the attachment.
14 Q. My question is did you find any e-mails
15 concerning this matter?
16 A. I don't recall. I don't recall if I found
17 any e-mails in my archive specifically to this case.
18 Q. When did you do the search?
19 A. I think I did the search when I was first
20 informed that this trial, this case was going to
21 come to a deposition stage.