# EXHIBIT 17

BILLIE NICHOLS DEPOSITION    September 27, 2007 VonMuhlenbrock v. Billington

Page 1

In the U.S. District Court
For the District of Columbia

------------------------------x
                              :
Gisela Von Muhlenbrock        :
                              :
              v.              : NO. 05-1921
                              :
James H. Billington,          :
Librarian of Congress         :
                              :
------------------------------x

September 27, 2007

DEPOSITION OF:

Billie Nichols,

a witness, called by counsel pursuant to notice,
commencing at 10:00 a.m., which was taken at Thaler,
Liebeler, 1825 Eye Street, NW, Washington, DC

Page 22

1    Q.  Is that common, that you will select
2  active referral lists?
3    A.  No, it's not common at all.
4    Q.  Have you ever done it?
5    A.  I have done it, yes.
6    Q.  What are the circumstances that you would
7  choose active referral list?
8    A.  The circumstances are those when the
9  selecting official has agreed to receive an active
10  referral list as opposed to a hard copy list.
11    Q.  On what basis would that happen?  Why
12  would he choose that then at a particular time?
13    A.  At the Library of Congress the system was
14  introduced I guess right about the time that I
15  started in 2001 and the selecting officials,
16  management are very accustomed to receiving hard
17  copy lists and some of them are not very receptive
18  to the new technology.
19    Q.  Almost always you check "test" on that
20  drop-down box?
21    A.  Almost always, yes.

Page 23

1    Q.  Is there anything that you are aware of
2  that would make it improper for you to check "active
3  referral list" consistent with the policies at the
4  Library of Congress?
5    A.  I'm sorry?
6    Q.  What would be improper about checking the
7  "active referral list" choice?
8    A.  Well, it would be improper for the
9  selecting official to be able to review the
10  applications until it's actually time for the
11  referral list to be prepared.
12    Q.  Is it your understanding that the
13  selection process for who will be interviewed is
14  supposed to be blind at this point of the process
15  that we're talking about?
16    A.  When the scoring breakdown is provided
17  consisting of the scores of the applications and the
18  number of applications meriting that score, that is
19  a blind process, yes.
20    Q.  It remains blind until when, according to
21  the policies of the Library of Congress?

Page 24

1    A.  When the selecting official, having
2  received the scoring breakdown, decides on a cutoff
3  score which would indicate the number of
4  applications that would be referred for interview.
5      After having received that cutoff score, at
6  that point I can prepare or I do prepare the
7  interview referral list which consists of the memo
8  with the typed names of the candidates that are
9  referred and the referral package also includes an
10  interview booklet for each candidate.
11    Q.  The typed name list, what order is that
12  supposed to be in?
13    A.  It's supposed to be in alphabetical order.
14    Q.  Because that's what the policies of the
15  Library of Congress say?
16    A.  That is the way it is supposed to be
17  submitted, yes.
18    Q.  Yes, that's what the policies say, right?
19    A.  In all candor, I can't recall seeing it in
20  the policy.  It may have been so long ago.  It's
21  just that's the way they are to be submitted.

Page 25

1    Q.  When did you last review the Library of
2  Congress -- let me make sure I get this term
3  right -- merit selection and promotion plan?  When
4  did you last review that?
5    A.  I reviewed it this week.
6    Q.  That was one of the things you reviewed
7  for deposition today, is that right?
8    A.  Yes.
9    Q.  You said that earlier.
10    A.  Right.
11    Q.  Before you reviewed it in preparation for
12  the deposition, when would you say was the last time
13  you reviewed those policies?
14    A.  I reviewed them this week.
15    Q.  Before this week, when would you say you
16  had last reviewed them?
17    A.  I don't know.  I can't recall.
18    Q.  Would you say it's been years?
19    A.  No, I wouldn't say it's been years, no.
20    Q.  Months?
21    A.  Well, in terms of reviewing the policies,

7 (Pages 22 to 25)

BILLIE NICHOLS DEPOSITION    September 27, 2007 VonMuhlenbrock v. Billington

Page 42

1    Q.  But there's nothing in particular about
2  this case that you specifically remember from years
3  ago, is there?  You are just saying this is not
4  done?
5    A.  I know that I didn't do it.  I know what
6  was submitted and I know how it was submitted.
7    Q.  Based on your review of the file or
8  something else?
9    A.  It's not done.  We don't do that.  It is
10  procedure only to provide the scores and the number
11  of applications at a particular score.  That is what
12  is always provided.
13    Q.  What do the policies say about what is
14  supposed to be provided in the first instance?
15    A.  The policies indicate that we are to
16  provide a scoring breakdown of the candidates for
17  the position, actually those that are minimally
18  qualified, and then the selecting official can
19  provide his cutoff score.
20    Q.  Does it say anything about the number of
21  people that are supposed to be reviewed?

Page 43

1    A.  That is, what you are referring to is that
2  the selecting official has to consider for interview
3  or receive for interview at least the minimum of the
4  top seven candidates plus tied scores within that
5  cutoff score range.
6       However, at the point in which I'm providing
7  the scoring breakdown, the scoring breakdown
8  consists of all of the applications or applicants
9  who applied for the position.
10      Let me rephrase that.  The scoring breakdown
11  consists of all of the applications that were
12  received for the position and that were minimally
13  qualified.
14      It lists the scores and number of
15  applications at that score.
16    Q.  In this case --
17    A.  In all cases.  I'm sorry.
18    Q.  In this case did you provide the list of
19  seven, including ties, to the selecting official?
20    A.  When the referral list was provided
21  consisting of the names of the candidates who were

Page 44

1  referred for interview, it did contain the names of
2  the top seven candidates, plus tied scores.
3       So it contained the names of individuals
4  that met the cutoff score of 97.  Those included the
5  top seven and the tied scores within the score
6  range.
7    Q.  Ultimately how many were interviewed in
8  this case?
9    A.  If I remember correctly from my review, I
10  believe all of them were interviewed.
11    Q.  Any more other than seven?
12    A.  No, there were ten interviewed.  Ten went
13  on the referral list.
14    Q.  My question is how did that circumstance
15  change from the default position pursuant to the
16  policy being seven plus ties to a final number of
17  ten in this case?
18       MR. BRUMER:  Objection as to form,
19  assumes facts not in evidence.
20       You can go ahead and answer?
21       THE WITNESS:  There were seven

Page 45

1  individuals.
2       When you look at the scoring breakdown
3  there were seven top candidates plus the tie scores
4  within the score range.
5       So the tied scores within the score
6  range resulted in ten candidates being referred for
7  interview.
8  BY MR. THALER:
9    Q.  The seventh candidate plus whoever was
10  tied for that candidate made it ten?
11    A.  The top seven plus tied scores within the
12  cutoff score range.
13    Q.  You don't remember any reason why it would
14  be expanded beyond the typical result of having
15  seven plus whoever happened to be tied with the
16  seventh place candidate?
17    A.  Well, the level 2AA review report that's
18  submitted to our affirmative action office, if they
19  had indicated when I provided that report that we
20  needed to drop down further in order to meet
21  diversity requirements then in that instance we