# EXHIBIT 5

## TRANSCRIPT OF PROCEEDINGS

```
 1

 2                    In the U.S. District Court
                    For the District of Columbia
 3
      -------------------------------x
 4                                   :
      Gisela Von Muhlenbrock          :
 5                                   :
                    v.               : NO. 05-1921
 6                                   :
      James H. Billington,            :
 7    Librarian of Congress           :
                                     :
 8    -------------------------------x

 9                    November 1, 2007

10    DEPOSITION OF:

11                    Rubens Medina,

12    a witness, called by counsel pursuant to notice,
      commencing at 10:00 a.m., which was taken at Thaler,
13    Liebeler, 1825 Eye Street, NW, Washington, DC

14

15

16

17
```

This transcript has been completely indexed for your convenience. It will help you locate the testimony you want FAST. The index is located in the back pages of this volume.

**Overnite**
Court Reporting Service
Serving Washington, D.C. metro area                    (301) 593-0671

Page 10

1   Q. Does any of it affect your ability
2   to -- does it affect your memory or your ability to
3   speak?
4   A. I don't think so but I cannot tell you.
5   Q. You haven't taken any other drugs today?
6   A. No. Coffee. Is caffeine a drug?
7   Q. Did you review any documents in preparing
8   for today's deposition?
9   A. No, I have not.
10  Q. Have you reviewed any of the documents in
11  this litigation?
12  A. Yesterday I was shown documents concerning
13  personnel action recommendations.
14  Q. Then I'm confused. The prior question was
15  did you review any documents in preparation for your
16  testimony and you said no.
17  A. I was given these documents, look at my
18  signature. I didn't review the document.
19  Q. I see. So you saw some documents?
20  A. Yes.
21  Q. Which documents did you see?

Page 11

1   A. Personal action recommendations. It's a
2   form document.
3   Q. Any others?
4   A. No.
5   Q. Have you seen or reviewed any other
6   documents relating to this litigation since the
7   inception of the litigation?
8   A. No.
9   Q. Have you participated in the preparation
10  of any kind of responses in this litigation?
11  A. No, sir.
12  Q. You have not been submitted documents to
13  review and sign in this litigation?
14  A. No.
15  Q. Have you discussed the lawsuit brought by
16  this plaintiff, Gisela Von Muhlenbrock, with anybody
17  at the Library of Congress?
18  A. What happened yesterday --
19  Q. Let me caution you. I hate to interrupt
20  you, but I do want to caution you that as you
21  probably know, you do have a privilege. To the

Page 12

1   extent that your answers require you to identify
2   communications with counsel, it's okay to say you
3   spoke with your lawyer but don't, unless you are
4   waiving your privilege, don't disclose the
5   substance.
6   A. I spoke with the attorneys of the library
7   and Mr. Brumer yesterday.
8   Q. Aside from your meeting with counsel
9   yesterday, have you discussed this lawsuit with
10  anybody at the Library of Congress?
11  A. No.
12  Q. So you've not discussed the lawsuit with
13  Mr. Billington?
14  A. No.
15  Q. You've not discussed it with Bill Nichols?
16  A. No.
17  Q. You've not discussed it with Kersi Shroff?
18  A. No.
19  Q. You have not reviewed, for instance, the
20  interrogatories served by Ms. Von Muhlenbrock to the
21  Library of Congress?

Page 13

1   A. I have not.
2   Q. Ever?
3   A. Ever.
4   Q. Would that also apply to the request for
5   production of documents? Have you ever seen that?
6   A. No, I have not.
7   Q. Has anyone asked you to identify or
8   produce documents that might be requested in this
9   litigation?
10  A. I do believe my director of personnel
11  mentioned to me that there was a request for
12  documentation.
13      I don't recall that it was related.
14  Q. Aside from the fact that there was a
15  request, did you endeavor to look for documents?
16  A. No, I have not.
17  Q. Have you reviewed your own e-mails that
18  might relate to the substance of this lawsuit?
19  A. No.
20  Q. Do you archive your own e-mails?
21  A. The office does, not me personally.

Page 14

1   Q. Were there any steps that you took with
2   regard to your e-mails that were not the ordinary
3   and customary steps that you take with regard to
4   maintaining your e-mail files, anything different
5   that you've handled your e-mails as it relates to
6   this case?
7   A. Please repeat that question.
8   Q. It wasn't a very good question, was it?
9   Have you handled the maintenance of your
10   e-mails differently since this lawsuit was brought?
11   A. No.
12   Q. If your e-mails were archived they would
13   have been archived in the ordinary course as the
14   library archives?
15   A. That is correct.
16   Q. Is it your understanding that documents,
17   including e-mails, need to be handled differently
18   once a lawsuit is brought? Do you know anything
19   about that?
20   A. I am not aware of any special treatment of
21   documents.

