# EXHIBIT 6

## TRANSCRIPT OF PROCEEDINGS

1

2             In the U.S. District Court
           For the District of Columbia
3
   ------------------------------x
4                                 :
   Gisela Von Muhlenbrock         :
5                                 :
                v.                : NO. 05-1921
6                                 :
   James H. Billington,           :
7  Librarian of Congress          :
                                  :
8  ------------------------------x

9             October 3, 2007

10  DEPOSITION OF:

11                Kersi Shroff,

12  a witness, called by counsel pursuant to notice,
    commencing at 10:00 a.m., which was taken at Thaler,
13  Liebeler, 1825 Eye Street, NW, Washington, DC

14

15

16

17

        This transcript has been completely indexed for your
        convenience. It will help you locate the testimony
19      you want FAST. The index is located in the back
        pages of this volume.

20

21                    **Overnite**
                  Court Reporting Service
Serving Washington, D.C. metro area              (301) 593-0671

Page 18

1  protection.
2  A. Yes.
3  Q. When you brought the file to meet with the
4  lawyer, was it a full and complete copy made of your
5  file at any time, to your knowledge?
6  A. There wasn't any copy made.
7  MR. BRUMER: Objection.
8  MR. THALER: I want to make sure I
9  get a copy of that complete file.
10  BY MR. THALER:
11  Q. Just so that we're clear, there's no
12  communications between you and an attorney contained
13  in that file, right?
14  A. I don't know if the EEO investigator was
15  an attorney.
16  Q. I mean between you and an attorney
17  representing you.
18  A. No.
19  MR. THALER: Then the full contents
20  of that file I'd like to have.
21  BY MR. THALER:

Page 19

1  Q. So you reviewed that file, you reviewed
2  probably the complaint by plaintiff and you reviewed
3  the answers to interrogatories that were filed in
4  this case on behalf of the defendant?
5  A. Yes.
6  Q. With whom did you discuss your deposition
7  prior to coming to the deposition today?
8  A. With my attorneys.
9  Q. Who else?
10  A. I did not discuss the deposition itself
11  but I did mention that I was being deposed to my
12  current boss.
13  Q. Is this the same person you identified a
14  few minutes ago?
15  A. No, Mr. Sharp is no longer with us. I'm
16  referring to Dr. Reubens Medina.
17  Q. Who else?
18  A. None that I can recall.
19  Q. When was your discussion with -- it's
20  Dr. Medina, is that right?
21  A. Yes.

Page 20

1  Q. When was your discussion with Dr. Medina?
2  A. When we were first scheduled for the
3  deposition prior to this date, the original date of
4  the deposition, prior to that date I had mentioned
5  to him that I'm going to be tied up in the
6  preparation of the deposition and the deposition
7  itself.
8  Q. Tell me, if you would, anything else you
9  remember about the conversation.
10  A. Nothing of a specific nature.
11  Q. What about a general nature?
12  A. Well, "do what you have to do," that sort
13  of thing.
14  Q. That's what he said or what you said?
15  A. That's what he said.
16  Q. So Dr. Medina said "do what you need to
17  do," roughly?
18  A. Yes.
19  Q. What did that mean to you?
20  A. That meant to me that I could take the
21  time off. We had several projects. I had a couple

Page 21

1  of meetings that I had to miss and so forth. I was
2  just informing him that I was going to be tied up
3  with this matter and that's why I could not attend
4  to those.
5  Q. Did you have any discussions with
6  Dr. Medina about the substance of the lawsuit?
7  A. No, I did not.
8  Q. Did you discuss with Dr. Medina even the
9  identity of the plaintiff in this action?
10  A. Yes, I did.
11  Q. What did you say?
12  A. I said this is the matter involving
13  Gisela.
14  Q. What did he say?
15  A. He said "yes," acknowledging his knowledge
16  of it.
17  Q. Anything further?
18  A. Nothing further.
19  Q. You think that was roughly a month or so
20  ago?
21  A. Maybe less than that.

