# EXHIBIT 11

# TRANSCRIPT OF PROCEEDINGS

1

2            In the U.S. District Court
For the District of Columbia

3 ------------------------------x

4                               :

Gisela Von Muhlenbrock       :

5                               :

              v.           : NO. 05-1921

6                               :

James H. Billington,         :

7 Librarian of Congress        :

                              :

8 ------------------------------x

9               September 27, 2007

10 DEPOSITION OF:

11               Billie Nichols,

12 a witness, called by counsel pursuant to notice,
commencing at 10:00 a.m., which was taken at Thaler,

13 Liebeler, 1825 Eye Street, NW, Washington, DC

14

15

16

17

19 **This transcript has been completely indexed for your convenience. It will help you locate the testimony you want FAST. The index is located in the back pages of this volume.**

20

21

# Overnite

**Court Reporting Service**

Serving Washington, D.C. metro area                   (301) 593-0671

BILLIE NICHOLS DEPOSITION    September 27, 2007    VonMuhlenbrock v. Billington

Page 58

1    Q.   What year?

2    A.   I don't recall.  I don't know.

3    Q.   Was it long after 1980 or was it shortly

4    after 1980?

5    A.   Well, I'm trying to think.  I don't think

6    it was too long.  Maybe it was two years.  You are

7    asking me to guess.

8    Q.   That's okay.  How long were you with the

9    D.C. government, how many years?

10    A.   I believe I was with D.C. government for

11    seven years.  Well, actually, I was with the

12    Department of Human Services for seven years which

13    was D.C. government and with the school system I

14    believe approximately three years.

15    Q.   So ten years in D.C. and 2001 with the

16    Library of Congress?

17    A.   Yes.

18    Q.   All right.

19    A.   Getting back to one of your earlier

20    questions, with regards to the difference between 98

21    and 97, again the system scores the applications on

Page 59

1    the basis of the responses and it may be that an

2    individual who selected a -- there are three

3    choices.

4        Some choices are the highest level -- some

5    choices are the highest level in skill or experience

6    for a particular KSA.

7        Then there's a middle choice and a bottom

8    choice.  Depending upon which choice is selected,

9    the system would calculate so many points for that

10    particular one and if a candidate selected a lesser

11    choice for a KSA that was weighted higher, that

12    might have made the significance or the difference

13    between a 98 and 97.  I don't know that I'm really

14    answering your question but that's the best that I

15    can explain it.

16    Q.   It's your testimony that the selecting

17    official, Mr. Shroff, told you he wanted a cutoff of

18    97.  So far that's true?

19    A.   He indicated in the e-mail that he would

20    like to receive the top ten candidates.  That was in

21    the e-mail, but in the first e-mail which I don't

Page 60

1    recall seeing in the merit file he requested a

2    cutoff score of 97, I think.

3    Q.   In your experience, is there any way for

4    Mr. Shroff -- is there some significance to that

5    number?

6        That's what I'm trying to get at.  Why is it

7    that a selecting official would choose a particular

8    number over another number?

9    A.   Well, again, knowing that he had to at

10    least receive the top seven and when he saw the

11    scoring breakdown he knew that there were three

12    additional candidates within that score range which

13    would result in ten candidates.

14        If there were going to be several -- I mean,

15    selecting officials don't necessarily want to see 50

16    or 30 or 40 candidates, knowing at least they have

17    to receive the top seven and tied scores within that

18    range, that's where he cut off his cutoff scoring.

19    Q.   That's where the policy comes in, top

20    seven --

21    A.   Yes, plus whoever is tied with seven.

Page 61

1    Q.   But he wanted to go beyond that because he

2    saw that there were some individuals who came close

3    enough, is that right?  He wanted to go beyond the

4    top seven?

5    A.   He knew that the tied scores had to be

6    referred as well.  That's why he indicated that I

7    want to interview the top ten.

8    Q.   I'm going to show you what's being marked

9    as number two.

10        (Whereupon the proffered item was

11    marked as exhibit number 2.)

12    BY MR. THALER:

13    Q.   Is this the breakdown that you showed to

14    Mr. Shroff?

15    A.   Yes.

16    Q.   Is this the computer generated result of

17    when you punched in on the drop-down menus that we

18    were talking about earlier?

19    A.   No, this is a typed document.

20    Q.   Typically the computer generates

21    something, right, with the scores and the names?

