Page 1

In the U.S. District Court
For the District of Columbia

----------------------------------x
                                  :
Gisela Von Muhlenbrock            :
                                  :
             v.                   : NO. 05-1921
                                  :
James H. Billington,              :
Librarian of Congress             :
                                  :
----------------------------------x

October 3, 2007

DEPOSITION OF:

Kersi Shroff,

a witness, called by counsel pursuant to notice, commencing at 10:00 a.m., which was taken at Thaler, Liebeler, 1825 Eye Street, NW, Washington, DC

Overnite Court Reporting Service     (301) 593-0671          Fax - (301) 593-8353
Washington, DC Metro Area                                    www.DCCourtReporters.com

Gov. Exh. A

KERSI SHROFF DEPOSITION          October 3, 2007          VonMuhlenbrock v. Billington

Page 30

1  with other employees at the time?
2    A. Ms. Von Muhlenbrock happened to be the
3  steward of the union so there were some matters that
4  were dealt with in her capacity as a steward.
5    Q. When was the last time you communicated
6  with her, would you say?
7    A. I think that the e-mail that I proffered
8  would probably be the last written communication,
9  the e-mail in which she informed me of her change of
10 address.
11   Q. That's one of the handful of documents
12 provided to us this morning, is that right?
13   A. Yes.
14      MR. THALER: I'm going to gather
15 these up as a single exhibit. At this point,
16 obviously we don't have copies. Are these documents
17 that have now been marked as number three the ones
18 that were brought with you today and provided to us
19 this morning?
20      THE WITNESS: Yes, I believe it's the
21 e-mail dated October 2, 2003 in which I responded

Page 31

1  briefly to her note saying "please make a note of my
2  new address."
3        (Whereupon the proffered item was
4    marked as exhibit number 3.)
5  BY MR. THALER:
6    Q. That you believe is the last time that you
7  had communication directly with the plaintiff?
8    A. Yes, I believe so.
9    Q. What are the other documents that you
10 brought this morning?
11   A. The second document is a note particular
12 Mr. Paul Greenberg who wrote to me on November 29,
13 2004 in which he states that he's following up on a
14 phone conversation and he asked me to meet with him
15 in connection with the investigation of the
16 plaintiff's claim.
17   Q. Continue, please.
18   A. The third document is a note dated
19 November 18, 2004 in which I informed Walter Gary
20 Sharp stating that I had received a call from Paul
21 Greenberg, who was an EEO investigator, for an

Page 32

1  appointment to discuss a complaint filed by Gisela
2  Von Muhlenbrock and I mentioned to him that Gisela's
3  name was not among the applicants that were referred
4  to the division for interviews and Paul has asked me
5  to see the interview notes which I referred him to
6  Billie Nichols.
7     I also mentioned that this is the second
8  meeting relating to the complaint because I met
9  another EEO investigator earlier.
10   Q. Prior to October 2, 2003 do you recall the
11 facts and circumstances surrounding the previous
12 communication with the plaintiff before October 2,
13 2003?
14   A. I believe I met the plaintiff it must have
15 been a few years prior to that when she was visiting
16 the law library.
17   Q. Do you know approximately what year that
18 would have been?
19   A. I believe it could have been 1998 or 1999.
20   Q. Between 1998 and 1999 and October 2, 2003
21 you had no communication with the plaintiff?

Page 33

1    A. Not that I can recall.
2    Q. Would you say that your relationship with
3  the plaintiff was a friendly one?
4    A. Yes.
5       MR. BRUMER: Objection, asked and
6  answered.
7       MR. THALER: I'm not sure I did ask
8  about that.
9       MR. BRUMER: You asked about the
10 relationship.
11 BY MR. THALER:
12   Q. You hadn't heard from Ms. Von Muhlenbrock
13 for several years, you received an October 2 e-mail
14 in which she is giving you information about her new
15 address and your response was "muchas gracias"?
16   A. It was my attempt at weak Spanish. I
17 thought I meant "muchas gracias."
18   Q. And that's it? Someone who you considered
19 to be a friend, you asked no followup questions
20 about how she is doing or what she has been up to or
21 anything?

