1

1

2          In the U.S. District Court
           For the District of Columbia

3

-----------------------------x

4                        :

Gisela Von Muhlenbrock        :

5                        :

           v.      : NO. 05-1921

6                        :

James H. Billington,          :

7     Librarian of Congress      :

                         :

8     -----------------------------x

9              September 27, 2007

10    DEPOSITION OF:

11              Billie Nichols,

12    a witness, called by counsel pursuant to notice,
      commencing at 10:00 a.m., which was taken at Thaler,
13    Liebeler, 1825 Eye Street, NW, Washington, DC

14

15

16

17

18

19

20

21

Gov. Exh. B

17

1    A.  I saw the interview referral list and the

2    final referral list.

3    Q.  Did you see any other lists other than

4    those two?

5    A.  I saw duplications of those lists.

6    Q.  I don't mean duplication.  I mean separate

7    lists.

8    A.  There are lists that were used to -- how

9    can I explain this -- to help the selecting official

10   determine how many candidates he wishes to

11   interview.

12       It's a practice to have the system to rank

13   the minimally qualified applications so that I can

14   prepare the scoring breakdown and the scoring

15   breakdown consists of the scores and the number of

16   applications rated at a particular score.

17       So there is a list in the merit file that

18   showed that that ranking was provided or done by the

19   computer in order that I could provide the scoring

20   breakdown.

21   Q.  In the system-ranked list that you

Gov. Exh. B

18

1    described, is it clear on the face of it that it's

2    generated not by you but by a computer?

3         What is marked on that list that makes it

4    clear that it's generated by a computer and not by

5    you?

6         A.  Well, it's not a typed list.  The typed

7    list, interview referral list, is a list that I

8    provided to the selecting official.

9         Q.  What does the system ranked list look

10   like?

11        A.  It shows a breakdown of the scores

12   starting at 100, coming down.  It also includes the

13   names of the individuals at a particular score.

14        Q.  While we're talking about that, when the

15   system generates this ranked list with scores and

16   names --

17        A.  Well, the system doesn't just

18   automatically do it.

19        I have to have the system provide me with a

20   ranking of the applications that were minimally

21   qualified.

Gov. Exh. B

19

1    Q.  What is the process?  How do you do that?

2    How do you tell the computer?

3    A.  Let me think about that.

4        Just go into the system.  At the top there's

5    a drop-down and that -- a drop-down box and I select

6    "ranked."  I also check "test" which is further

7    down.  I also check "include ties," meaning tied

8    score, "include ties."

9        I have to, I believe, include my name as the

10   specialist, and I can actually also include my name

11   as the selecting official as a name goes in the box,

12   and then I click "competitive" and then there's a

13   button, I push a button, "submit," and it will print

14   out a listing of the scores in rank order of the

15   minimally qualified applicants.

16   Q.  It's that one that has the scores and

17   names?

18   A.  It does list scores and names.

19   Q.  How many times would you say you've gone

20   through this process?

21   A.  Numerous times.  I mean, I can't guess but

Gov. Exh. B

20

1    I do this -- this is a regular part of the process

2    so that I can provide a scoring breakdown to the

3    selecting official, particularly when you have a

4    number of applications.

5        Q.  Hundreds of times, would you say?

6        A.  You're asking me to guess.

7        Q.  Yes.  On this one it's okay.  Would you

8    guess you've done it hundreds of times?

9        A.  Probably so.

10       Q.  When you make these selections what is the

11   basis for you making these selections where you say

12   that you go in the drop-down boxes and you are

13   making your choices there, how do you decide which

14   choice to make?

15       A.  Use the "select ranked" so it will rank

16   the scores.

17       Q.  What are the other choices in that

18   drop-down box?

19       A.  Alphabetical.

20       Q.  It's either alphabetical or ranked?

21       A.  Yes.

Gov. Exh. B

23

1    Q.  Is there anything that you are aware of

2    that would make it improper for you to check "active

3    referral list" consistent with the policies at the

4    Library of Congress?

5    A.  I'm sorry?

6    Q.  What would be improper about checking the

7    "active referral list" choice?