Page 15

1   Q. Do you know whether or not an effort
2   should be taken to ensure that e-mails and other
3   documents are not destroyed once litigation begins?
4   A. I understand the library has a system to
5   protect documentation but I don't know exactly how
6   they do it.
7   Q. Who is responsible for that?
8   A. The ITS, Information Technology Services.
9   Q. How is it conveyed to them that a lawsuit
10   has been served against the library?
11   A. I have no idea, sir.
12   Q. You don't know?
13   A. No.
14   Q. You are Dr. Medina, correct? I just want
15   to make sure I address you properly.
16   A. I have the degree but I don't claim
17   to -- I don't demand anybody to call me doctor.
18   Q. You have a Ph.D.?
19   A. Yes.
20   Q. I'll call you doctor. Dr. Medina, I'm
21   going to show you what have been marked as exhibits

Page 16

1   one and two today. Have you seen exhibit one
2   before?
3   (Whereupon the proffered item was
4   marked as exhibit number 1, 2.)
5   THE WITNESS: Exhibit one?
6   BY MR. THALER:
7   Q. Yes.
8   A. I don't recall having seen this document
9   before, no.
10   Q. Then I ask you to look at number two. Is
11   that your signature?
12   A. This is my signature.
13   Q. Do you recall signing this document?
14   A. Yes, I do.
15   Q. Do you remember the circumstances
16   surrounding your execution of this document, exhibit
17   two?
18   A. May I read it?
19   Q. Of course.
20   (Pause)
21   THE WITNESS: I don't recall the

Page 17

1   content but I see my signature there.
2   BY MR. THALER:
3   Q. You don't recall the circumstances
4   surrounding your execution of exhibit two?
5   A. That is correct, I don't recall.
6   Q. Having seen exhibit two now, does that
7   change your answer with regard to number one?
8   A. No, the recollection is still not there
9   having seen or read this document under exhibit
10   number one.
11   Q. Do you recall being asked to sign
12   documents that relate to other documents without
13   seeing the documents they relate to?
14   A. Would you ask it again?
15   Q. Let me direct your attention to number
16   two. It indicates that you have reviewed -- I'm
17   just reading from the certification, exhibit
18   two: "I have reviewed the factual information
19   contained in defendant's responses to
20   interrogatories number 2B of plaintiff's first set
21   of interrogatories." Then you certify under the

Page 18

1  laws of the United States that the responses are
2  true and correct to the best of your knowledge and
3  belief.
4      Is it your testimony that you did not even
5  see the responses?
6      A. I think the word I used was I don't recall
7  having seen or read this document.
8      I don't recall this particular document
9  having signed myself now. That's all I can say.
10 I'm not saying I did not. I just don't recall
11 absolutely.
12     Q. So you don't have any reason to believe
13 that you were given a certification certifying that
14 something is true without seeing the underlying
15 document?
16     A. I don't believe so, sir.
17     Q. Where did you attend college?
18     A. Two places. In Asuncion, Paraguay and
19 Madison, Wisconsin.
20     Q. Your degrees were what?
21     A. In Paraguay it was an attorney at law and

Page 19

1  in Wisconsin it was first a Masters in legal
2  institutions and then a Ph.D. in law and sociology.
3      Q. In Paraguay did you get the equivalent of
4  a JD?
5      A. That is correct.
6      Q. Did you ever sit for a bar exam anywhere?
7  I don't know if they have that in Paraguay or not.
8      A. Certification to sit before the
9  Supreme Court.
10     Q. In the States did you ever sit for the
11 bar?
12     A. No.
13     Q. Prior to coming to the Library of Congress
14 what jobs did you hold?
15     A. The title I don't recall contractually.
16 In Madison, Wisconsin I believe it was a visiting
17 lecturer or visiting professor and then at NYU Law
18 School also visiting lecturer prior to coming to the
19 library.
20     Q. How many years were you at NYU Law School?
21     A. That was an academic year, nine months