Page 26

1    Q. And you signed the certification, did you?
2    A. I did.
3    Q. That certification references only
4  interrogatory 1E.
5        Do you recall whether the information that
6  you assisted in providing for the responses to this
7  was limited to just that one? Do you need to see
8  the answers?
9    A. May I?
10   Q. I'll show them to you.
11       (Pause)
12 BY MR. THALER:
13   Q. Mr. Shroff, forgive me for asking. Shall
14 I refer to you as Mr. Shroff or Dr. Shroff?
15   A. Mr. Shroff.
16   Q. Thank you. Mr. Shroff, I'm going to show
17 you what's been marked as numbers 1 and 2.
18       (Whereupon the proffered item was
19       marked as exhibit number 1, 2.)
20 BY MR. THALER:
21   Q. Can you identify what these are?

Page 27

1    A. Exhibit number one relates to defendant's
2  response to plaintiff's first set of interrogatories
3  and second set of document requests to defendant in
4  the case of Gisela Von Muhlenbrock, plaintiff,
5  versus James Billington, defendant.
6    Q. And number two?
7    A. Number two is headed Certification and it
8  carries a statement that I made and which I signed
9  on September 26, 2007.
10   Q. My question goes to the extent to which
11 you participated and provided responses to these
12 answers to interrogatories and whether you can now
13 confirm that what's contained in the answers to
14 interrogatories is consistent with your
15 recollection.
16   A. In the certification I have stated that I
17 have reviewed the factual information contained in
18 defendant's responses to 1E or plaintiff's first set
19 of interrogatories and so forth and I certify that
20 the responses are true and correct.
21   Q. I'm just wondering whether or not that was

Page 28

1  the full extent of your previous review of the
2  answers to interrogatories or whether you actually
3  did review all of them or some of them and at that
4  point confirmed that they were accurate?
5    A. The portions that relate to my role in the
6  matter are the ones that I reviewed and I agreed to
7  certify.
8    Q. As you sit here today, your recollection
9  is, and correct me if I'm wrong, that what appears
10 in the answers to interrogatories is consistent with
11 your understanding of the facts in this case?
12   A. They are, yes.
13   Q. Wherever your name appears you reviewed
14 those and confirmed that those were accurate?
15   A. Yes.
16   Q. When did you first come to know Gisela
17 Von Muhlenbrock?
18   A. Whenever it is that she started working at
19 the library. It must have been in the early
20 eighties, 1980s.
21   Q. Were you co-workers at that point?

Page 29

1    A. Yes.
2    Q. What was your position and what was her
3  position at that time?
4    A. My position was as a legal specialist and
5  I would believe that she had a similar position.
6    Q. Were your offices close to each other,
7  your desks?
8    A. Not particularly close. They were at a
9  distance of -- there were about five offices between
10 us.
11   Q. How often would you say you interacted
12 with the plaintiff at that time?
13   A. I would see her on a regular basis.
14   Q. Daily?
15   A. No, not daily. She worked in a different
16 division from mine.
17   Q. Did you ever socialize?
18   A. Yes, we did.
19   Q. How often would that happen?
20   A. We had the occasional lunch meetings.
21   Q. Anything different than your interactions

Page 34

1    A. No, I did not.
2    Q. Had you been aware of what she had been
3 doing for those several years already?
4    A. No, I wasn't.
5    Q. Do you, sitting here today, know what
6 happened to her in her life after she left the
7 Library of Congress?
8    A. After she left the Library of Congress,
9 certainly, because I know she went back to Chile and
10 then after several years, maybe some time in the
11 early 1990's she may have come back and I recall
12 having a conversation with her about her experience
13 after leaving the library.
14   Q. That's in the early 1990s?
15   A. As best as I can recall.
16   Q. There was a period of time when you didn't
17 hear or see her for many years until the late 1990s,
18 is that true?
19   A. I believe that's true.
20   Q. Are you aware of a previous complaint that
21 she filed with the EEOC against the library in the

Page 35

1 eighties?
2    A. Yes.
3    Q. What do you know about that?
4    A. I believe that three or four of the female
5 employees had filed a discrimination complaint
6 against the law library and the plaintiff was one of
7 them.
8    Q. How do you know about that complaint?
9    A. Just through general office conversation.
10 I may even have discussed it with the plaintiff at
11 the time.
12   Q. What do you know about the basis for the
13 complaint?
14   A. I believe it was sexual discrimination.
15   Q. Did you come to form an opinion about the
16 allegations in the complaint?
17   A. No, I did not know the details of the
18 complaint. I respected the plaintiff. As far as I
19 know, she was a good worker. In that sense I had an
20 opinion.
21   Q. How was she regarded at the Library of