Page 74

1   closing.
2          MR. BRUMER:  Let the record reflect
3   that the witness again is pointing to plaintiff's
4   exhibit four.
5   BY MR. THALER:
6       Q.  Is this typically what the computer will
7   generate at the end of a closing?
8       **A.  It will generate a list at the end of**
9   **closing after I request it to, yes.  This is a**
10  **ranking list.**
11      Q.  What was forwarded to Mr. Shroff?
12      **A.  This document --**
13      Q.  Use exhibit numbers when you say it.
14      **A.  Exhibit two was forwarded to Mr. Shroff.**
15      Q.  What else?
16      **A.  The e-mail I believe that it was attached**
17  **to providing him with a scoring breakdown.**
18      Q.  Had you had prior discussions about the
19  breakdown before sending him that document that's
20  been marked as number two?
21      **A.  I sent a scoring breakdown probably one to**

Page 75

1   two days before it closed, before the vacancy
2   closed.
3          **It included a ranking of the individuals or**
4   **the applications that were received prior to vacancy**
5   **closing, one or two days prior to vacancy closing.**
6       Q.  What did you do with that list?
7       **A.  The list was maintained as a part of the**
8   **merit file but I sent a document like this as well**
9   **that showed the scoring breakdown prior to closing.**
10         MR. BRUMER:  Let the record reflect
11  that the witness is referring to plaintiff's exhibit
12  two.
13         MR. THALER:  I'm not sure we have
14  that document either.  Is that still part of the
15  file?
16         THE WITNESS:  I noticed when I was
17  reviewing the file that the document prior to
18  closing which would have looked like this was not in
19  the file and there's one other document I noticed.
20         During my processing of the vacancy I
21  had domain over the file.  However, since then the

Page 76

1   EEO investigator had access to it and so did
2   Ms. Douds, so it may have been the document
3   inadvertently --
4   BY MR. THALER:
5       Q.  Is lost?
6       **A.  Right.**
7       Q.  But you know, don't you, that the files
8   are supposed to be maintained especially in a
9   circumstance involving a claim such as this, right,
10  supposed to be retained until the claim is over,
11  isn't that right?
12      **A.  Yes, I do.  As I stated, during the**
13  **process in which I had dominion or domain of the**
14  **file I know that the documents were included in the**
15  **file.**
16      Q.  Any other documents that are not in the
17  file that you remember being there?
18      **A.  One that comes to mind is the -- there**
19  **were two level -- it's the AA review form which**
20  **reflects the diversity information about the**
21  **candidates and that's the one that was included**

Page 77

1   **prior to what's in the file, but I didn't see the**
2   **one that was included after, after the vacancy**
3   **closed.**
4       Q.  When you answered "yes" when I say they
5   are supposed to be maintained, you are saying that
6   because of the policy at the Library of Congress is
7   merit selection files will be maintained for
8   two -- if a grievance is filed you are supposed to
9   maintain it until the grievance is over, right?
10         Isn't that your understanding of the
11  policies?
12      **A.  That is my understanding of the policies.**
13  **"Merit selection files will be maintained for two**
14  **years from the date of selection or cancellation of**
15  **a vacancy."**
16      Q.  You said that there was another document
17  that you generated -- that you sent another document
18  to Mr. Shroff.
19      **A.  I sent another e-mail attachment prior to**
20  **this one.**
21      Q.  When you say "this one," you are pointing

BILLIE NICHOLS DEPOSITION     September 27, 2007     VonMuhlenbrock v. Billington

Page 78

1  to number two?
2      A.  Exhibit two, yes.
3      Q.  It looked similar?
4      A.  It looked similar.  However, I recall in
5  the e-mail when I sent this one that I indicated to
6  him that the numbers had changed somewhat and that's
7  because additional applicants, there were additional
8  applications received after closing and consequently
9  there were additional individuals or scores on the
10  ranking.
11      Q.  So number two has more numbers than the
12  one that you thought was an attachment to an e-mail
13  that you don't know where it is any more, is that
14  what your testimony is?
15      In other words, the total number on number
16  two is bigger than the total number that you would
17  have had on the prior submission to Mr. Shroff, is
18  that right?
19          MR. BRUMER:  Objection, vague.  It's
20  not clear what "total number" means.  Of what?
21          MR. THALER:  There's only one series

Page 79

1  of numbers on this number two.  It's number of
2  applicants that are minimally qualified.
3          THE WITNESS:  I could answer this
4  question better.
5          I believe you may have a document
6  that's reflecting, that's showing -- it's dated 1/24
7  that looks like this and we can look at --
8  BY MR. THALER:
9      Q.  We'll see about that in a second but let
10  me ask you this.
11      I show you what's number five.  Is that the
12  e-mail to which you were just referring?
13          (Whereupon the proffered item was
14      marked as exhibit number 5.)
15          THE WITNESS:  Yes.  Where I say
16  submitting the attached to you after vacancy
17  closing, the numbers have changed somewhat.  This is
18  the document that was attached after vacancy
19  closing, exhibit two.
20  BY MR. THALER:
21      Q.  When you say the numbers have changed

Page 80

1  somewhat on this e-mail from you to Kersi Shroff,
2  the numbers to which you refer are what?
3      A.  I'm not referring to a change in a
4  particular application score.
5          There may have been additional applications
6  that were on the scoring breakdown who had a
7  particular score.
8      Q.  Your recollection is that there had been
9  some communication between you and Kersi Shroff
10  before the exchange of exhibit number two, is that
11  right?
12      A.  Yes.  The exchange was that I provided a
13  scoring breakdown before this one, before closing.
14      Q.  How are you able to generate a document
15  such as that before the process is even closed,
16  before the application time as ended?
17      A.  I can ask the system again to provide a
18  ranking of the applications that are currently
19  received, those that are minimally qualified.
20      Q.  Just the raw data?  Does it have names
21  with it?