| KERSI SHROFF DEPOSITION | October 3, 2007 | VonMuhlenbrock v. Billington |

**Page 46**

1  THE WITNESS: No.
2      MR. BRUMER: Ambiguous. I don't know
3  which lawsuits you are discussing.
4      MR. THALER: The ones that we've just
5  been focusing on, the previous claims that were
6  brought.
7  BY MR. THALER:
8  Q. You say no, you never discussed them?
9  A. The previous claim?
10  Q. Yes.
11  A. No. I've already said that I have a
12  general collegial type of exchange of information on
13  it without any details.
14  Q. When did you become aware that
15  Ms. Von Muhlenbrock was no longer employed at the
16  Library of Congress?
17  A. I'm sorry. I know Ms. Von Muhlenbrock
18  left her position at a certain point but I do not
19  know if that was the time she left her employment or
20  if it was later.
21  Q. What's your best recollection about when

**Page 47**

1  she left?
2  A. Could you please explain what do you mean
3  by "left"?
4  Q. You were making a distinction between when
5  she departed and when she stopped working at the
6  Library of Congress. I'm trying to understand what
7  you mean.
8  A. I have no knowledge of when she actually
9  stopped working for the Library of Congress, Law
10  Library of Congress. I can sort of recall roughly
11  when she left her position.
12  Q. What do you recall about the circumstances
13  of her leaving the Library of Congress and her
14  position?
15  A. From what I recall, I think she had
16  decided to leave the position but the termination
17  did not occur at the point that she went back to
18  Chile. It may have occurred later on.
19  Q. When you say termination, you don't mean
20  to say, do you, that she was fired?
21  A. No, I mean when she terminated her

**Page 48**

1  employment with the Library of Congress.
2  Q. When the employment ended is what you
3  mean?
4  A. Yes, when the employment ended.
5  Q. You are not aware of any basis for which
6  she would have been fired?
7  A. No, I'm not.
8  Q. In fact, you testified earlier that to the
9  best of your recollection, sir, she was a good
10  employee at the Library of Congress?
11  A. Yes, I did.
12  Q. Do you remember how you came to understand
13  why she was no longer working at the Library of
14  Congress?
15  A. When she came back from Chile in the early
16  1990s I may have picked up some understanding that
17  she had found a position in Chile.
18  Q. How would you have come to that
19  conclusion?
20  A. When she came back we had a chat and I
21  recall her telling me that she was working at the

**Page 49**

1  Department of Justice of Chile.
2  Q. Do you recall anything else about that
3  conversation?
4  A. That she seemed very comfortable in her
5  position, she had made great strides and that she
6  had been offered an ambassadorship by her country.
7  Q. Anything else?
8  A. No.
9  Q. Do you recall any attempts by plaintiff to
10  seek reemployment with the Library of Congress?
11  A. No, I don't.
12  Q. Ever?
13  A. Of course, obviously, I do know now after
14  I received the first call from the EEO examiner
15  asking me to talk about it, yes, at that point I do
16  recall. Not prior to that.
17  Q. So it's your testimony then that from the
18  time that you last saw her when she came back until
19  the time that you were contacted by the EEOC a few
20  years ago -- is that the timeframe that you are
21  talking about, when you were contacted?

Overnite Court Reporting Service    (301) 593-0671    Fax - (301) 593-8353
Washington, DC Metro Area                              www.DCCourtReporters.com

Gov. Exh. A

| KERSI SHROFF DEPOSITION | October 3, 2007 | VonMuhlenbrock v. Billington |

**Page 50**

1  A. The EEOC contacted -- as I said, probably
2  in 2004 it was.
3  Q. All right. In that timeframe you were
4  aware of no efforts that she took to gain reentrance
5  into the Library of Congress as an employee?
6  A. No, I don't.
7  Q. Would that also be your answer with regard
8  to any requests that she made for applications?
9  Were you aware of any request that she made for an
10 application?
11 A. No, I was not aware of any application
12 request.
13 Q. Do you remember any request that she made
14 to personnel at the Library of Congress to be made
15 aware of future vacancies if they became available?
16 A. No, I'm not aware of that.
17 Q. Was there a hiring freeze at the Library
18 of Congress in the early nineties?
19 A. I cannot recall.
20 Q. Do you recall there ever being a hiring
21 freeze?