8    A.  Well, it would be improper for the

9    selecting official to be able to review the

10   applications until it's actually time for the

11   referral list to be prepared.

12   Q.  Is it your understanding that the

13   selection process for who will be interviewed is

14   supposed to be blind at this point of the process

15   that we're talking about?

16   A.  When the scoring breakdown is provided

17   consisting of the scores of the applications and the

18   number of applications meriting that score, that is

19   a blind process, yes.

20   Q.  It remains blind until when, according to

21   the policies of the Library of Congress?

Gov. Exh. B

24

1      A.   When the selecting official, having

2    received the scoring breakdown, decides on a cutoff

3    score which would indicate the number of

4    applications that would be referred for interview.

5          After having received that cutoff score, at

6    that point I can prepare or I do prepare the

7    interview referral list which consists of the memo

8    with the typed names of the candidates that are

9    referred and the referral package also includes an

10   interview booklet for each candidate.

11     Q.   The typed name list, what order is that

12   supposed to be in?

13     A.   It's supposed to be in alphabetical order.

14     Q.   Because that's what the policies of the

15   Library of Congress say?

16     A.   That is the way it is supposed to be

17   submitted, yes.

18     Q.   Yes, that's what the policies say, right?

19     A.   In all candor, I can't recall seeing it in

20   the policy.  It may have been so long ago.  It's

21   just that's the way they are to be submitted.

Gov. Exh. B

28

1    are misstating her prior testimony.

2              MR. THALER:  She said it's true.

3              MR. BRUMER:  Go ahead.

4              THE WITNESS:  What I was about to say

5    is it's not so much that the process is supposed to

6    be blind; the process is blind until the selecting

7    official provides his or her cutoff score, at which

8    time the referral list, the typed referral list is

9    prepared that contains the names of the candidates

10    meeting that cutoff score and that is submitted

11    along with the interview booklets or each candidate.

12    BY MR. THALER:

13       Q.  Are you the only person who gets the

14    computer generated list of scores and names?

15       A.  Yes, I am, unless the selecting official

16    has requested an active referral list, which is

17    extremely rare.

18       Q.  And that didn't happen in this case,

19    right?

20       A.  No, it did not.

21       Q.  The drop-down box, the next thing you

Gov. Exh. B

41

1    A.  They had to know I had to come and do this

2    and so, her being my supervisor, you know, and

3    Ms. Friday has done this before as well.

4    Q.  She has also testified in deposition?

5    A.  From my understanding, yes.

6    Q.  What was that it that made you so certain

7    it was not the case as you say in your testimony

8    that you provided names and scores to the selecting

9    official?

10        MR. BRUMER:  Objection, vague.  You

11    are not being clear about when.

12    BY MR. THALER:

13    Q.  You can answer.

14        MR. BRUMER:  You can answer.

15        THE WITNESS:  We don't do that.  I

16    don't do that.  I've never done that.  It is

17    procedure to provide only the scores and the number

18    of applications at a particular score for the

19    selecting official so that he can provide his cutoff

20    score.

21    BY MR. THALER:

Gov. Exh. B

42

1    Q.   But there's nothing in particular about

2    this case that you specifically remember from years

3    ago, is there?  You are just saying this is not

4    done?

5    A.   I know that I didn't do it.  I know what

6    was submitted and I know how it was submitted.

7    Q.   Based on your review of the file or

8    something else?

9    A.   It's not done.  We don't do that.  It is

10   procedure only to provide the scores and the number

11   of applications at a particular score.  That is what

12   is always provided.

13   Q.   What do the policies say about what is

14   supposed to be provided in the first instance?

15   A.   The policies indicate that we are to

16   provide a scoring breakdown of the candidates for

17   the position, actually those that are minimally

18   qualified, and then the selecting official can

19   provide his cutoff score.

20   Q.   Does it say anything about the number of

21   people that are supposed to be reviewed?

Gov. Exh. B

43

1    A.   That is, what you are referring to is that

2    the selecting official has to consider for interview

3    or receive for interview at least the minimum of the

4    top seven candidates plus tied scores within that

5    cutoff score range.