Page 20

1  actual teaching there.
2      Q. What course?
3      A. It was a course, empirical research
4  methodology for lawyers in developing countries.
5      Q. Then you came to the Library of Congress?
6      A. That is correct.
7      Q. What year was that?
8      A. 1971, I believe.
9      Q. You were in the Hispanic Law Division, is
10 that correct?
11     A. Yes.
12     Q. Your current position is law librarian?
13     A. That is correct.
14     Q. Have you held that since 1994?
15     A. 1994.
16     Q. How would you describe your duties and
17 responsibilities as a law librarian for the Library
18 of Congress?
19     A. It's managerial fundamentally,
20 administration of resources, application of LCR's on
21 all matters concerning production and management of

Page 21

1  resources, participating in the Library of Congress'
2  decision-making but not making decisions,
3  participating in them.
4      I'm a member of an executive committee,
5  leading the library into what has been defined to be
6  the fulfillment of a mission which is collect,
7  preserve and disseminate information as well as
8  provide status to the U.S. Congress, the U.S.
9  government.
10     That's a summary. It's difficult to go
11 through my position description.
12     Q. How many people are underneath your
13 supervision as law librarian right now?
14     A. Direct supervision I'd say ten.
15     Q. When you used the word "direct," I took
16 that to mean --
17     A. People that are assigned to my office, the
18 office of the law librarian.
19     Q. But your office oversees the entire --
20     A. Oversees, yes, but not direct supervision.
21 There are layers of supervision under the umbrella

Page 46

1  kind of memory problems as a neurological issue?
2     A.  Not yet.
3     Q.  Are you aware of any memory concerns that
4  you've had for yourself?
5     A.  I'm 78. That's all I can say. Whatever
6  happens at that age, maybe.
7     Q.  You haven't noticed a pattern of having
8  memory deficits over the past several years?
9     A.  Not yet.
10    Q.  Since the mid-nineties it's your testimony
11 that you've had no communication whatsoever with
12 Ms. Von Muhlenbrock until you greeted her this
13 morning?
14    A.  That is correct.
15    Q.  Do you recall shortly before that meeting
16 to say hello a communication with
17 Ms. Von Muhlenbrock concerning her interest in
18 returning to the Library of Congress?
19    A.  No.
20    Q.  You don't recall that?
21    A.  No.

Page 47

1     Q.  Between the time she resigned in 1989 and
2  today, this morning, is it your testimony that you
3  had one communication with Ms. Von Muhlenbrock which
4  was to say hello outside your office in --
5     A.  By the door of my office, yes.
6     Q.  Were there other communications?
7     A.  In person she came to visit, in person,
8  yes. It wasn't a visit but just to say hello.
9     Q.  Aside from that, though, you've had no --
10    A.  I don't recall. No communication that I
11 either initiated or received, no, not that I can
12 recall.
13    Q.  And you don't recall her expressing
14 interest in coming back to the Library of Congress
15 ever?
16    A.  I don't recall that.
17    Q.  What is your opinion about her returning
18 to the Library of Congress?
19    A.  Opinion?
20    Q.  Yes. Do you have an opinion about that?
21    A.  It's a good place to be in, I think.

Page 48

1     Q.  From the library's perspective, is that a
2  good thing that she wants to come back?
3     A.  It's hard for me to judge as to what is
4  for her. Is it good for her? Probably it is, yes.
5     Q.  Assuming it's good for her because she has
6  expressed an interest, as you know from the
7  litigation, to return, sir, but is it your
8  impression that that would be a good thing for the
9  library to have her come back?
10    A.  I cannot pass a judgment on that. Would
11 you hire her -- for instance, is that the question?
12 It's not the question. I say I have no answer to
13 that question.
14    Q.  Would you rehire her if given the
15 opportunity?
16    A.  Opportunity and given that we need someone
17 with her qualifications.
18    Q.  The answer is yes?
19    A.  Yes, if there is such a need and it's
20 defined with a position description.
21    Q.  You were at one point her supervisor?

Page 49

1     A.  Yes. There was a need at the time. She
2  fit the expectations. I hired her.
3     Q.  Given the opportunity, you would rehire
4  her again?
5     A.  I would.
6     Q.  Are you saying you don't remember a phone
7  conversation with Ms. Von Muhlenbrock?
8     A.  I don't remember.
9     Q.  Even if I were to put a timeline roughly
10 January of 1999?
11    A.  No.
12    Q.  You don't remember receiving any letters
13 from her?
14    A.  No, I don't.
15    Q.  Dr. Medina, I'm going to show you what's
16 been marked as exhibit number three and ask you to
17 review both pages because I'm probably going to
18 focus my attention on the second page more than the
19 first.
20        (Whereupon the proffered item was
21 marked as exhibit number 3.)