Page 36

1 Congress?
2    A. Well, I would say.
3    Q. Do you recall any negatives about her
4 during her employment at the Library of Congress?
5    A. No, I do not.
6    Q. Do you recall anyone at the Library of
7 Congress ever speaking negatively about her, the
8 plaintiff, during her tenure at the Library of
9 Congress?
10   A. No, I don't.
11   Q. Did you discuss the previous EEO complaint
12 with anyone other than I think you identified the
13 plaintiff, did you discuss it with anyone else?
14   A. No, I did not.
15   Q. Did you ever discuss it with Dr. Medina?
16   A. No, I did not.
17   Q. What do you remember about your discussion
18 with the plaintiff about that prior case?
19   A. That there was some difference in
20 treatment of the female employees from the rest of
21 the specialists and that they grieved that.

Page 37

1    Q. Do you know the outcome of that matter?
2    A. I believe it was settled in some fashion.
3    Q. Did you hear the terms of the settlement?
4    A. No, I did not.
5    Q. Were there discussions about the matter in
6 the office aside from this discussion that you've
7 already identified with the plaintiff?
8    A. Not that I recall.
9    Q. When you said general office conversation
10 about how you knew about the matter, this previous
11 EEO matter, what were you referring to?
12   A. Maybe one of the other plaintiffs. There
13 were two other women.
14   Q. What do you mean "maybe one of the other
15 plaintiffs"?
16   A. I may have heard about the matter from one
17 of the other plaintiffs.
18   Q. So you spoke about the matter with one of
19 the other plaintiffs as well?
20   A. Or she may have spoken to me about it,
21 yes.

Page 42

1  Hispanic law division who were not specialists so
2  I'm not including them.
3  Q. How about today?
4  A. There is no Hispanic Law Division any
5  more.
6  Q. When was that done away with, the Hispanic
7  Law Division?
8  A. The five divisions were done away with in
9  the early 1990s, about 1992, 1993.
10  Q. What was substituted?
11  A. In place of the five divisions, two new
12  divisions were created, the Eastern Law Division
13  which incorporated the staff from the Hispanic Law
14  Division, the Near Eastern and African Law Division
15  and the Far Eastern Law Division.
16  Q. What was the other one?
17  A. The Western Law Division. I'm sorry, the
18  Hispanic Law Division was not merged into the
19  Eastern Law Division. The Hispanic Law Division was
20  merged into the Western Law Division. I beg your
21  pardon.

Page 43

1  Q. What other divisions were merged into the
2  Western Law Division?
3  A. European Law Division, American-British
4  Law Division, my division, and the Hispanic Law
5  Division.
6  Q. Is that still the case today?
7  A. There are two divisions, directorate of
8  legal research which was created at the same time,
9  that's right.
10  Q. And contained within each division how
11  many law specialists are there?
12  A. Presently in the Western Law Division we
13  have a staff of ten foreign law specialists, as we
14  call them now, and one specialist who works on a
15  contract basis as and when the work requires it.
16  Q. How about the Eastern Law Division?
17  A. I'd have to look at a list but I think
18  they have about eight or nine specialists. They've
19  just hired two people so I don't have the up to date
20  count. That's not my division.
21  Q. The size of the different offices, when

Page 44

1  you look at them either separately or combined,
2  they've remained roughly the same through the years,
3  is that true?
4  In other words, today the Western Law
5  Division comprising three previous divisions totals
6  roughly the same number of law specialists if you
7  had added them up previously?
8  A. Roughly. I think there's been an addition
9  there. The Western Law Division we've added, and
10  even in the Eastern Law Division, we've added extra
11  positions.
12  In the Western Law Division we've added a
13  Brazilian law specialist. That division did not
14  exist in the Spanish Law Division. In the Eastern
15  Law Division we've added an Australian law
16  specialist and that position was not a position by
17  itself previously.
18  Q. You are aware, are you not, that there was
19  also a previous lawsuit brought by the plaintiff
20  here?
21  A. Which previous lawsuit are we talking

Page 45

1  about?
2  Q. Are you aware of any previous lawsuit?
3  A. Well, I thought we discussed the issue of
4  the plaintiff's sex discrimination complaint.
5  Q. Your understanding is that's what took
6  place in the eighties and you gave me all your
7  testimony about that already?
8  A. That's right.
9  Q. Your testimony is that you never formed an
10  opinion about the validity of the claims brought?
11  A. I had no basis for forming any opinion
12  about that.
13  Q. Were you aware of any other opinions
14  expressed by other employees at the Library of
15  Congress about the allegations brought in those
16  claims?
17  A. No.
18  Q. Did you ever discuss with
19  Ms. Von Muhlenbrock the allegations that were
20  previously brought?
21  MR. BRUMER: Objection.