Page 81

1      A.  Yes, it will have names with it.
2      Q.  Is it much like the one I showed you which
3  is marked --
4      A.  It's similar, right, to this.
5      Q.  Was this document -- what number is this?
6          MR. BRUMER:  Plaintiff's exhibit
7  four.
8  BY MR. THALER:
9      Q.  With whom did you share number four?
10      A.  This document wasn't shared with anyone.
11      Q.  You are saying that there was a similar
12  document that you believed was dated I think you
13  said January 24?
14      A.  I believe so, yes.
15      Q.  You saw that recently in the merit file?
16      A.  I thought I saw it when I reviewed the
17  merit file.
18      Q.  Do you remember what the difference
19  between the 124 and the 130 list would be?  Is it
20  just an additional number of applicants?
21      A.  I think when I looked at them there may

**BILLIE NICHOLS DEPOSITION**      September 27, 2007      VonMuhlenbrock v. Billington

Page 118

1  Q.  Who is your supervisor?
2  A.  Sheila Williamson.
3  Q.  How long has she been your supervisor?
4  A.  About a year, a little longer.
5  Q.  Before that who was your supervisor?
6  A.  Bill Ayers.
7  Q.  How long was Mr. Ayers your supervisor?
8  A.  I don't remember when he first came on
9  board. This is a guesstimate. Maybe three years.
10  Q.  Prior to Mr. Ayers was who?
11  A.  Her first name was Towanda. I can't
12  remember the last name. She was there for a short
13  while. I can't remember her last name.
14  Q.  Who was your direct supervisor at the time
15  this hiring was taking place?
16  A.  Bill Ayers.
17  Q.  Did you come to learn anything about the
18  prior lawsuit and action back in the eighties that
19  Ms. Von Muhlenbrock brought?
20  A.  No.
21  Q.  When did you first become aware that

Page 119

1  Ms. Von Muhlenbrock was a prior employee of the
2  Library of Congress who was trying to get back in?
3  A.  Well, I became aware that she was a prior
4  employee when the EEO investigator met with me when
5  I provided an affidavit.
6  Q.  So you had no knowledge, even though her
7  name was on a list, that she happened to already
8  have worked at the Library of Congress?
9  A.  No, because the focus is on numbers and
10  her name was just one of many other names of
11  individuals who had applied for a position.
12  Q.  Does that fact, that a potential new hire
13  has a background of having already worked at the
14  Library of Congress, matter in the hiring process at
15  the Library of Congress?
16  A.  No.
17  Q.  They are given no advantage for their
18  previous experience at the Library of Congress?
19  A.  Well, in terms of -- they are given no
20  advantage, but depending upon how they respond to
21  the KSA's, but there's no advantage given from the

Page 120

1  standpoint of any additional points or anything for
2  a particular candidate.
3  Q.  Whatever their response is to the KSA
4  questionnaire on their application, that's the only
5  basis in which they are ranked going into the
6  interview process?
7  A.  Yes. Depending upon the choices they
8  select, the computer assigns a score incorporating
9  the weights that are assigned to a given KSA and
10  then if they meet the cutoff score then they are
11  referred for interview.
12  Q.  Is it your testimony that the first time
13  you became aware of Gisela Von Muhlenbrock was when
14  the EEOC matter was brought to your attention
15  subsequent to the hiring in this position?
16  A.  The first time I became?
17  Q.  You became aware of Gisela
18  Von Muhlenbrock, it was when the EEOC brought it to
19  your attention?
20       MR. BRUMER: Objection, asked and
21  answered.

Page 121

1       THE WITNESS: When you say became
2  aware of her, aware of her in what context?
3  BY MR. THALER:
4  Q.  In any context. I recognize that she
5  appears on a list, but aside from that, was that the
6  first time you became aware or familiar with her as
7  a person, as a potential employee, a former
8  employee?
9       Was it the first time that the EEOC matter
10  was brought to your attention?
11  A.  Yes, but I wouldn't say I became familiar
12  with her as a person.
13  Q.  I understand.
14  A.  Okay.
15  Q.  Was there a hiring freeze that you are
16  aware of in the nineties at the Library of Congress?
17  A.  I have no idea. I started in 2001.
18  Q.  Did you participate in any other capacity
19  in the hiring process for the job vacancy in this
20  case other than what you've already testified to?
21  A.  Could you be more specific?