**Page 51**

1  A. There have been several periods of time
2  during which employment has been restricted.
3  Q. Do you recall when those periods of time
4  were?
5  A. No, I cannot.
6  Q. You say several. How many different times
7  were they?
8  A. The budget cycle being what it is in the
9  United States Congress, there have been several such
10 threats or actually decisions not to hire for a
11 while.
12 Q. Do you happen to recall the last such
13 freeze?
14 A. No, I don't.
15 Q. Would you say it's been a period of many
16 years since the last such freeze?
17 A. Within the Law Library of Congress we've
18 had a policy to maintain FTE's which are called full
19 time employment at a certain level, so in that sense
20 we've stayed the same. I don't know if you would
21 want to call that a freeze.

**Page 52**

1  But a general freeze imposed on it from
2  outside on the entire library I do not recall.
3  Q. The level of FTE's, I believe your
4  testimony was, at least with regard to the divisions
5  we've been focusing on, pretty consistently the same
6  throughout the years you've been there, true?
7  A. Except for the one or two growth positions
8  that I did mention to you.
9  Q. So your answer is yes, with that
10 exception?
11 A. Yes.
12 Q. Who established, to your knowledge, this
13 policy to maintain the FTE's at a certain level?
14 A. That's done by the law library's
15 management team.
16 Q. Who are members of the law library's
17 management team?
18 A. Which period of time are we talking about?
19 Q. Who are they now?
20 A. The law librarian has been at the helm of
21 the law library's affairs ever since he was

**Page 53**

1  appointed, so he is one.
2  Q. Can you use the names of the people?
3  A. Dr. Medina is the law librarian of
4  Congress and he's the top executive.
5  Q. Since what year?
6  A. I would say about 1992, but I'm not sure.
7  Q. For the past 15 years he's been in charge
8  and a member of the management team?
9  A. That's right.
10 Q. Who else are members of the management
11 team?
12 A. Currently the directors of the two
13 services within the law library constitute part of
14 the management team and there may be a couple of
15 other positions. One, a new position, counsel to
16 the law librarian, I think he's part of the
17 management team.
18 Q. Were these the same members of the law
19 management team when the policy was put into place
20 to maintain FTE's at a certain level?
21 A. Yes, in terms of the offices, not in terms

Overnite Court Reporting Service    (301) 593-0671    Fax - (301) 593-8353
Washington, DC Metro Area    www.DCCourtReporters.com

Gov. Exh. A

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 54

1  of the personnel.
2  Q. Different personnel would be in those
3  spots?
4  A. Yes.
5  Q. Roughly when was this policy put into
6  place?
7  A. Which policy?
8  Q. To maintain FTE's at a certain level.
9  A. I cannot pinpoint a period of time but
10 that's been sort of emphasized over the years.
11 Q. You've been there for how many years?
12 A. I have been employed at the Library of
13 Congress for 31 years, 30 plus years.
14 Q. Do you know that to be the policy
15 throughout your tenure?
16 A. No, I don't.
17 Q. I'm trying to think of another way to help
18 jog your memory as to when the policy was put into
19 place.
20     Any ballpark estimate of when this policy
21 became policy of the law library?

Page 55

1  A. I would say the nineties after Dr. Medina
2  became law librarian and once he had the time to
3  reorganize the five divisions into two and create a
4  directorate of legal research and a directorate of
5  library services which is the library part of it and
6  once that was done, then gradually over that period
7  of time since then, the policy of going to Congress
8  and saying we need these FTE's for the kind of
9  service that we provide.
10 Q. You've identified several foreign law
11 specialists within the Spanish Law Division and it's
12 been roughly the same through the years. How many
13 other employees would be part of the Hispanic Law
14 Division during the nineties?
15 A. I would say about three or four on a
16 fluctuating basis.
17 Q. Do you recall whether employees were hired
18 for the Hispanic Law Division in the nineties?
19 A. Yes, there were.
20 Q. And they posted the available positions
21 for that position in the nineties?