6         However, at the point in which I'm providing

7    the scoring breakdown, the scoring breakdown

8    consists of all of the applications or applicants

9    who applied for the position.

10        Let me rephrase that. The scoring breakdown

11   consists of all of the applications that were

12   received for the position and that were minimally

13   qualified.

14        It lists the scores and number of

15   applications at that score.

16    Q.   In this case --

17    A.   In all cases. I'm sorry.

18    Q.   In this case did you provide the list of

19   seven, including ties, to the selecting official?

20    A.   When the referral list was provided

21   consisting of the names of the candidates who were

Gov. Exh. B

50

1    Q.  Yes.  It's on page nine.

2    A.  Yes.

3    Q.  Well, in that response you indicated that

4    Mr. Shroff on January 30, 2003 responded to an

5    e-mail that you sent and stated he would like to

6    interview the top ten candidates.

7        My question is if the cutoffs resulted in a

8    list that was the ten that you gave him why was he

9    asking you for top ten?

10   A.  He was just indicating that he wanted to

11   interview -- could you rephrase the question?

12   Q.  Your testimony was that you gave him a

13   list of ten candidates that fulfilled the --

14   A.  No, no, I gave him the scoring breakdown

15   and the scoring breakdown consisted of all of the

16   applications that were minimally qualified for the

17   position, consisted of the scores of all of the

18   applications that were minimally qualified and the

19   number of applications at that score.

20       He set his cutoff score at 97 which resulted

21   in a referral of ten applications for interview.

Gov. Exh. B

51

1     Q.  Was the request to interview ten

2   candidates or was it a request to interview people

3   with a cutoff score of 97?

4     A.  I see what you're saying.

5       His e-mail request indicated that he wanted

6   to interview the top ten candidates, I believe, and

7   that was because he knew that he had to at least

8   interview or have referred for interview the top

9   seven and when he saw the scoring breakdown he saw

10   that there were three additional individuals within

11   that cutoff score so he knew that there would be ten

12   applicants that would be referred.

13       He stated it that way, I still want to

14   interview the top ten candidates.

15       The attachment showed the scoring breakdown

16   and the attachment reflected seven candidates or I

17   should say seven scores and three additional within

18   that cutoff score range, but all of the selecting

19   officials know that at least a minimum of the top

20   seven must be referred.

21     Q.  What's the significance in your mind

Gov. Exh. B

67

1   documents.

2       Prior to closing, maybe one to two days

3   prior to closing, I provided a scoring breakdown to

4   the selecting official and that indicated -- it

5   would have been another document like this.

6       MR. BRUMER:  Let the record reflect

7   that the witness just referred to plaintiff's

8   exhibit two.

9   BY MR. THALER:

10      Q.   You are familiar with what we talked about

11  earlier, the Library of Congress policy, merit

12  selection promotion plan, and you know that in it,

13  it indicates, and I can show it to you if you want,

14  that the automated system generates a list of the

15  top seven applicants plus tied scores?

16      A.   But in my interrogatory response that I

17  certified that the computer generates that list

18  after the cutoff score is determined by the

19  selecting official or if that cutoff score

20  determined by the selecting official is keyed into

21  the system and it results in that.

Gov. Exh. B

68

1       The system will not automatically do

2    anything.  I noticed that it was worded that way but

3    the system can't do it without me.

4    Q.  You put in what the cutoff score is?

5    A.  Yes.

6    Q.  And --

7    A.  And then after putting -- I put in the

8    cutoff score and the cutoff score resulting in the

9    top seven candidates plus tied scores because the

10   selecting official and management knows that they

11   have to receive at least a minimum of the top seven

12   plus tied scores.

13      So when I provided the scoring breakdown to

14   the selecting official and he saw this --

15      MR. BRUMER:  Let the record reflect

16   that the witness is referring to plaintiff's exhibit

17   two.

18      THE WITNESS:  He saw that -- see

19   under 100 there were three applicants or three

20   applications, there were two applications rated at

21   99 and there were three rated at 98.  So the seventh

Gov. Exh. B

70

1      A.  He requested a cutoff score of 97 after

2   receiving these statistics, the scoring breakdown.