Page 62

1   Q.  Do you have access to applications for
2   applicants?
3   A.  No.
4   Q.  Do you have access to their responses to
5   the KSA?
6   A.  No.
7   Q.  Are there ways that an LOC employee can
8   override an applicant's response?  Do you know?
9   A.  No, sir, I'm not aware of that.
10  Q.  You are familiar with the KSA's, correct?
11  A.  It's an acronym for something.  K is
12  knowledge -- yes, I am familiar with that.
13  Q.  There are a series of questions that are
14  given to applicants and those responses are
15  weighted?
16  A.  By the system, yes.  I wouldn't dare to
17  describe what the system is because it's very
18  complicated.
19      My assessment of it -- it's handled by the
20  Human Resources department.  We are not part of
21  that.

Page 63

1   Q.  Have you ever been to the file room at the
2   Library of Congress?
3   A.  No, I've never been there.
4   Q.  You know where it is, though, right?
5   A.  No idea.  I don't even know that it
6   exists.
7   Q.  When you are given a vacancy announcement
8   such as the one that was part of this process -- I
9   might as well show it to you.  This would be number
10  13.
11      I'm going to show you number four to your
12  deposition, exhibit number four.
13      (Whereupon the proffered item was
14  marked as exhibit number 4.)
15  BY MR. THALER:
16  Q.  This is purportedly a vacancy announcement
17  request which is the name of it at the top.
18      Do you know this to be the vacancy
19  announcement that's the subject matter of this
20  lawsuit?
21  A.  I cannot relate directly.  There are many

Page 64

1   actions like this.  This may be, yes.
2   Q.  When you are given such a vacancy
3   announcement request, please describe the actions
4   that you would take when given such a request.
5   A.  Attached to this comes the proposal for
6   posting.  I review that and approve so that the
7   procedure could move on.
8   Q.  You did approve this particular one,
9   correct?
10  A.  Yes.
11  Q.  On or about November 21, 2002?
12  A.  November 21, 2002, correct.
13  Q.  About how much time do you spend in your
14  review of this type of announcement request?
15  A.  To read the posting and justification, 15
16  minutes, 20 minutes maximum.
17  Q.  And it's your testimony, is it, that you
18  don't have any discussions with the people who
19  submit this to you for your review?
20  A.  I don't recall any discussions about this
21  position.

Page 65

1   Q.  How many times in the last 13 years in
2   which you've been reviewing these things have you
3   had -- are you okay?
4   A.  A hundred employees.  It's a lot.  I can't
5   tell you a number.
6   Q.  I think you were answering a question I
7   wasn't asking.
8   A.  Sorry.
9   Q.  I wanted to know how many times of the
10  hundreds, whatever the number is that you've had
11  requests, do you recall following up with
12  communications, oral communications or e-mails or
13  something, asking questions about the request?
14  A.  I cannot mention the number.  From time to
15  time there are some references to can we do this, do
16  we have funding, before they initiate the action.
17  Q.  But subsequent to you getting this form,
18  approximately how many times would you say over the
19  last --
20  A.  After I get the form there is no further
21  discussions.  Either rejected or approved.

Page 74

1  determining which applicants would be selected for
2  an interview in the process of hiring someone at the
3  Library of Congress?
4      A. I think the system, AVUE, determines who
5  will be accepted as qualified applicants.
6      Q. Did you have any discussions with anyone
7  at the Library of Congress regarding which
8  applicants would be selected to be interviewed for
9  this position?
10     A. No, sir, I did not.
11     Q. Have you ever had such discussions?
12     A. As a law librarian I never have, no.
13     Q. Are you make mag distinction --
14     A. When I was a selecting and recommending
15 officer I would participate in that but not as a law
16 librarian.
17     Q. When you participated in that, would you
18 please describe for the record what the process is
19 in identifying who will be interviewed?
20     A. There is a pre-AVUE system where the
21 interviewing process -- we were trained to do that

Page 75

1  but it was less structured. Now the process is very
2  structured.
3      Q. What is your understanding of the process?
4      A. Now it's control, it's a controlled
5  process, it's a very standardized -- when I say
6  structured, it goes to the method. You are expected
7  to ask exactly the same question using the same
8  words to every applicant.
9      Q. You said that's since when?
10     A. AVUE, I don't know when they started, but
11 10, 15 years ago.
12     Q. Do you understand what the criteria is
13 used to determine which applicants will be
14 interviewed?
15     A. No, sir. That's previous to coming
16 to -- we get the applicants that have been selected
17 by the system.
18     Q. Do you recall having any communications
19 with the director of legal research regarding the
20 status of the hiring process for this position?
21     A. No.