Page 54

1  of the personnel.
2      Q.  Different personnel would be in those
3  spots?
4      A.  Yes.
5      Q.  Roughly when was this policy put into
6  place?
7      A.  Which policy?
8      Q.  To maintain FTE's at a certain level.
9      A.  I cannot pinpoint a period of time but
10 that's been sort of emphasized over the years.
11     Q.  You've been there for how many years?
12     A.  I have been employed at the Library of
13 Congress for 31 years, 30 plus years.
14     Q.  Do you know that to be the policy
15 throughout your tenure?
16     A.  No, I don't.
17     Q.  I'm trying to think of another way to help
18 jog your memory as to when the policy was put into
19 place.
20      Any ballpark estimate of when this policy
21 became policy of the law library?

Page 55

1      A.  I would say the nineties after Dr. Medina
2  became law librarian and once he had the time to
3  reorganize the five divisions into two and create a
4  directorate of legal research and a directorate of
5  library services which is the library part of it and
6  once that was done, then gradually over that period
7  of time since then, the policy of going to Congress
8  and saying we need these FTE's for the kind of
9  service that we provide.
10     Q.  You've identified several foreign law
11 specialists within the Spanish Law Division and it's
12 been roughly the same through the years.  How many
13 other employees would be part of the Hispanic Law
14 Division during the nineties?
15     A.  I would say about three or four on a
16 fluctuating basis.
17     Q.  Do you recall whether employees were hired
18 for the Hispanic Law Division in the nineties?
19     A.  Yes, there were.
20     Q.  And they posted the available positions
21 for that position in the nineties?

Page 56

1      A.  I have no knowledge of that.
2      Q.  After Ms. Von Muhlenbrock departed from
3  the Library of Congress you were never made aware by
4  anyone else at the Library of Congress that she was
5  seeking reemployment at the Library of Congress?
6      A.  No, I was not.
7      Q.  What role do you generally take in the
8  employee hiring processes at the Library of
9  Congress?
10     A.  Well, in 2000 when I became chief of the
11 Western Law Division the hiring of staff in the
12 division became one of my responsibilities.
13     Q.  Is that for all staff or just parts of the
14 staff?
15     A.  That would be all staff for the Western
16 Law Division.
17     Q.  The Western Law Division?
18     A.  Right.
19     Q.  Is that part of your job description?
20     A.  Yes, I believe it is.
21     Q.  You're aware of the position that this

Page 57

1  lawsuit concerns, the job vacancy announcement known
2  as 020307, you're aware of that?
3      A.  I'm aware of the position.  I'd have to
4  refresh my memory as to the number that you recited.
5      Q.  And you took part in filling that
6  position, did you?
7      A.  I did.
8      Q.  How much of the development of the
9  description of the vacancy did you contribute?
10     A.  What we do is form a panel for each
11 vacancy that we propose to announce, a panel of
12 three subject matter experts as we call them.  I was
13 one of the three.
14     Q.  Did you select the other two members of
15 the panel?
16     A.  I think we sort of left it by tradition
17 that the two members would be the chiefs of each of
18 the two divisions and then the division, other than
19 the one that was hiring, would select the subject
20 matter expert for the particular position, for the
21 third panel member.

Page 58

1   Q. Specifically with regard to this vacancy,
2   do you remember who was involved, the names of the
3   people involved on the panel?
4   A. Yes, Dr. Tao-Tai Hsia, Ms. Ruth Levush.
5   Q. What other people were involved in the
6   hiring process for this vacancy?
7           MR. BRUMER: Objection, assumes facts
8   not in evidence.
9           THE WITNESS: In developing the
10  vacancy I had to work with my then bosses, the
11  director of legal research, so that would be one.
12  BY MR. THALER:
13  Q. Please use names at this point.
14  A. I cannot recall names because we've had
15  five or six directors of legal research during the
16  years.
17  Q. So you worked with the director of legal
18  research and who else?
19  A. In developing the position. Then
20  administrative assistant to help with the background
21  paperwork for the development.