Page 56

1  A. I have no knowledge of that.
2  Q. After Ms. Von Muhlenbrock departed from
3  the Library of Congress you were never made aware by
4  anyone else at the Library of Congress that she was
5  seeking reemployment at the Library of Congress?
6  A. No, I was not.
7  Q. What role do you generally take in the
8  employee hiring processes at the Library of
9  Congress?
10 A. Well, in 2000 when I became chief of the
11 Western Law Division the hiring of staff in the
12 division became one of my responsibilities.
13 Q. Is that for all staff or just parts of the
14 staff?
15 A. That would be all staff for the Western
16 Law Division.
17 Q. The Western Law Division?
18 A. Right.
19 Q. Is that part of your job description?
20 A. Yes, I believe it is.
21 Q. You're aware of the position that this

Page 57

1  lawsuit concerns, the job vacancy announcement known
2  as 020307, you're aware of that?
3  A. I'm aware of the position. I'd have to
4  refresh my memory as to the number that you recited.
5  Q. And you took part in filling that
6  position, did you?
7  A. I did.
8  Q. How much of the development of the
9  description of the vacancy did you contribute?
10 A. What we do is form a panel for each
11 vacancy that we propose to announce, a panel of
12 three subject matter experts as we call them. I was
13 one of the three.
14 Q. Did you select the other two members of
15 the panel?
16 A. I think we sort of left it by tradition
17 that the two members would be the chiefs of each of
18 the two divisions and then the division, other than
19 the one that was hiring, would select the subject
20 matter expert for the particular position, for the
21 third panel member.

Gov. Exh. A

**KERSI SHROFF DEPOSITION**   October 3, 2007   VonMuhlenbrock v. Billington

Page 78

1  Q. And you took notes of those calls?
2  A. I believe there's a form that needs to be
3  filled out for that purpose.
4  Q. And you filled out that form?
5  A. I believe I did.
6  Q. And that form is part of the record?
7  A. I do not know that. That form is not with
8  me.
9  Q. Do you recall getting through to each of
10 the references identified by Mr. Guerra?
11 A. Yes, I recall getting through.
12    It sticks in my mind because one or two of
13 the references in Mexico were difficult to get and
14 so I had managed to get them after some repeated
15 attempts.
16 Q. So you recall there being a difficulty but
17 then ultimately you were able to get through?
18 A. Ultimately I was able to get that his
19 credentials were as stated on his paper and he came
20 highly recommended by the references, by the
21 referees.

Page 79

1  There was a third reference here at
2  Georgetown as well.
3  Q. Why do you have independent recollection
4  of that? I'm curious.
5  A. Because of the way in which I had to track
6  down the references.
7     I remember having had to call Mexico several
8  times. I ended up making the more convenient call
9  first, a local call here.
10 Q. Do you remember who that call was with?
11 A. No, I don't recall now.
12 Q. Did anyone verify the accuracy of the
13 representations made in his application?
14    MR. BRUMER: Objection, asked and
15 answered.
16    MR. THALER: I asked about
17 references.
18    MR. BRUMER: Could you repeat the
19 question?
20 BY MR. THALER:
21 Q. Did anyone verify the accuracy of the

Page 80

1  representations, the statements made in his
2  application?
3     MR. BRUMER: Asked and answered, but
4  you can answer again.
5     THE WITNESS: I would recall that,
6  let's say with the Georgetown professor, I would
7  have asked did you work with Mr. Guerra or did
8  Mr. Guerra work with you, and so that to me would
9  have been verification.
10    And with the Mexican referees, I
11 believe one or both of them were judges and I asked
12 the question what do you think of his work based on
13 the assistance he had provided to the judges during
14 his professional career in Mexico.
15 BY MR. THALER:
16 Q. And his bar membership was confirmed, was
17 it?
18 A. We did not take any independent steps to
19 confirm that but I believe that we had a copy on the
20 record that had been filed.
21 Q. What is your recollection of the