3          MR. BRUMER:  We've been going about

4   an hour and a half.  Were you thinking about taking

5   a break soon?

6          MR. THALER:  Shortly, yes.

7   BY MR. THALER:

8      Q.  The first thing that was generated was a

9   larger compilation of scores and flames which you

10   created that exhibit number two, is that right?

11     A.  Yes.

12     Q.  Your testimony is that the selecting

13   official decided to go beyond what the normal policy

14   is of the top seven including ties, which would have

15   been a 98, and decided for some reason to go to 97

16   to add two more?  Is that what your testimony is

17   now?

18     A.  My testimony is that the selecting

19   official requested a cutoff score, or requested to

20   see -- to have referred for interview the top ten

21   candidates, and even though -- that is his or her

Gov. Exh. B

71

1    option to request -- they can request additional

2    candidates.

3        Q.   I'm just trying to get the order of events

4    here, though.

5            The computer is supposed to spit out

6    something, right, after you put in what you want?

7        A.   Right.

8        Q.   You're saying that at some point someone

9    told you 97 and it spit outnumber two, is that what

10   you're saying?

11       A.   This is what I did.  This is a typed copy.

12           MR. BRUMER:  Let the record reflect

13   that the witness is pointing to plaintiff's exhibit

14   two.

15           MR. THALER:  Right.

16   BY MR. THALER:

17       Q.   I'm trying to find out where is the

18   document that the computer generated that's

19   referenced in the policies that the automated system

20   generates a list of the top seven plus tied scores.

21           Is it your testimony that it's the one

Gov. Exh. B

74

1    closing.

2              MR. BRUMER:  Let the record reflect

3    that the witness again is pointing to plaintiff's

4    exhibit four.

5    BY MR. THALER:

6         Q.  Is this typically what the computer will

7    generate at the end of a closing?

8         A.  It will generate a list at the end of

9    closing after I request it to, yes.  This is a

10    ranking list.

11        Q.  What was forwarded to Mr. Shroff?

12        A.  This document --

13        Q.  Use exhibit numbers when you say it.

14        A.  Exhibit two was forwarded to Mr. Shroff.

15        Q.  What else?

16        A.  The e-mail I believe that it was attached

17    to providing him with a scoring breakdown.

18        Q.  Had you had prior discussions about the

19    breakdown before sending him that document that's

20    been marked as number two?

21        A.  I sent a scoring breakdown probably one to

Gov. Exh. B

75

1    two days before it closed, before the vacancy

2    closed.

3        It included a ranking of the individuals or

4    the applications that were received prior to vacancy

5    closing, one or two days prior to vacancy closing.

6    Q.  What did you do with that list?

7    A.  The list was maintained as a part of the

8    merit file but I sent a document like this as well

9    that showed the scoring breakdown prior to closing.

10        MR. BRUMER:  Let the record reflect

11    that the witness is referring to plaintiff's exhibit

12    two.

13        MR. THALER:  I'm not sure we have

14    that document either.  Is that still part of the

15    file?

16        THE WITNESS:  I noticed when I was

17    reviewing the file that the document prior to

18    closing which would have looked like this was not in

19    the file and there's one other document I noticed.

20        During my processing of the vacancy I

21    had domain over the file.  However, since then the

Gov. Exh. B

76

1    EEO investigator had access to it and so did

2    Ms. Douds, so it may have been the document

3    inadvertently --

4    BY MR. THALER:

5    Q.  Is lost?

6    A.  Right.

7    Q.  But you know, don't you, that the files

8    are supposed to be maintained especially in a

9    circumstance involving a claim such as this, right,

10    supposed to be retained until the claim is over,

11    isn't that right?

12    A.  Yes, I do.  As I stated, during the

13    process in which I had dominion or domain of the

14    file I know that the documents were included in the

15    file.

16    Q.  Any other documents that are not in the

17    file that you remember being there?

18    A.  One that comes to mind is the -- there

19    were two level -- it's the AA review form which

20    reflects the diversity information about the

21    candidates and that's the one that was included

Gov. Exh. B

77

1    prior to what's in the file, but I didn't see the

2    one that was included after, after the vacancy

3    closed.