Page 76

1      Q. Can you describe how the scores are
2  assigned for each applicant?
3      A. The system does, as far as I know. I
4  don't know.
5      Q. And you do not interview people for the
6  positions, is that correct?
7      A. Not for these. For those that are
8  reporting directly to my office.
9      Q. The seven or ten --
10     A. The seven or ten that I mentioned before.
11     Q. Do you know how many applicants are
12 selected for interviews?
13     A. No.
14     Q. How many would you expect there would be
15 for this type of position?
16     A. I have no idea. 40, 50, 30, I have no
17 idea.
18     Q. Those are a reasonable number for --
19     A. That's what I hear. We have no access to
20 the applications until they are interviewed.
21     Q. Do you know the name of the applicant who

Page 77

1  was hired for the position that's at issue here?
2      A. I do believe it is -- I'm not certain but
3  I do believe it is Mr. Guerra from Mexico, a Mexican
4  attorney from the United States.
5      Q. You approved of his hiring?
6      A. I approved the selection and
7  recommendation, yes.
8      Q. What was the basis for your approving his
9  hiring?
10     A. The justification, that is the selection
11 and the recommendation made by the selecting
12 officer.
13     Q. Did you review any of the supporting
14 documents submitted by the applicants themselves?
15     A. No. That's up to the selecting and
16 recommending officer.
17     Q. For instance, do you know whether or not
18 he's even a lawyer?
19     A. I do know that.
20     Q. How?
21     A. The statement made by the selecting

Page 86

1   A. Five or six years ago, maybe more, ten
2   maybe.
3   Q. Is that an Outlook program, do you know?
4   A. I don't know what it is. It's Group Wise.
5   Q. I take it those files are not deleted, are
6   they?
7   A. I don't know what the library does with
8   those.
9       MR. THALER: I'd like to get
10  production of the calendar that was in existence at
11  the time.
12      MR. JAMES: I can tell you it doesn't
13  exist. Every year the computer system deletes. It
14  does it automatically.
15      MS. DOUDS: For which years?
16      MR. THALER: The years that we're
17  talking about, 2001 --
18      MS. DOUDS: I know we don't have
19  them. I just called about something like this on
20  another case.
21      MR. JAMES: What happens is it cycles

Page 87

1   out every six months anyway and anything -- and the
2   system wasn't that sophisticated back when it first
3   started. It is not a good system. It doesn't
4   exist.
5       We have this question consistently and
6   it doesn't exist.
7   BY MR. THALER:
8   Q. What about your personal e-mails that you
9   get? You have a computer at your desk, right?
10  A. Yes, I do.
11  Q. You have an e-mail account that comes to
12  you?
13  A. I do.
14  Q. Do you participate in maintaining them?
15  A. No. It's ITS.
16  Q. The tech service people?
17  A. The Information Technology Services group.
18  Q. Would you have your calendar for two weeks
19  ago when you met with Mr. Clarke?
20  A. I would assume so.
21  Q. Is there a protocol once you are made

Page 88

1   aware of someone filing this type of action, are
2   there actions or steps that you take in your
3   capacity?
4   A. I haven't received any instructions to do
5   that, no. When I receive instructions, do this, do
6   that, then I do, but in this case, no.
7   Q. Have you reviewed yourself the library's
8   merit selection and promotion plan?
9   A. No, I have not.
10  Q. Ever?
11  A. May have read it.
12  Q. You may have read it but you don't
13  specifically remember?
14  A. I don't recall having studied it and to
15  tell you what it consists of.
16  Q. So you can't say one way or the other
17  sitting here today whether or not you've ever
18  reviewed it?
19  A. That's correct.
20  Q. Do you know what it is?
21  A. It's a policy statement, I believe. Merit

Page 89

1   selection, merit -- I'm not an expert in that field.
2   Q. Do you know whether or not there are any
3   responsibilities that you are supposed to have
4   pursuant to the terms of this merit selection and
5   promotion plan?
6       Do you know?
7   A. Only with respect to those that I am
8   directly responsible for in the sense of a matter in
9   which the procedure will be complied with to
10  recruit, examine, select and recommend.
11  Q. What are those?
12  A. Those are things -- the judgment is made
13  of the applicants that go through the interview as
14  to who is the best qualified to perform the duties
15  assigned.
16  Q. But you're saying that you are familiar
17  with that part of the merit selection and promotion
18  plan.
19  A. Yes.
20  Q. What is it?
21  A. I just mentioned. The interview is