Page 59

1   Q. Who would that have been?
2   A. Again, there could be more than one name
3   for that.
4   Q. Anyone else?
5   A. At a certain point after the position
6   description is developed and the vacancy is ready to
7   be announced we would have involvement with our
8   Human Resources.
9   Q. What person in particular would have been
10  involved from Human Resources?
11  A. There could be several but in this
12  instance it ended up with a staffing specialist in
13  HR by the name of Billie Nichols.
14  Q. Who else was involved? These are people
15  involved in the hiring process for this vacancy.
16  A. These are people in HR. I wouldn't even
17  know their names.
18  Q. We're still with the list. We've
19  identified the director of legal research, the
20  administrative assistant and Billie Nichols. Were
21  there any others?

Page 60

1   A. The two panelists, we mentioned that.
2   None other than that, no, that I can recall.
3   Q. Dr. Medina?
4   A. Dr. Medina would be the final signing off
5   authority.
6       Once we developed a position description
7   between myself and the director of legal research,
8   the document went to him for final sign-off.
9   Q. So Dr. Medina would have to sign off
10  before it goes to Billie Nichols, is that right?
11  A. Before the position description is
12  accepted for whatever formal purposes that we have,
13  yes.
14  Q. Did you have conversation with Dr. Medina
15  about this position?
16  A. No, I did not have any specific
17  conversation about this position.
18  Q. Do you remember having e-mails between you
19  and Dr. Medina about the position?
20  A. No, I do not. I did not communicate with
21  Dr. Medina by e-mail.

Page 61

1   Q. Were there any questions that he posed
2   concerning the position when the form was -- was a
3   form submitted to him that he needed to sign?
4   A. It was, yes.
5   Q. When that was submitted to Dr. Medina,
6   were there any questions at all posed by him?
7   A. Not that I recall, not to me, because as I
8   said, I would be reporting to the director of legal
9   research and the director would be dealing with
10  Dr. Medina.
11  Q. You were a level removed?
12  A. I was a level removed.
13  Q. Dr. Medina, if he had any questions, he
14  would have directed them to the director of legal
15  research?
16  A. Correct.
17  Q. This person, we don't know who it was in
18  the timeframe?
19  A. I would have to refresh my memory as to
20  the various appointments that we've had. There were
21  three people who worked in acting positions at

Page 62

1  various periods of time until Mr. Sharp was
2  eventually appointed as a permanent director.
3      Q. Who was the selecting official for the
4  position?
5      A. The specific position that we're talking
6  about?
7      Q. Yes.
8      A. I was the selecting official.
9      Q. What responsibilities does the selecting
10 official have at the Library of Congress in filling
11 a vacancy?
12     A. Various responsibilities relating to equal
13 opportunity and to observe the processes of the
14 library and the Library of Congress as a whole, to
15 make the process as fair, open, transparent as
16 possible so that all qualified persons would be
17 encouraged to apply and to be considered for the
18 position.
19     Q. Any other responsibilities the selecting
20 official has?
21     A. The responsibilities of the selecting

Page 63

1  official would be to be part of the panel, to see
2  that the proceedings, the questions, the structured
3  interview process that was in place were observed
4  and to, after the interview process was over, to
5  deliberate with the panel in order to get a
6  consensus on the candidate to be appointed to the
7  position.
8      Q. Any other responsibilities the selecting
9  official has?
10     A. I think I've given you the totality of it.
11     Q. What EEO responsibilities are you
12 referring to when you said that you have EEO
13 responsibilities, equal employment opportunity --
14     A. Meaning that this process was put into
15 place as a result of a class action brought by some
16 employees of the Library of Congress and as part of
17 the -- I believe there was a consent decree in the
18 case.
19        The library had set in motion a new
20 transparent process for the hiring of employees.
21     Q. What is your understanding about that new

Page 64

1  transparent process? What does that mean?
2      A. That means that it was done on an
3  objective basis where any individual opinions or any
4  individual interference would not occur.
5      Q. How is that ensured?
6      A. I believe it's ensured through the
7  application process which is on line, the handling
8  of the on line applications by HR, which are not
9  notified to the hiring agency and protective
10 measures like that.
11     Q. But for what you've called new transparent
12 process, if you had been given the opportunity,
13 would the plaintiff in this action have been a good
14 selection for this job vacancy, in your opinion?
15        MR. BRUMER: Objection as to form.
16 BY MR. THALER:
17     Q. Please answer.
18        MR. BRUMER: You can answer.
19        THE WITNESS: I'm sorry, that is a
20 hypothetical.
21        I certainly would have looked at the