Page 81

1  discussions you had concerning the interview
2  process, meaning the discussions that took
3  place -- you spoke with Billie Nichols about the
4  interview process when it came time to interview the
5  applicants, did you?
6     MR. BRUMER: Objection, compound and
7  confusing question, but you can answer if you
8  understand.
9  BY MR. THALER:
10 Q. Did you have discussions with Billie
11 Nichols about the interview process for this job
12 vacancy?
13 A. Yes, I had contact with Billie Nichols.
14    She was the point person in Human Resources
15 for this vacancy announcement.
16    So as and when the vacancy closed, she would
17 have come back to us as the panel to tell us how
18 many applicants had successfully made it through the
19 application process and then asking us as to how
20 many applicants would you, out of those that have
21 successfully completed the process, would the panel

Gov. Exh. A

**KERSI SHROFF DEPOSITION**    October 3, 2007    VonMuhlenbrock v. Billington

Page 82

1  want to interview.
2      I would have gone back to the panel and said
3  this is the breakdown. She would have provided us
4  with a score showing the number of the applicants
5  who had scored at certain rates.
6      So the panel was made aware that X number of
7  applicants had qualified and that a certain number
8  were at this 100 percent rate, 98 percent,
9  97 percent ranking.
10     And on the basis of that information the
11 panel decided in its wisdom let's see the top ten
12 candidates, widen the pool. We were not required to
13 do so but we wanted to see the top ten candidates,
14 to interview them.
15     Q. What is the standard number of candidates
16 who are interviewed pursuant to the policies and
17 procedures at the Library of Congress, to your
18 knowledge?
19     A. I believe the standard number is seven.
20     Q. Seven being the standard, with ties,
21 correct? In other words, the top seven candidates

Page 83

1  and then whoever is tied with the 7th, is that
2  right? Is that your understanding?
3      A. No, that's not my understanding. I meant
4  top seven candidates.
5      Q. How many times have you gone through this
6  process at the Library of Congress of filling a job
7  vacancy?
8      A. This was the first position and subsequent
9  to that I have filled two more positions.
10     Q. As part of your participation did you
11 review the policies and procedures of the Library of
12 Congress in filling positions?
13     A. Yes, we have guidelines provided to us on
14 that.
15     Q. And you did so on this occasion for this
16 job vacancy that we're talking about?
17     A. Yes.
18     Q. It's your understanding that it's the top
19 seven without ties?
20     A. I don't even believe it's the top seven.
21 I think -- the number that stays in my mind, it's

Page 84

1  seven candidates, seven candidates to be
2  interviewed, successful candidates.
3      Q. If that's your understanding, why do
4  something different in this case?
5          MR. BRUMER: Objection, compound
6  question, but you can answer, if that's your
7  understanding.
8          THE WITNESS: We wanted to broaden
9  the pool of talent that we wanted to see for the
10 position.
11 BY MR. THALER:
12     Q. Why?
13     A. When we looked at the breakdown of the
14 scores, the candidates were in the 100th percentile,
15 the 99th percentile and the 98th percentile, they
16 seemed to be the type of people we wanted to
17 interview and there happened to be ten candidates, I
18 believe, who scored at that level.
19     Q. What was it in your mind that made it
20 significant that they had those particular scores?
21     A. I'm sorry, I don't understand the

Page 85

1  question.
2      Q. You said the scores 100, 99, 98 were the
3  types of candidates that you wanted to interview.
4  Correct me if I'm wrong, but I think that's what you
5  said.
6      A. Yes, because they were the top candidates.
7      Q. So my question is what is it about those
8  scores of 100, 99, 98 that distinguishes them from,
9  say, a 97?
10     A. Three percentages more than 97.
11     Q. And 99 is one percentage more than 98, so
12 why not stop at 99, why go to 98?
13     A. As I said, we wanted to broaden the pool,
14 see what talent was out there for this position and
15 I believe at the 98 percent there was a nice break
16 there because if he had gone above 98 it would have
17 meant seeing, I believe, more candidates.
18     It was not just one person who scored at
19 that level. There were I think three or four or
20 five or whatever.
21     So seeing that there were ten candidates who