4        Q.   When you answered "yes" when I say they

5    are supposed to be maintained, you are saying that

6    because of the policy at the Library of Congress is

7    merit selection files will be maintained for

8    two -- if a grievance is filed you are supposed to

9    maintain it until the grievance is over, right?

10        Isn't that your understanding of the

11    policies?

12        A.   That is my understanding of the policies.

13    "Merit selection files will be maintained for two

14    years from the date of selection or cancellation of

15    a vacancy."

16        Q.   You said that there was another document

17    that you generated -- that you sent another document

18    to Mr. Shroff.

19        A.   I sent another e-mail attachment prior to

20    this one.

21        Q.   When you say "this one," you are pointing

Gov. Exh. B

81

1    A.  Yes, it will have names with it.

2    Q.  Is it much like the one I showed you which

3    is marked --

4    A.  It's similar, right, to this.

5    Q.  Was this document -- what number is this?

6        MR. BRUMER:  Plaintiff's exhibit

7    four.

8    BY MR. THALER:

9    Q.  With whom did you share number four?

10   A.  This document wasn't shared with anyone.

11   Q.  You are saying that there was a similar

12   document that you believed was dated I think you

13   said January 24?

14   A.  I believe so, yes.

15   Q.  You saw that recently in the merit file?

16   A.  I thought I saw it when I reviewed the

17   merit file.

18   Q.  Do you remember what the difference

19   between the 124 and the 130 list would be?  Is it

20   just an additional number of applicants?

21   A.  I think when I looked at them there may

83

1    of this exhibit that you are looking at?

2        A.   These?

3        Q.   Yes.

4        A.   That's my handwriting.

5        Q.   Why stop at 14? Why did you number up to

6    14?

7        A.   I've been trying to figure that out

8    myself.

9            The level AA review form -- the level AA

10   review report that's not -- that I did not see in

11   the merit file -- there is one dated January 24 and

12   I think I can explain what I was doing here better

13   if I had that document.

14       Q.   Do the best you can. I don't have that at

15   this minute.

16       A.   Okay. Our merit selection policies, when

17   we provide to the AA office a tentative referral

18   list, there had to be at least referred the top

19   seven, plus tied scores.

20           But the form also took into consideration

21   that the selecting official wanted to see the top

Gov. Exh. B

84

1    ten candidates.

2        At the top of the form we provided or I

3    provided the scores and the diversity information

4    for the candidates at that particular score.

5        At the bottom I believe the form indicated

6    additional RNO information, if necessary. We had to

7    at least show twelve.

8        Well, okay. If there had only been seven at

9    the top, meaning tentative referral, at the bottom I

10    would have had to have gone down to add at least

11    five more to make a total of twelve and the

12    diversity office would have looked at the top, the

13    seven -- again, I'm speaking if there had only been

14    seven at the top and five at the bottom, the

15    diversity office would have looked at the top seven

16    and if they didn't feel that there was sufficient

17    diversity within those top seven candidates then

18    they would have suggested that I drop down and refer

19    those five additional candidates that were at the

20    bottom of the form under additional RNO, they would

21    have perhaps made that recommendation or recommended

Gov. Exh. B

85

1    that the vacancy be extended or that the recruitment

2    efforts be broadened to try and meet diversity for

3    the particular situation or I should say for the

4    vacancy.

5        Q.  Is that the policy of the Library of

6    Congress, to go to that number twelve spot when

7    considering diversity?

8        A.  It is the policy, at that time it was the

9    policy that we at least go down to the twelfth

10    candidate, if necessary, and the tied scores.

11       Q.  And that's changed?

12       A.  However, because there were ten at the

13    top, on the bottom I only included two more because

14    that made twelve.

15       Q.  Why then were you marking down 14?

16       A.  Because there were ten here.

17       Q.  I see.  The 96 was the eleventh person's

18    score so it's everyone who tied with number eleven,

19    getting you to 14, is that right?