Page 65

1  applicants, including the plaintiff, from the
2  perspective of what they would bring to the
3  position.
4         Yes, I certainly would have looked at
5  it.
6  BY MR. THALER:
7      Q. Knowing what you know today, would you
8  have chosen, given the opportunity, the plaintiff
9  here today, Ms. Von Muhlenbrock, or the person who
10 did fill the position, in your opinion?
11     A. Well, Ms. Von Muhlenbrock was not a part
12 of the persons that we interviewed so I cannot make
13 that comparison.
14     Q. But you know her. You've testified about
15 your opinion about her as an employee and you know
16 the person who filled the position, right?
17     A. I would make the decision on the basis of
18 the resumes that I see, the current information that
19 I'm supplied with, the interview that I've
20 conducted.
21        So on that basis I cannot make the

Page 94

1  A. Yes, I do.
2  Q. That testimony, does that spring from
3  these policies and procedures?
4  A. I don't believe it does. I do not know
5  without going through this document. I'm just
6  calling my recall of what I learned through the
7  training process.
8  Q. I direct your attention to page ten at the
9  very top where it starts off with little letter D.
10 A. Yes.
11 Q. Do you see that? Do you see where it says
12 "the automated system generates a list of the top
13 seven applicants plus tied scores"?
14 A. Yes.
15 Q. Do you have any reason to believe that
16 that's not the process and procedure that was in
17 place at the time of this vacancy?
18 A. I have no reason to believe that. It's
19 not part of the process.
20 Q. Do you now agree that the general default
21 position at the Library of Congress in filling a job

Page 95

1  vacancy is to interview the top seven, plus anyone
2  who was tied with that seventh person?
3  A. I believe so.
4  Q. Had that worked out in this case, in other
5  words had you kept the number of interviewees to
6  that number, what score would have been the score of
7  the seventh person, plus any tie, according to the
8  chart that's in front of you?
9  A. The way I see it in the chart, we would
10 have asked for candidates scoring 98 and up.
11 Q. You were employing your discretion as a
12 panel to expand that number?
13 A. Yes, we were.
14 Q. Do you recall getting a referral list from
15 Ms. Nichols? Well, strike that.
16    I'm going to show you what's been marked as
17 number six.
18    (Whereupon the proffered item was
19    marked as exhibit number 6.)
20 BY MR. THALER:
21 Q. Do you recall that e-mail exchange between

Page 96

1  you and Ms. Nichols?
2  A. Yes, I believe this is the same e-mail
3  that you showed me in the batch of documents that we
4  gave you earlier.
5  Q. Is this the e-mail that you indicated a
6  few minutes ago that was essentially the cover of
7  the chart that we've been referring to?
8  A. Yes, I believe it is.
9  Q. You said that the chart was an attachment
10 to an e-mail?
11 A. To me it looks like it was, yes.
12 Q. Tell me about the discussion that you had
13 that's referenced at the very top in your e-mail to
14 Billie Nichols in which you say "Hi, Billie, as we
15 discussed, at first I would still like to interview
16 the top ten candidates."
17 A. I do not recall that discussion now.
18 Q. Do you recall what was your understanding
19 of what was meant in the e-mail that's below from
20 Billie Nichols to you in which she says: "The
21 numbers have changed somewhat"?

Page 97

1  A. I would have thought that to mean that at
2  the closing maybe more applications came in and so
3  those who qualified was either higher or lower than
4  what she previously mentioned.
5     To me that's the best I can interpret, the
6  way I can interpret it.
7  Q. Had you seen any lists prior to the chart
8  that you got in front of you there?
9  A. No, I don't recall seeing this prior to.
10 Q. What was the first list you recall seeing
11 for this job vacancy?
12 A. It would be the one that's exhibit 12E.
13 Q. Could you use the exhibit number?
14 A. I'm sorry, exhibit four.
15 Q. Subsequent to that, what was the list that
16 you received and when did you receive it, as best
17 you can recall?
18 A. I do not recall receiving any subsequent
19 list except for the ten applicants who were asked to
20 be interviewed.
21 Q. I'm going to show you what's been marked