KERSI SHROFF DEPOSITION          October 3, 2007          VonMuhlenbrock v. Billington

Page 86

1  had scored in the top three percent, we decided that
2  that would be a nice break.
3      Q. I'm going to show you what's been marked
4  as number four.
5          (Whereupon the proffered item was
6      marked as exhibit number 4.)
7  BY MR. THALER:
8      Q. Is this the sheet which you were basing
9  these decisions you've just testified about?
10     A. This seems to be the attachment to the
11 e-mail that I received from Ms. Nichols.
12     Q. But this is the breakdown that you're
13 making your decision about who to invite to
14 interview or was there something else?
15     A. No, this would be the breakdown on which
16 we made the decision to invite ten candidates.
17     Q. So your testimony was that you invited
18 100, 99 and 98?
19     A. I'm sorry. I obviously meant 100 to 97.
20 97 upwards.
21     Q. So if the general policies and procedures

Page 87

1  of the Library of Congress that had been established
2  prior to this job vacancy are to include the top
3  seven, and pursuant to your testimony I'm going to
4  show it to you in a second because I think it
5  was -- well, let's assume it's top seven. What's
6  the magic -- I'm trying to understand what in your
7  mind and the rest of the panel's mind was
8  significant about going beyond what had already been
9  established as the appropriate number of
10 interviewees, in this case seven would have been
11 through 98, correct?
12         MR. BRUMER: Objection. That's
13 vague, confusing and compound.
14 BY MR. THALER:
15     Q. You agree with me looking at this exhibit
16 in front of you right now, sir, that the scores
17 through a score of 98 gets you eight candidates, is
18 that right?
19     A. That's right.
20     Q. I'm trying to understand the significance
21 in your mind and the rest of the panel's minds of

Page 88

1  going beyond that.
2      If eight satisfies the policies and
3  procedures and it takes you for the first three
4  scores which a few minutes ago you thought those
5  were the right ones and now it seems it's 97 which
6  is the correct score, what is the significance
7  between these numbers to you?
8          MR. BRUMER: Objection, misstating
9  prior testimony and it's argumentative, but go ahead
10 and answer.
11         THE WITNESS: The policy of the
12 library doesn't confine us to that. That is a
13 minimum number, I understand, but it doesn't stop us
14 from interviewing more than the minimum number.
15     Based on that and based on our
16 appraisal at that time of the breakdown, to the best
17 of my knowledge looking at it again, the 97 percent
18 seemed to provide a convenient break for us, because
19 you'll see if you go up to 96 there would be five
20 more candidates to interview.
21     At the 97 percentile we reached the

Page 89

1  number ten, giving us a more than adequate pool of
2  talent to interview for the position.
3      In the wisdom of the panelists, number
4  ten being a very convenient number, also being in
5  conformance with the break that I mentioned that if
6  you take it one percent more you would end up with
7  five more candidates, to the best of my recollection
8  that was the wisdom that we employed in picking the
9  ten candidates.
10 BY MR. THALER:
11     Q. What was the important dividing line at
12 this point in the mind of the committee? Was it the
13 score of -- now it's 97, or the fact that you ended
14 up with ten interviewees? Which was the more
15 important part?
16     A. The score and the number, both, the score
17 meaning capturing the top, the candidates who had
18 ranked at the top, plus making a convenient point
19 for us to draw a line so that we saw a rich pool of
20 interviewees.
21     Q. Do you think that the normal course, in

Overnite Court Reporting Service          (301) 593-0671                Fax - (301) 593-8353
Washington, DC Metro Area                                               www.DCCourtReporters.com

Gov. Exh. A