20           In other words, you couldn't do a cutoff at

21    twelve because there were two other people tied with

Gov. Exh. B

86

1    number twelve? Don't let me testify for you. I

2    thought that's what you were getting at.

3        A. I understand. That is correct.

4        I could not have stopped at twelve because

5    there were two other people tied at 96. There were

6    two other people tied at the twelfth score. So I

7    would have had to submit those other two on that

8    form so that the diversity office could review it

9    and make the determination as to whether or not we

10    needed to drop down further in order to meet

11    diversity.

12        Q. You say it used to be the policy to go to

13    twelve?

14        A. We don't do the level two any more. Our

15    procedures and policies have changed

16    various -- there have been numerous changes since

17    2003 or 2002, whenever this vacancy was advertised

18    and we do not do the level four or the level three

19    any more and neither do we do the level two.

20        Q. Going back to the e-mail exhibit that's

21    number five --

Gov. Exh. B

113

1          (Afternoon Session)

2              MR. THALER:  Back on the record.

3     BY MR. THALER:

4          Q.   I think we ended where we were asking

5     about whether you knew Ms. Von Muhlenbrock and you

6     indicated that you had never met her before.

7              What had you heard about her, if anything,

8     prior to, let's say prior to the hiring in this

9     case?

10         A.   I didn't hear anything about her prior to

11    the hiring.

12             As I indicated before, her name was

13    mentioned to me during the time that I provided an

14    affidavit to the EEO investigator.

15         Q.   Your testimony is that prior to that you

16    weren't familiar with her name?

17         A.   No.

18         Q.   That's not your testimony?

19         A.   It's my testimony that prior to that I was

20    not familiar with her name.

21         Q.   You're aware that there had been a prior

Gov. Exh. B

117

1    Q.  Yes.

2    A.  I remember speaking with Edith Friday and

3  indicating what was alleged in this case.

4    Q.  Did she have any response or reaction,

5  anything?

6    A.  Her response was something to the effect

7  what I said before, that, well, you know, this is

8  what we do just to get the scoring breakdown and

9  then, of course, you know, we provide the typed copy

10  with the memo containing the candidates' names.

11    Q.  Who said that to you?  Ms. Friday?

12    A.  Yes, sort of just talking it through, that

13  this is all we do is provide a scoring breakdown

14  because this is procedure, this is what's always

15  done.

16    Q.  I don't understand why you needed her to

17  tell was the procedures were.

18    A.  I didn't need her to tell me.  This is

19  just conversation.

20      I didn't need her to tell me.  I know what

21  the procedure --

Gov. Exh. B

140

1     A.   I know that if the KSA is weighted five,

2     depending upon which level the applicant selects,

3     which choice they select, if they select the choice

4     that represents the highest level of skill and

5     experience of those three choices then more points

6     will be assigned for that particular KSA and then

7     after they have applied and selected a choice for

8     each KSA, the system will tabulate or calculate

9     those scores, those points, and assign the score.

10     Q.   My question goes to:  Do you understand

11     how that computation works?

12          I understand that you get more points on a

13     KSA where you give the best answer and it's weighted

14     heavily, but do you understand literally how the

15     computer is computing the final total score, how it

16     reaches that?

17     A.   I can't say that I have an absolute

18     understanding of it, no.

19     Q.   Do you have a general understanding, even

20     though not absolute?

21     A.   May I see?

Gov. Exh. B

141

1    Q.  I'm going to show you number nine.

2            (Whereupon the proffered item was

3    marked as exhibit number 9.)

4    BY MR. THALER:

5    Q.  Is this the KSA's questionnaire as you

6    remember it for this particular position that we're

7    talking about?

8    A.  Yes.  And in response to your question,

9    no, I can't say it's just a matter of multiplying

10   two times four.

11   Q.  Probably some sort of logarithms or higher

12   math things going on there?

13   A.  Yes.

14   Q.  Are we able to tell from the exhibits -- I

15   know the highest score was 100.  What was the lowest

16   score that anyone scored on this particular

17   position?

18       Can you tell from the information you have

19   already?

20   A.  The lowest score of the individuals

21   that -- I should say the applications, that were

Gov. Exh. B